# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| WANDA COOPER in her individual capacity and as administrator of the estate of the decedent AHMAUD ARBERY **Plaintiff** | : : : : : | |
| **v.** | : : | **Civil Action** **2:21-CV-20-LGW-BWC** |
| TRAVIS McMICHAEL et al., | : : | |
| **Defendants.** | : : | **The Honorable Lisa G. Wood** |

## PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

Defendants Officer Robert Rash, Police Chief John Powell, Glynn County, Jackie Johnson, and George Barnhill separately have moved to dismiss Plaintiff's Complaint, contending that Plaintiff fails to state plausible claims for relief, and that certain Defendants are protected by various immunities. Doc. Nos. 57, 59, 63, 66-67. Defendants' motions should be denied.

### SUMMARY OF FACTUAL ALLEGATIONS

On February 23, 2020, Ahmaud Arbery ("Arbery"), a young Black man and avid runner, was murdered in broad daylight while he was unarmed and jogging in his neighborhood in Brunswick, Georgia. Compl. ¶¶ 1, 5. The three armed white men ("the Private Defendants") who hunted and murdered him were encouraged and entrusted by Defendant Rash to act as law enforcement and were then protected from accountability by the Glynn County Police Department and Defendants Johnson and Barnhill. *Id.* ¶¶ 1-4.

At the time of Arbery's murder, Larry English was in the process of building a home on his property at 220 Satilla Drive in the Satilla Shores neighborhood in Brunswick ("the Construction Lot"). *Id.* ¶ 18. From October 2019 to February 2020, English received at least

1

eleven alerts to his cell phone and corresponding video recordings from motion-sensor security cameras he had installed indicating that there was activity on the Construction Lot—the videos showed various visitors, including a couple of kids and a white couple. *Id. ¶¶* 18-22. English reported multiple alerts to the Glynn County Police Department via their non-emergency line. *Id.* ¶ 20. On October 25, 2019, Defendant Rash responded to the Construction Lot with other police officers after English called the non-emergency line; on this day, Defendant Rash and English exchanged phone numbers. *Id. ¶* 21. After the Police Department responded to several trespassing reports from English, and after English texted Defendant Rash on December 20, 2019, a video clip of someone entering the Construction Lot a few days prior, Defendant Rash texted English the name and number of Defendant Gregory McMichael, whom English could turn to as "retired Law Enforcement." *Id. ¶¶* 21-24, 29-30. Defendant Rash told English that he had spoken with Defendant Gregory McMichael, and English could "call him day or night when you get action on your camera." *Id.* ¶ 30. This text message reflected that Defendant Rash had communicated with Defendant Gregory McMichael to confirm his willingness to be the main point of contact and responder for English's complaints of trespassers. *Id.* ¶ 31. This text message also reflected Defendant Rash's endorsement and ratification of Defendant Gregory McMichael acting as a law enforcement agent. *Id.*

Defendant Gregory McMichael has a long history with Glynn County law enforcement. *Id.* ¶ 33. He was employed for seven years by the Glynn County Police Department and then worked as an investigator for the Brunswick District Attorney's office for twenty-four years. *Id.* During that period, he repeatedly failed to complete state-mandated peace officer trainings and ultimately had his basic law enforcement certification suspended by the Georgia Peace Officer Standards Training ("P.O.S.T") Council on February 1, 2019. *Id. ¶¶* 34-37. Later that month, he

was reassigned to the Camden County DA's office and a memo was circulated making clear that he was not to "engage in any activity that would be construed as being law enforcement in nature." *Id.* ¶ 38. However, after his retirement, Defendant Gregory McMichael had a practice of engaging in law enforcement conduct. *Id.* ¶ 41. On at least one occasion, he and his adult son, Defendant Travis McMichael, "made contact" with individuals they suspected of crimes and informed the Glynn County Police Department that they had done so; the Police Department did not discourage them. *Id.* ¶¶ 42-43. Defendant Travis McMichael has an extensive history of racist and anti-Black behavior, including on social media and in correspondence with friends: while in the Coast Guard, he once told a friend that he loved his job because "there weren't any Niggers anywhere"; on social media, he responded to a post with "That would have only been better if that had blown that fucking Nigger's head off"; and in a text exchange with a friend he discussed shooting a "black coon with gold teeth that had a high point .45." *Id.* ¶¶ 45-48. Defendant William Bryan, who is a friend and ally of Defendant Gregory McMichael, also had a history of making racist and anti-Black comments in correspondence with friends. *Id.* ¶¶ 50-52.

On February 11, 2020, English was alerted that someone had entered the Construction Lot, and he contacted his neighbor, Diego Perez, who armed himself and went to investigate. *Id.* ¶¶ 53, 55. The man who had entered the Construction Lot was Arbery, who did not damage or take anything from the property. *Id.* ¶ 54. Perez met Defendant Travis McMichael, who told Perez that he had seen a man entering the Construction Lot and had pursued him. *Id.* ¶¶ 55-56. After his unsuccessful pursuit of Arbery, Defendant Travis McMichael updated the police that he "just caught a guy run into a house being built" and that "about four" people from the neighborhood were attempting to find and stop the man. *Id.* ¶ 57. These four men were Perez, Defendants Travis and Gregory McMichael, and possibly Defendant William Bryan. *Id.* ¶ 58. All four men had

armed themselves and searched for Arbery with the intent to confront and arrest him by force or threat of force.  *Id.*  After the four men had conducted their armed search, English texted the footage from his security camera to Defendant Rash, who responded to the Construction Lot with other Glynn County police officers.  *Id.* ¶ 60.  Once they arrived, Defendant Rash and the other officers searched for Arbery together with the four armed neighbors "for a good while."  *Id.* ¶ 61.  This joint search for Arbery further established Glynn County's authorization, ratification, and endorsement of the Private Defendants acting as law enforcement agents under color of law.  *Id.* ¶ 64.

In the afternoon on February 23, 2020, Arbery went for a jog around his neighborhood.  *Id.* ¶ 65.  He stopped at the Construction Lot during his jog to drink water from a spigot or rest, and then continued with his run.  *Id.* ¶¶ 67, 72-73.  Defendant Gregory McMichael saw Arbery run by his house and recognized him from previous video footage of the Construction Lot.  *Id.* ¶¶ 73, 76. Defendant Gregory McMichael immediately ran inside his home and told Defendant Travis McMichael that "the guy" from the previous videos was running down the street, and to get their guns to pursue him.  *Id.* ¶¶ 78-79.  Neither Defendant Gregory McMichael nor Defendant Travis McMichael observed Arbery engage in any criminal conduct—they did not even see Arbery enter or leave the Construction Lot on February 23, 2020.  *Id.* ¶¶ 75, 80.  Yet, they got in a truck and began to pursue Arbery, who tried to escape the armed men.  *Id.* ¶¶ 85-86.  As they passed Defendant Bryan's house, Bryan joined the chase in his own truck.  *Id.* ¶¶ 87, 89-90.  During the pursuit, Defendant Bryan blocked Arbery's path and struck Arbery with his truck, forcing him into a ditch.  *Id.* ¶¶ 96-99.  After nearly four minutes of pursuit, Defendants Travis and Gregory McMichael and Defendant Bryan cornered Arbery.  *Id.* ¶¶ 104-06.  Defendant Travis McMichael exited his truck and waited as Arbery ran toward him.  *Id.* ¶ 106.  Only then did Defendant Gregory

McMichael call 911 to tell the operator that "There's a black male running down the street." *Id.* ¶ 107. But the Private Defendants did not wait for law enforcement; instead, acting with the authority they had been given by Defendant Rash, Defendant Gregory McMichael ordered Arbery to stop, and then, without provocation, Defendant Travis McMichael fired his shotgun at Arbery and hit him in the chest. *Id.* ¶¶ 109, 111-12, 120. Defendant Travis McMichael shot Arbery twice more at close range, and Arbery fell to the ground. *Id.* ¶¶ 113-15. Defendant Gregory McMichael rolled Arbery over, confirming, as they had known, that Arbery had been unarmed during the whole encounter. *Id.* ¶¶ 117. As he stood over Arbery, who lay bleeding to death in the street, Defendant Travis McMichael said, "fucking Nigger." *Id.* ¶¶ 118-19.

The Glynn County Police Department began to cover up Arbery's murder from the moment their personnel arrived at the crime scene. *Id.* ¶ 122. The officers failed to arrest Defendants Gregory McMichael, Travis McMichael, and Bryan on the scene even though the officers were given admissions, statements, and video establishing that Arbery was murdered, and the officers knew that the McMichaels and Bryan did not see Arbery engage in any criminal conduct. *Id.* ¶¶ 124-28.

Defendant Jackie Johnson, who had been the Brunswick District Attorney since 2010, immediately directed police not to charge or arrest the Private Defendants for any crimes relating to Arbery's murder. *Id.* ¶¶ 132, 144-45. Defendant Johnson had known Defendant Gregory McMichael personally for years when he served as her investigator, and had previously intervened to help him keep his job after he repeatedly failed to complete state-mandated officer training. *Id.* ¶¶ 3, 133-38. Knowing that she was going to have to recuse herself based on her relationship with Defendant Gregory McMichael, Defendant Johnson handpicked Defendant Ware County District Attorney George Barnhill to take over the investigation, knowing that he too had a personal

connection to Defendant Gregroy McMichael—his son worked closely with Defendant Gregory McMichael at the Brunswick District Attorney's Office—and with the understanding that he would also decline to pursue charges against the Private Defendants despite the overwhelming evidence. *Id.* ¶¶ 146-50, 155-56, 160. Only then was the Georgia Attorney General's office "made aware" that Defendant Johnson had *already* contacted Defendant Barnhill and that he had "agreed to accept the case" when it received Defendant Johnson's recusal notice. *Id.* ¶ 150.

On February 24, 2020, before Defendant Barnhill was even officially appointed as prosecutor on the case, he met with Glynn County detectives to tell them he had concluded that "the act was justifiable homicide." *Id.* ¶ 157. After officially being appointed to prosecute the case, Defendant Barnhill spoke to the press on February 28, 2020, and falsely conveyed that the investigation centered on the burglary of a home under construction, that the investigation was about 70 percent done, and that he ordered a toxicology report on Arbery because, "There's some behavior that warrants explanation." *Id.* ¶ 158. Defendant Barnhill directed police not to investigate charges against the Private Defendants. *Id.* ¶ 160. On April 2, 2020, Defendant Barnhill wrote a defamatory memo to support his decision not to charge them, which contained multiple false statements, including that the Private Defendants "were following, in 'hot pursuit', of a burglary suspect, with solid first hand probable cause." *Id.* ¶ 162-63. Defendant Barnhill also provided false information to the Georgia Attorney General, claiming that he had "video of Arbery burglarizing a home immediately preceding the chase and confrontation." *Id.* ¶ 164. Defendant Barnhill was eventually forced to recuse himself once his close ties to Glynn County law enforcement and his conflict of interest became known. *Id.* ¶ 159. Only after video of Arbery's murder was made public on May 5, 2020, did the Georgia Bureau of Investigation take over the investigation. *Id.* ¶¶ 166-67. Defendants Gregory McMichael and Travis McMichael were

subsequently arrested on May 7, 2020, and Defendant Bryan was arrested on May 21, 2020, for Arbery's murder. *Id.* ¶¶ 169-70.

The Glynn County Police Department has consistently failed to supervise, discipline, and train its officers, and has routinely engaged in cover-ups to prevent its officers from being held accountable for misconduct. *Id.* ¶¶ 194-208. A September 2018 audit of the Glynn County Police Department conducted by the International Association of Chiefs of Police found that the Department's policies were not reflective of contemporary police best practices, specifically citing concerns about "accountability." *Id.* ¶ 181. Also in 2018, the Police Department lost its accreditation from the Georgia Police Accreditation Coalition because of mismanagement of evidence and missing disciplinary records. *Id.* ¶ 185. On November 8, 2019, in response to a Grand Jury report that detailed extensive misconduct in the Glynn County Police Department, Glynn County Manager Alan Ours issued a Memorandum finding that there was an "ongoing culture of cover-ups, failure to supervise, abuse of power, and lack of accountability" within the Police Department. *Id.* ¶ 175-79. The Memorandum found that there was a systemic failure to report complaints against police officers, supervisors were unwilling to investigate, report, or discipline the misconduct of police officers, supervisors directed officers to falsify reports to protect fellow officers, and Internal Affairs investigators encouraged officers to change their statements to protect supervisors. *Id.* ¶ 180. Despite the cronyism, outdated policies, lack of appropriate training, and lack of officer accountability, neither Ours nor the Glynn County Commissioners made changes in policy or procedures. *Id.* ¶ 184.

There are also specific incidents that demonstrate how the culture of cover-up, corruption, and lack of accountability in the Police Department manifested in unconstitutional conduct. *Id.* ¶ 194. In 2005, Police Sergeant Robert C. Sasser shot and injured a man in his car at a gas station,

and yet was permitted to remain a police officer. *Id.* ¶ 195. In 2010, Sergeant Sasser and Officer Michael T. Simpson shot and killed Carolina Small, and a video revealed illegal and unconstitutional conduct on behalf of law enforcement that led to Small's death. *Id.* ¶¶ 196-97. The Police Department conspired with Defendant Johnson to cover up the murder of Small, and as a result, no officer was held accountable. *Id.* ¶¶ 198-202. In 2018, Defendant Rash covered up the violent conduct of a fellow officer who assaulted his wife in front of Rash. *Id.* ¶ 203. The officer went on to kill his wife, her paramour, and himself, and despite this tragic and violent outcome of Defendant Rash's reckless and corrupt conduct, he was permitted to continue working as a police officer. *Id.* ¶¶ 204-05. On February 4, 2019, a Glynn County police drug task force officer was involved in a sexual relationship with a confidential informant, and used and provided illegal narcotics to informants. *Id.* ¶ 206. Police Chief John Powell was aware of this illegal and unconstitutional conduct and instead of trying to end it, he actively tried to shield the wrongdoer and ultimately was indicted on criminal charges for his role in attempting to protect the officer. *Id.* ¶¶ 188, 207. This pervasive failure to supervise, train, and discipline permitted Defendant Rash to engage in reckless and dangerous conduct—specifically, to encourage and deputize the Private Defendants to respond to suspected trespassers as if they were law enforcement officers—without fear that he would be investigated, reported, disciplined, or otherwise held accountable. *Id.* ¶¶ 189-192.

Plaintiff Wanda Cooper, Arbery's mother and personal representative of his estate, brings eleven claims against the various Defendants at issue here. In Count III, Plaintiff alleges that Defendants Rash, Gregory McMichael, Travis McMichael, Bryan, and John Doe Police Officials 1-10 engaged in a conspiracy to violate Arbery's Fourth Amendment rights. *Id.* ¶¶ 222–27. In Count IV, she alleges that Defendants Rash, Gregory McMichael, Travis McMichael, Bryan, and

John Doe Police Officials 1-10 engaged in a racially motivated conspiracy to interfere with Arbery's civil rights.[1]  *Id.* ¶¶ 228-34.  In Count V, she alleges that Defendant Rash and John Doe Police Officials 1-10 failed to prevent harm to Arbery.  *Id.* ¶¶ 235-38.  In Count VI, she alleges that Defendant Rash and John Doe Police Officials 1-10 placed Arbery in state-created danger.[2]  *Id.* ¶¶ 239-44.  In Count VII, she alleges that Defendant Rash and John Doe Police Officials 1-10 violated Arbery's right to substantive due process.  *Id.* ¶¶ 245-51.  In Count VIII, she alleges a *Monell* claim against Defendants Glynn County and Chief Powell in his official capacity.[3]  *Id.* ¶¶ 252-67.  In Count IX, she alleges that Defendants Jackson and Barnhill denied her access to courts.  *Id.* ¶¶ 268-71.  In Count X, she alleges that Defendants Johnson and Barnhill engaged in a racially motivated conspiracy to obstruct justice.  *Id.* ¶¶ 272-76.  In Count XI, she alleges a state law wrongful death/survival action claim against all Defendants.[4]  *Id.* ¶¶ 277-83.  In Count XIII, she alleges that Defendants Rash, Gregory McMichael, Travis McMichael, Bryan, John Doe

---

[1]  In Plaintiff's Complaint, she alleges Count IV against all Defendants.  However, Plaintiff intends to assert this claim only against Defendants Rash, Gregory McMichael, Travis McMichael, Bryan, and John Doe Police Officials 1-10, and voluntarily dismisses all the remaining Defendants from this count.

[2]  Plaintiff agrees to voluntarily dismiss Count VI, as the Eleventh Circuit no longer recognizes a separate doctrine of state-created danger.  *See, e.g.*, *Waldron v. Spicher*, 954 F.3d 1297, 1306 (11th Cir. 2002); *Waddell v. Henry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003).

[3]  Plaintiff acknowledges that a claim against Chief Powell in his official capacity is duplicative of a claim against Glynn County.  *See Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999)  ("[A] suit against a governmental official in his official capacity is deemed a suit against the entity that he represents."); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly.").  Plaintiff therefore agrees to voluntarily dismiss Chief Powell from this case.

[4]  In Plaintiff's Complaint, she alleges Count XI against "All Defendants."  However, Plaintiff intends to assert this claim only against Defendants Rash and John Doe Police Officials 1-10, and voluntarily dismisses all the remaining Defendants from this count.

Police Officials 1-10, and Glynn County[5] engaged in willful and wanton misconduct that amounted to an intent to harm Arbery. *Id.* ¶¶ 9-13. And in Count XIV, she alleges a state law claim for libel against Defendant Barnhill. *Id.* ¶¶ 14-18.

## STANDARD OF REVIEW

The plaintiff's obligation at the pleading stage—before the plaintiff has had the opportunity to conduct any discovery and to further investigate the factual predicates of her claims—is a limited one. To state a claim, a complaint need only contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, it need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). When considering a motion to dismiss, "a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007).

## ARGUMENT

### I. Plaintiff Has Properly Alleged Section 1983 Conspiracy Claims (Counts III and IV)

Defendant Rash seeks dismissal of Counts III and IV of Plaintiff's Complaint, contending that Plaintiff's allegations are insufficient to support a claim for Section 1983 conspiracy. Rash Mot. at 7-13. Defendant Rash's argument does not hold water.

---

[5] In Plaintiff's Complaint, she alleges Count XIII against Rash, Gregory McMichael, Travis McMichael, Bryan, John Doe Police Officials 1-10, and Glynn County. However, Plaintiff voluntarily dismisses this claim as to Glynn County.

**A.    Defendant Rash's Focus On Whether The Private Defendants Were Officially Deputized Is A Red Herring.**

Defendant Rash's principal response to whether he engaged in a conspiracy with the Private Defendants to seize Arbery is to divert attention from whether a conspiracy existed, to the distinct question of whether the Private Defendants were officially deputized as law enforcement. According to Defendant Rash, Plaintiff's conspiracy claims fail because Rash did not have the authority to officially deputize the Private Defendants to perform law-enforcement work on behalf of the County.  Rash Mot. at 7; County Mot. at 12-18.  This is a red herring.

Plaintiff's conspiracy claim is not contingent on Plaintiff sufficiently pleading facts to support a legal theory of deputization whereby the Private Defendants were *actually* transformed into law enforcement agents.  "[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). The relevant question in determining whether the Private Defendants were state actors under color of law for purposes of Section 1983 liability is whether they participated in joint action with Defendant Rash.  *Sheppard v. City of Blackshear, GA.*, No. CV 512-136, 2015 WL 300458, at *12 (S.D. Ga. Jan. 22, 2015) (collecting authorities), *aff'd* 631 F. App'x 718 (11th Cir. 2015).  Because the joint action analysis does not turn on whether Defendant Rash had the authority to officially deputize the Private Defendants or whether Defendant Rash's actions amounted to such a deputization, Rash's analysis and the cases cited therein are beside the point.

It is well established that private individuals who engage in joint action with the state or its agents act under color of state law for purposes of Section 1983.  *See id*. (explaining that private parties act under color of law if they engage in "joint action," which is alternatively referred to as a "joint-engagement" or "conspiracy" with state officials); *Tower v. Glover*, 467 U.S. 914, 920 (1984) (holding that "an otherwise private person acts 'under color of' state law when engaged in

a conspiracy with state officials to deprive another of federal rights"); *Dennis*, 449 U.S. at 28-29

(explaining that private parties who corruptly conspired with a judge acted under color of law

within the meaning of Section 1983); *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990)

("Private parties who corruptly conspire with state officials to maliciously prosecute an individual

also act under color of state law and can be sued by that individual under section 1983.").  In other

words, Defendant Rash's arguments about deputization are all distraction; it is because the Private

Defendants engaged in joint action with Defendant Rash to seize Arbery that they are state actors

for purposes of Section 1983.[6]  In addition, as set forth below, Plaintiff has clearly alleged the

elements of a conspiracy claim.

### B.      Plaintiff Has Pled A Section 1983 Conspiracy.

A plaintiff charging conspiracy need not plead the details of a conspiracy to survive a

motion to dismiss, but must set forth "allegations plausibly suggesting . . . agreement." *Twombly*,

550 U.S. at 557; *see also Iqbal*, 556 U.S. at 680-81.  To state a claim of conspiracy under Section

1983, Plaintiff must show "(1) a violation of [Arbery's] federal rights; (2) an agreement among

the Defendants to violate such a right; and (3) an actionable wrong." *Gibbons v. Mcbride*, 124 F.

Supp. 3d 1342, 1379 (S.D. Ga. 2015).  Defendant Rash does not dispute that Plaintiff has

adequately alleged a violation of Arbery's federal rights and an actionable wrong.  Defendant Rash

argues only that Plaintiff has not sufficiently alleged an agreement among the Defendants to violate

Arbery's rights.  Rash Mot. at 8-12.  That is incorrect.

The Eleventh Circuit and this Court have been clear that a plaintiff need not have a

"smoking gun" to create the inference that the defendants came to an agreement. *Bendiburg v.*

---

[6] Indeed, the Private Defendants themselves do not contest that the Complaint sufficiently pleads them as state actors and do not even attempt to dismiss the claims against them as state actors, instead choosing to answer the Complaint.

*Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990); *Sheppard*, 2015 WL 300458, at *12. Rather, an agreement or understanding may be inferred through circumstantial evidence, such as "the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami,* 637 F.3d 1178, 1191-92 (11th Cir. 2011); *see also Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) ("Factual proof of the existence of a § 1983 conspiracy may be based on circumstantial evidence."). An agreement between parties may be inferred from the willful participation or mere presence of a co-conspirator during the misconduct, even absent an allegation of direct communication between the conspirators. *See Adickes v. S.H. Kress & Co*, 398 U.S. 144, 157-59 (1970) (finding that a jury could infer that an officer and restaurant workers had come to an agreement to refuse service to the plaintiff because the officer was present in the restaurant at the time of the refusal even though the plaintiff "had no knowledge of an agreement between [the employees] and the police"); *Bendiburg*, 909 F.2d at 469 (11th Cir. 1990) ("[N]othing more than an 'understanding' and 'willful participation' between private and state Defendants is necessary to show the kind of joint action that will subject private parties to § 1983 liability."); *Sheppard*, 2015 WL 300458, at *13 (finding that evidence of officer's willing participation in private citizen's assault on the plaintiff could reasonably suggest that the private citizen reached an understanding with the officer to commit the assault). Further, knowledge and acquiescence of a co-conspirator's actions raise a reasonable inference that an agreement was struck between the parties. *See Williams v. Fulton County Sch. Dist.*, 181 F. Supp. 3d 1089, 1153-55 (N.D. Ga. 2016) (finding that plaintiff's allegations that school administrators knew of abuse by a teacher and failed to take proper actions to stop the unlawful conduct were sufficient to state a claim of conspiracy).

Plaintiff has sufficiently alleged an agreement among Defendant Rash and the Private Defendants to seize Arbery. Plaintiff alleges that Defendant Rash sent a text message to English on December 20, 2019, informing English that he should contact Defendant Gregory McMichael "day or night" if he saw anyone enter his property. This text reflected that Defendant Rash had communicated with Defendant Gregory McMichael to confirm his willingness to respond to English's complaints of trespassers entering the Construction Lot. This text also reflected Defendant Rash's endorsement of Defendant Gregory McMichael acting as a law enforcement agent. Plaintiff further alleges that on February 11, 2020, the Private Defendants engaged in an armed pursuit of Arbery after Perez received a text from English alerting him that someone had entered the Construction Lot. Plaintiff alleges that Defendant Rash also responded to English's text and once on scene, joined the search for Arbery with the armed Private Defendants, but failed to find him. It is reasonable to infer from these allegations that Defendant Rash reached an understanding with the Private Defendants that they would unlawfully seize Arbery—who they incorrectly deemed to be a trespasser[7]—by force or threat of force the next time they saw him. This inference is further supported by Plaintiff's allegation that on February 23, 2020, Defendant Gregory McMichael recognized Arbery from previous video footage of the Construction Lot and so decided to pursue Arbery with guns—even though he did not see Arbery on the Construction Lot that day—to unlawfully seize him by force or threat of force. These allegations, viewed in the light most favorable to Plaintiff, provide enough circumstantial evidence to support a reasonable inference that Defendant Rash and the Private Defendants agreed to violate Arbery's Fourth Amendment rights. *See Taylor v. Villegas*, No. CV 617-135, 2018 WL 2269911 at *3 (S.D. Ga.

---

[7] Georgia's trespass statute requires more than presence on another's property in order to be held criminally liable. *See* O.C.G.A § 16-7-21(a)-(b)(3).

May 17, 2018) (refusing to dismiss plaintiff's conspiracy claim where plaintiff alleged the relevant dates, parties, underlying agreement, and method of conspiracy); *Sheppard*, 2015 WL 300458, at *13 (denying summary judgement on plaintiff's conspiracy claim because a reasonable jury could infer that officers and a private citizen reached an understanding to violate the plaintiffs' constitutional rights from evidence that officers held the plaintiffs still so that the private defendant could assault the plaintiffs); *Gibbons*, 124 F. Supp. 3d at 1379-80 (finding that an agreement can be inferred based on "the chronology of events and the commonality of actors" during the relevant time period).

Further, Plaintiff's allegations lead to a reasonable inference that Defendant Rash knew that the Private Defendants would seize Arbery with force the next time they saw him, and yet not only did he fail to stop the Private Defendants from engaging in law enforcement activity, but he encouraged this behavior by telling English to call Defendant Gregory McMichael and by searching for Arbery with the armed Private Defendants. Defendant Rash's knowledge and subsequent failure to prevent the unlawful conduct of the Private Defendants leads to a strong inference of his agreement with the Private Defendants to violate Arbery's constitutional rights. *See Williams*, 181 F. Supp. 3d at 1153-55.

Defendant Rash incorrectly asserts that Plaintiff's allegations only support an agreement for the Private Defendants to assist English by checking on the Construction Lot and not an agreement to specifically violate Arbery's constitutional rights. Rash Mot. at 12. As explained in detail above, Plaintiff's allegations that Defendant Rash and the Private Defendants (who were armed) together searched for Arbery after suspecting him of trespassing on the Construction Lot plausibly suggest that they agreed to seize Arbery with force, and thereby violate his constitutional rights, the next time they saw him. Plaintiff was not required to allege that Defendant Rash and

the Private Defendants communicated specifically about seizing Arbery when "that conclusion could easily be inferred from the circumstances." *Sheppard*, 2015 WL 300458, at *13; *see also Gibbons*, 124 F. Supp. 3d at 1379-80 (finding that plaintiff sufficiently alleged a conspiracy claim despite lacking allegations that the defendants communicated with one another at all).[8] Even though they did not know Arbery's name at the time, they searched for him together and came to an understanding to seize him with force.

### C. Defendant Rash's Intracorporate Conspiracy Argument Is Meritless.

Defendant Rash further argues that Plaintiff's conspiracy claims are barred by the intracorporate conspiracy doctrine. Rash Mot. at 7-8. Under this doctrine, a corporation or public entity "cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Grider*, 618 F.3d at 1261. However, the doctrine is doubly inapplicable. First, Plaintiff alleges that Defendant Rash, an officer with the Glynn County Police Department, conspired with the Private Defendants, who are not employees of the Glynn County Police Department. While it is true that the Private Defendants were acting under color of law when they violated Arbery's constitutional rights, that does not make them *employees* of the Glynn County Police Department. In *Robinson v. City of Darien*, this Court recently held that the intracorporate conspiracy doctrine does not apply when a private citizen who is not a member of the police department is part of the conspiracy. 362 F. Supp. 3d 1345, 1376

---

[8] Defendant Rash's convenient reading of *Gibbons* would constrain that case to its facts. *See* Rash Mot. at 10 ("In *Gibbons*, this Court held that circumstantial evidence is sufficient to show an agreement only where (1) plaintiff alleges 'all defendants actively participated in the events leading up to the alleged constitutional violation'; (2) the allegations show that 'all Defendants 'acted in concert' when the constitutional violation was committed'; and (3) where the complaint is 'replete with allegations that the [d]efendants communicated with one another and actively participated with one another' leading up to and during the event in question.'"). That reading is plainly contrary to the decision itself, which recognized the low burden plaintiff must satisfy at the motion to dismiss stage and found that the circumstantial evidence the plaintiff alleged, despite not meeting all those factors, was sufficient. *Gibbons*, 124 F. Supp. 3d at 1379-80.

(S.D. Ga. 2019). Because the Private Defendants and Defendant Rash were not employees of the same entity, the intracorporate conspiracy doctrine does not control. *See U.S. v. Hartley*, 678 F.2d 961, 970 (11th Cir. 1982), abrogated on other grounds by *United States v. Goldin Indus., Inc.*, 219 F.3d 1268 (11th Cir. 2000) ("[T]he existence of noncorporate coconspirators alleviates the need for a discussion of the intracorporate conspiracy doctrine."); *Lee v. Christian*, 221 F. Supp. 3d 1370, 1378 (S.D. Ga. 2016) (finding that the intracorporate conspiracy doctrine did not apply where one defendant was a member of a separate public entity from all other defendants); *cf. Grider*, 618 F.3d at 1261 (finding that the intracorporate conspiracy doctrine applied because both defendants are law enforcement officers with the police department and "[n]o outsiders are involved").

Second, and in any event, the intracorporate conspiracy doctrine does not apply to criminal conduct. "The Eleventh Circuit recognizes at least one exception to the intracorporate conspiracy doctrine, which applies when a plaintiff alleges criminal conduct or conduct that could result in criminal charges." *Walton for Estate of Smith v. Florida Dep't of Corr.*, No. 3:16-cv-1130-J-39JRK, 2019 WL 2103024, at *9 (M.D. Fla. May 14, 2019) (citing *Grider*, 618 F.3d at 1261); *see also McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000) ("[W]e hold that just as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal wrongdoing, from civil liability."). Because Plaintiff alleges that the Private Defendants engaged in criminal conduct when they stalked, unlawfully seized, and killed Arbery—indeed the Private Defendants have been criminally charged for their conduct—the intracorporate conspiracy doctrine does not apply. *See Walton*, 2019 WL 2103024, at *9 (finding that the criminal conduct exception to the intracorporate conspiracy doctrine applied where plaintiff alleged that the

defendants conspired to pursue criminal interests and to cause the underlying tort of murder or manslaughter"); *Desrouleaux v. Village of Biscayne Park*, No. 18-cv-23797-GAYLES/OTAZO-RETES, 2019 WL 2076189, at *4 (S.D. Fla. May 10, 2019) (finding that the criminal conduct exception to the intracorporate conspiracy doctrine clearly applied and thus plaintiff's conspiracy claims based on his false arrest and malicious prosecution were not barred).

### D. A State Actor Who Conspires To Have Private Parties Violate Someone's Legal Rights Is Not Entitled To Qualified Immunity.

Defendant Rash, in a footnote, claims that because "it is not clearly established that Rash's actions amount to an agreement for purposes of conspiracy," Plaintiff fails to meet the clearly-established prong of the qualified immunity test. Rash Mot. at 12.[9] This argument, made in a "perfunctory and conclusory manner," is waived. *Nat'l Mining Assoc. v. United Steel Workers*, 985 F.3d 1309, 1327 n. 16 (11th Cir. 2021).[10]

In any event, it is meritless. Qualified immunity only protects officers whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Clearly established" for purposes of qualified immunity means that at the time of the challenged conduct, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). At this second step of the qualified

---

[9]  The case Defendant Rash cites for the "clearly-established" standard, *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003), applied a heightened pleading requirement for civil rights cases that has since been overruled. *See Randall v. Scott*, 610 F.3d 701, 707-710 (11th Cir. 2010).

[10]  Defendant Rash notes that qualified immunity is available to officials acting within their discretionary authority. Rash Mot. at 12 n. 2, 20-21. Plaintiff does not contest that Defendant Rash was acting in his discretionary authority. He is nonetheless not entitled to qualified immunity for the reasons set forth herein.

immunity inquiry, "courts must take care not to define a case's 'context' in a manner that" fails to view the facts in a light most favorable to the nonmoving party, or to fail to make plausible inferences from the alleged facts. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

The facts alleged here make a clearly-established agreement for the second element of a conspiracy claim. It is clearly established that it is unconstitutional to agree to violate a person's constitutional rights, *Am. Fed'n of Labor*, 637 F.3d at 1191, and that the existence of a conspiracy may be proved by circumstantial evidence, *Grider*, 618 F.3d at 1260. It is also clearly established that "an 'understanding' and 'willful participation' between private and state defendants" is all that is necessary—"smoking gun" allegations are not required. *Bendiburg*, 909 F.2d at 469.

On the alleged facts, appropriately construed, it would have been clear to a reasonable officer in Defendant Rash's position that he entered into an agreement. Defendant Rash told English that Defendant Gregory McMichael said English could contact him "day or night" if English saw anyone enter his property. It follows from that allegation that Defendant Rash and Defendant Gregory McMichael had previously communicated about the latter's willingness to act in response to English's complaints, and that both Defendant Gregory McMichael and English would understand Defendant Rash to be endorsing McMichael's acting as a law enforcement agent. In further support of that agreement, Plaintiff alleges the Private Defendants all pursued Arbery on February 11, 2020, that English notified Defendant Rash, and that Rash responded that evening to the Construction Lot.

Accordingly, Plaintiff's Section 1983 conspiracy claims should not be dismissed.

## II.    Plaintiff Has Properly Alleged a Section 1985(3) Conspiracy Claim (Count IV)

Defendant Rash seeks dismissal of Count IV of Plaintiff's Complaint, contending that Plaintiff fails to state a Section 1985(3) conspiracy claim. Rash Mot. at 12-15. Defendant Rash's argument lacks merit.

To establish a claim of conspiracy under Section 1985(3), Plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Defendant Rash focuses his challenge to Plaintiff's Section 1985(3) conspiracy claim on the second element, which requires a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102; *see also Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 628 (11th Cir. 1992); *Anderson v. Vanguard Car Rental USA, Inc.*, 304 Fed. App'x 830, 831 (11th Cir. 2008) ("To prove the second element, the plaintiff must show a deprivation of rights under a specific statute or constitutional provision and 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" (citation omitted)). In other words, Defendants must have taken their action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v Alexandria Women's Health Clinic*, 506 U.S. 263, 275-76 (1993).

Defendant Rash acknowledges that Plaintiff alleges that the Private Defendants initiated their pursuit of Arbery based on discriminatory animus but contends that Plaintiff has not alleged that *Defendant Rash* was motivated by racial discriminatory animus. Rash Mot. at 13-14. This

contention is wrong. Plaintiff alleges that Defendant Rash had a relationship with Defendant Gregory McMichael, who is Defendant Travis McMichael's father and Defendant Bryan's friend. Plaintiff alleges that at least Defendants Travis McMichael and Bryan had an extensive history of racist and anti-Black behavior, including on Internet social media and in correspondence with friends. It is thus reasonable to infer from Plaintiff's allegations that Defendants Travis McMichael and Bryan did not hide their racist attitudes and that their racial animus should have been known to Defendant Rash given his relationship with Gregory McMichael. Plaintiff's allegations also plausibly suggest that Defendant Rash would have been exposed to the Private Defendants' racist attitudes when they all searched for Arbery—the Black man who they suspected of trespassing—on February 11, 2020, and that Defendant Rash endorsed the Private Defendants acting as law enforcement despite having knowledge of their racial bias. *See Lee v. Christian*, 98 F. Supp. 3d 1265, 1272 (S.D. Ga. 2015) (holding that plaintiff sufficiently stated a claim under Section 1985(3) where she alleged that all of the defendants knew why one defendant sought to have her employment terminated, which was because she rejected his sexually-charged conduct and interest, as well as additional facts that create plausible grounds to infer that defendants agreed to bring about plaintiff's termination because of her female gender). Plaintiff further alleges that after Defendant Travis McMichael shot Arbery, he stood over Arbery as he lay dying and said, "fucking Nigger." This behavior undoubtedly shows that Defendant Travis McMichael and the other Private Defendants pursued Arbery on February 23, 2020, and also on February 11, 2020, when Defendant Rash was present, at least in part because of their discriminatory animus toward Black people. *See Park*, 120 F.3d at 1162 (finding that plaintiff's allegations that the crowd screamed "Kill the Koreans!" demonstrates "the type of racially discriminatory animus sufficient to invoke the protection of Section 1985(3)"). Plaintiff additionally alleges that while Defendant

Rash pursued Arbery on February 11, 2020, with the goal to unlawfully seize him under threat of force with the Private Defendants, Defendant Rash did not pursue or try to find any of the white trespassers on the prior occasions when he responded to English's calls.

Plaintiff's allegations make clear that the Private Defendants were motivated by racial animus and that Defendant Rash at worst also harbored racial animus or at best acquiesced to the Private Defendants' racial-animus based motivation to seize and arrest Arbery. Therefore, Plaintiff's allegations, viewed in the light most favorable to Plaintiff, plausibly suggest that Defendant Rash entered into an agreement with the Private Defendants to violate Arbery's constitutional rights at least in part because he was Black. *See Griffin*, 403 U.S. at 103 (finding that petitioners sufficiently stated a cause of action under Section 1985(3) where petitioners' allegations that respondents conspired to carry out the assault for the purpose of preventing the petitioners and other "Negro-Americans, through force, violence and intimidation, from seeking the equal protection of the laws" clearly supported "the requisite animus to deprive the petitioners of the equal enjoyment of legal rights because of their race"); *N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 1000 (N.D. Fla. 2019) (finding that plaintiff sufficiently pleaded facts to support a conspiracy claim under Section 1985(3) despite not specifically alleging that the defendants were motivated by a class-based animus because "it is evident from his other allegations and his substantive equal protection claim that he is asserting N.R.'s disability as the motivating factor").

Accordingly, Plaintiff's Section 1985(3) conspiracy claim should not be dismissed.

### III. Plaintiff Has Properly Alleged a Section 1986 Claim (Count V)

Defendant Rash seeks dismissal of Count V of Plaintiff's Complaint, contending that Plaintiff fails to state a Section 1986 claim. Rash Mot. at 15-19. To establish a claim under Section 1986, Plaintiff must show that Defendant Rash "knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so." *Park*, 120 F.3d at 1160.

Defendant Rash first argues that Plaintiff has not plausibly alleged that he had actual knowledge of a Section 1985(3) conspiracy among the Private Defendants. Rash Mot. at 15. That is incorrect. As explained in detail above, it is reasonable to infer from Plaintiff's allegations that Defendant Rash was part of the Section 1985(3) conspiracy, and therefore clearly had knowledge of the conspiracy. However, even if the Court determines that Defendant Rash was not part of the Section 1985(3) conspiracy, Plaintiff's allegations still plausibly suggest that Defendant Rash had the requisite knowledge. Plaintiff alleges that Defendant Rash called on Defendant Gregory McMichael to respond to English's concerns "day or night" about someone entering English's property. When English was notified of someone entering the Construction Lot on the evening of February 11, 2020, the Private Defendants all convened on the property, armed. When Defendant Rash and other Glynn County police officers arrived at the property, they conducted a joint search for Arbery with the armed Private Defendants. It is therefore reasonable to infer from these allegations that Defendant Rash had actual knowledge of a conspiracy among the armed Private Defendants to seize Arbery under the threat of force.[11]

---

[11] Defendant Rash argues that "[n]o agreement can be inferred" from the convergence on the Construction Lot on February 11, 2020. Rash Mot. at 16 n.3. This argument might be appropriate on a motion for summary judgment, but it is not at this stage in the litigation. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d at 1057 (when considering a motion to dismiss, "a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true"). Plaintiff's allegations plausibly allege a conspiracy, of which Defendant Rash was aware.

Defendant Rash next claims that Plaintiff's allegations do not demonstrate his knowledge of any discriminatory animus on the part of the Private Defendants.  Rash Mot. at 16.  However, as explained in detail above, Plaintiff's allegations plausibly suggest that Defendant Rash would have been exposed to the Private Defendants' racist attitudes when they all searched for Arbery—the Black man who they suspected of trespassing—on February 11, 2020.  Given Defendants Travis McMichael's and Bryan's openness with sharing their racist attitudes, it is plausible both that they would have used racial slurs or otherwise betrayed their racist attitudes the night of February 11, 2020, and that their racist attitudes would previously have been known to Defendant Rash based on his relationship with Defendant Gregory McMichael, Travis McMichael's father and Bryan's friend.  Finally, it is plausible that Defendant Gregory McMichael also shared—and was perhaps the source of—his son's racist views, and Defendant Rash would have known that, given their relationship.  This is supported by the fact that Defendant Travis McMichael was comfortable calling Arbery a "fucking Nigger" as Defendant Gregory McMichael stood next to him, and Defendant Gregory McMichael's silent acceptance of that assessment as Arbery lay dying on the pavement.

Defendant Rash further argues that the alleged facts fail to demonstrate that he could have stopped the implementation of the conspiracy.  Rash Mot. at 16.  But his argument on this front is based solely on the fact that the Private Defendants did not notify law enforcement *on February 23* that they had seen Arbery near the Construction Lot and had decided to pursue him.  *Id.* at 16-17.  But Plaintiff's allegations make clear that, at a minimum, on February 11 Defendant Rash was in a position to intercede.  When he arrived at the Construction Lot that evening to find multiple armed neighbors participating in a search for the trespasser, that was the time to get involved and call them off.  His failure to intervene on February 11 was at least negligence, which is all that is

required for Section 1986 purposes. *Park*, 120 F.3d at 1160 ("We concur . . . that negligence is sufficient to maintain a § 1986 claim.").

Defendant Rash's final argument fares no better. He contends that: (1) because Defendant Rash was not part of the Section 1985(3) conspiracy; (2) the Section 1986 claim that is derivative of the Section 1985(3) claim against him fails because; (3) the 1985(3) conspiracy, without Rash, becomes only a conspiracy between private parties; and (4) Section 1985(3) conspiracy claims against private parties only can only be alleged for violations of certain constitutional rights. Rash Mot. at 17-19. This argument is triply wrong. First, again, Plaintiff plausibly alleges that Defendant Rash *was* part of the Section 1985(3) conspiracy. Second, even assuming Defendant Rash was *not* part of the Section 1985(3) conspiracy, that does not turn the conspiracy into a "purely private" conspiracy. *See Bray*, 506 U.S. at 268 ("§ 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies"). In other words, Defendant Rash's participation in a Section 1985(3) conspiracy has no bearing on the identity of Bryan and the McMichaels as state actors for purposes of the civil rights statutes. As explained above, they are state, rather than private actors, for these purposes. Finally, while it is true that a private-party-only Section 1985(3) claim can only be based on deprivations of "select serious constitutional rights," Plaintiff's Complaint plausibly makes such an allegation. *Jimenez v. Wellstar Health Syst.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (cleaned up); *see also* Compl. ¶ 229 (grounding Section 1985(3) claim in Defendants conspiring to prevent Arbery from, on the basis of racial animus, "seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities . . . including but not limited to his right to freedom of movement; his right to be secure in his person; and his right not to be enslaved nor deprived of life and liberty other than by due process of law").

Plaintiff's allegations plausibly suggest that the Private Defendants deprived Arbery of his Thirteenth Amendment rights. There is nothing remarkable about recognizing a Section 1985(3) claim based on a conspiracy to interfere with Thirteenth Amendment rights. *See Bray*, 506 U.S. at 278 (noting that the Court has recognized Thirteenth Amendment-based rights may underlie such claim, and holding interference with right to abortion does not); *Park*, 120 F.3d at 1162 (same); *United Brotherhood of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 832-33 (1983) ("Section 1985(3) constitutionally can and does protect [Thirteenth Amendment] rights from interference by purely private conspiracies."). The Thirteenth Amendment covers not just literal enslavement, but a "badge or incident of slavery." *Williams v. Brooks Trucking Co.*, 757 F. App'x 790, 794 (11th Cir. 2018) (quoting *Terry Props. Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1536 (11th Cir. 1986)). "The Thirteenth Amendment is implicated [for a Section 1985(3) conspiracy claim] when it is alleged that a private individual or entity deliberately acted in a way to segregate, humiliate, or belittle" a Black person "in a way that prevented such a person from exercising a right guaranteed to all citizens." *Baker v. McDonald's Corp.*, 686 F. Supp 1474, 1480 (S.D. Fla. 1987). White townspeople pursuing, shooting, and killing a Black man based on a "hunch" that he committed a crime plausibly alleges a "badge or incident of slavery" and sounds in the Thirteenth Amendment.

Additionally, the Supreme Court has held that a case like this one can be the basis of a private-party-only Section 1985(3) conspiracy claim. In *Griffin v. Breckenridge*, the defendants, "white adult citizens of the United States," under the mistaken impression that the driver of a car worked at a civil rights organization, conspired "to block the passage of" the vehicle and its passengers "upon the public highways, to stop and detain them and to assault, beat and injure them with deadly weapons." 403 U.S. at 90. Concluding that the allegations stated a Section 1985(3)

claim, the Court noted that "the conduct here alleged lies so close to the core of the coverage intended by Congress that it is hard to conceive of wholly private conduct that would come within the statute if this does not." *Id.* at 103.

Lastly, Defendant Rash once again argues in a footnote that he is entitled to qualified immunity on this claim because "it is not clearly established that the Private Defendants violated a right protected against private impairment." Rash Mot. at 19 n.5. And, once again, this argument, made in a "perfunctory and conclusory manner," is waived. *See, e.g.*, *Nat'l Mining Assoc.*, 985 F.3d at 1327 n.16. It also lacks merit. As just explained, the Supreme Court has repeatedly recognized Thirteenth Amendment rights as those cognizable for purposes of a private-party-only Section 1985(3) conspiracy claim. Taking the facts alleged as true, no reasonable officer would have thought it constitutional to allow a group of armed white neighbors to hunt down a Black man who they suspected of trespassing. And any officer who would has certainly acted with at least negligence in creating what resulted in a modern-day lynching of Arbery.[12]

Accordingly, Plaintiff's Section 1986 claim should not be dismissed.

## IV. Plaintiff's Substantive Due Process Claim is Not Barred by Qualified Immunity (Count VII)

Defendant Rash seeks dismissal of Count VII of Plaintiff's Complaint, contending that he is entitled to qualified immunity. Qualified immunity is a two-step inquiry. The Court must

---

[12] It is important to note that "[t]he predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters," as Section 1985(3)'s proponents were concerned that the "[Ku Klux] Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983). Section 1985(3) was therefore aimed at preventing the exact type of conduct that occurred here: private parties, with the approval of state actors, working to undermine the civil rights of a Black man, ultimately resulting in a modern-day lynching. Defendant Rash would have this Court ignore the obvious application of this statute to facts of this case; however, any reasonable officer would have understood that working with racists to hunt down a Black man was unconstitutional.

determine whether the facts alleged constitute a violation of a constitutional right, and if the right was "clearly established" at the time of the officers' actions. *Pearson*, 555 U.S at 232.

### A. Plaintiff Has Properly Alleged a Substantive Due Process Claim.

Defendant Rash first argues that he is entitled to qualified immunity because Plaintiff has failed to state a viable Section 1983 claim against him for a violation of Arbery's substantive due process rights. The Fourteenth Amendment Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. When a government actor engages in "arbitrary or conscience shocking" conduct it constitutes a substantive due process violation under the Fourteenth Amendment. *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). In delineating the contours of this claim, the Eleventh Circuit has explained that "[w]hen split-second judgments are required, an official's conduct will shock the conscience only when it stems from a purpose to cause harm." *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1331 (11th Cir. 2020) (quotation marks and citation omitted). But, where, as here, "actual deliberation is practical," "[c]onduct that is not intentionally harmful" can violate substantive due process. *Id.* (quotation marks and citation omitted); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850-53 (1998) (explaining that emergency situations must be treated differently than those where deliberation is practical and that intent to cause harm is not always required to make out a substantive due process violation). In this second category of cases, where there is "time to make unhurried judgments" and the "chance for repeated reflection," "deliberate indifference can rise to a constitutionally shocking level." *Lewis*, 523 U.S. at 852-53. "To act with deliberate indifference, a state actor must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety." *Waddell*, 329 F.3d at 1306.

As an initial matter, Defendant Rash argues that this claim sounds in the Fourth Amendment and thus the Fourteenth Amendment's substantive due process analysis is beside the point. Rash Mot. at 23. That is incorrect. The conduct forming the basis for this claim against Defendant Rash is not a search or seizure; it is the authorization and encouragement of private persons to police other private persons. The Fourth Amendment does not reach such conduct— the Fourteenth Amendment's substantive due process clause does. *See, e.g.*, *Waugh v. Dow*, 617 F. App'x 867 (10th Cir. 2015) (analyzing an officer's decision to bestow law enforcement duties on a private person as a substantive due process claim). To be sure, Plaintiff's Complaint *also* alleges a Fourth Amendment conspiracy claim against Defendant Rash and the Private Defendants, but the overt act that *Defendant Rash* committed in furtherance of that conspiracy was the authorization and encouragement of the Private Defendants to act as law enforcement, not the seizing and killing of Arbery. Accordingly, Defendant Rash's conduct constitutes part of a Fourth Amendment conspiracy when viewed in conjunction with the actions of the Private Defendants, and *also* constitutes a standalone substantive due process violation. Thus, this claim properly sounds in the Due Process Clause and not, as Defendant Rash argues, in the Fourth Amendment.

Next, Defendant Rash argues that Plaintiff has not sufficiently alleged any actions by him that were arbitrary or conscience shocking. Rash Mot. at 24-25. However, Plaintiff's allegations plausibly suggest that Defendant Rash demonstrated "deliberate indifference to an extremely great risk of serious injury to someone in [Arbery's] position" that rises to a constitutionally shocking level. *Waddell*, 329 F.3d at 1305, 1306; *see also Lewis*, 523 U.S. at 852-53. An extremely great risk of harm exists when armed private persons are led to believe by law enforcement that they may engage in law enforcement activity by pursuing and detaining people suspected of trespassing. The risk here was all the greater because Defendant Gregory McMichael was not just any private

person: he had been pushed out of law enforcement for flouting law enforcement rules. He repeatedly failed to complete his state-mandated peace officer trainings while working as an investigator, and as a result, his basic law enforcement certification was suspended by the Georgia P.O.S.T. Council in February 2019, and his supervisors stated that he should be removed from "any activity that would be construed as being law enforcement in nature." Defendant Rash was not only aware of this excessive risk of harm, he helped create the risk by authorizing and encouraging Defendant Gregory McMichael and the other Private Defendants to engage in law enforcement activity.

Defendant Rash seeks to minimize his conduct by arguing that he merely "introduced English to Greg McMichael" and then later "responded to a call from English about a potential trespasser at the Construction Site." Rash Mot. at 25. But Plaintiff's allegations go much further. As discussed above, Defendant Rash told English that Defendant Gregory McMichael said to please call him day or night when English gets action on his camera. Passing this invitation along indicates that Defendant Rash previously told Defendant Gregory McMichael that McMichael could intercede if there were suspected trespassers. Defendant Rash then gave Defendant Gregory McMichael's phone number to English, further confirming that he approved of Gregory McMichael engaging in law enforcement activity. Moreover, it is a reasonable inference that Defendant Rash was aware of Defendant Gregory McMichael's removal from law enforcement: his text message to English showed that he knew Gregory McMichael had previously worked as law enforcement and as an investigator, and that he was now retired. So, far from simply introducing English and Defendant Gregory McMichael, Defendant Rash led Defendant Gregory McMichael to believe that he could pursue and detain suspected trespassers even though his law enforcement certification had been suspended and he was merely a private person.

Moreover, on February 11, 2020, Defendant Rash did not just respond to a call from English about a potential trespasser at the Construction Lot. When Defendant Rash arrived at the scene, he searched for Arbery along with the armed Private Defendants. By including the armed Private Defendants in the search, Defendant Rash reaffirmed his earlier authorization of Defendant Gregory McMichael and extended that authorization to Perez, Defendant Travis McMichael, and Defendant Bryan. Where, as here, "state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others," those officials can be held liable for a violation of substantive due process "even though none of the defendants are alleged to have communicated the approval explicitly." *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005) (finding a substantive due process violation where plaintiff alleged that officers implicitly condoned and encouraged an intoxicated off-duty officer's decision to drive drunk).

Defendant Rash argues that he could not have predicted the harm that resulted from his actions and that his conduct "must be viewed not through the lens of hindsight . . . but from the viewpoint of Rash at the time he acted." Rash Mot. at 25. However, no such hindsight is required to understand that sending off an armed private person with a history of ignoring law enforcement rules to pursue and seize suspected trespassers creates a serious risk. Other courts agree. A district court confronting an officer who engaged in similar conduct explained that it "is not a large leap of logic to find that arming a private citizen and sending him into a wooded area in search of a fugitive creates a[n] extreme risk of serious harm" and is "conscience shocking." *Waugh v. Dow*, No. CIV-11-1419-C, 2014 WL 2807574, at *1 (W.D. Okla. June 20, 2014), *aff'd*, 617 F. App'x 867 (10th Cir. 2015). On appeal, the Tenth Circuit agreed, noting that "a jury could reasonably

find from the circumstances that the risk was obvious and that [the officer's] conduct reflected a reckless disregard for that risk." *Waugh v. Dow*, 617 F. App'x 867, 878 (10th Cir. 2015).

Not only did Defendant Rash act with deliberate indifference to an extremely great risk of serious injury to someone in Arbery's position, but he did so for no good reason. That is, the governmental interest he was seeking to advance by his conduct is exceedingly week. The due process guarantee is meant to protect against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 845-46 (quotation marks and citations omitted). So where the conduct involves relatively "weak governmental interests," it counsels in favor of finding a substantive due process violation. *Waldron v. Spicher*, 954 F.3d 1297, 1311 (11th Cir. 2020). Here, the many people who went onto the Construction Lot did not harm the property in any way, nor is there any suggestion that they posed a danger to other people. At best, then, the governmental interest at issue here is the protection of the Construction Lot from curious passersby. This makes Defendant Rash's conduct even more egregious.

Ultimately, the "Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power." *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (quotation marks and citation omitted). To wield the state's power is a great and weighty responsibility; it is a fundamental abuse of this power for an officer to purport to unilaterally empower select private persons with that responsibility and lead them to believe that they can pursue and detain others. Defendant Rash engaged in such conduct despite the foreseeability of harm, the weakness of countervailing governmental interests, and the time for actual deliberation about the consequences of his actions. This is particularly egregious, conscience-shocking behavior.

**B. Arbery's Substantive Due Process Right Was Clearly Established.**

Defendant Rash next argues that he is entitled to qualified immunity because Plaintiff cannot show that he violated a right that was clearly established. Rash Mot. at 26-27. The Eleventh Circuit has laid out three ways to show that an officer had "fair warning" sufficient to satisfy the clearly established prong: (1) "the plaintiffs may show that a materially similar case has already been decided"; (2) "the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). Defendant Rash had fair warning in all three ways.

First, assuming any case is even required to provide fair warning for this conscious-shocking behavior, "[b]inding case law in [the Eleventh Circuit] holds that the 'relevant legal landscape'—including even cases from outside [the Eleventh Circuit] and unpublished cases—are informative in a court's determination of whether a particular constitutional right is clearly established." *Waldron*, 954 F.3d at 1307. At least one circuit has considered a materially similar case and squarely recognized that it shocks the conscience. In *Waugh v. Dow*, 617 F. App'x 867 (10th Cir. 2015), an officer called for backup when trying to locate and arrest Waugh. *Id.* at 869. An off-duty officer, who was with his brother, responded to the call. *Id.* This officer learned that Waugh had run into a wooded area and gave his brother—a private citizen—a gun and told him to enter the wooded area and try to find Waugh while he drove to the other side of the woods. *Id.* at 869-70. The brother shot Waugh in the leg. *Id.* at 870. On appeal, the court determined that the officer could be held liable for a substantive due process violation because his actions were so reckless that they shocked the conscience. *Id.* at 878. In fact, the court held not only that the defendant's behavior was conscience shocking, but that any reasonable officer would have known

such behavior violates the law, so as to already be clearly established and require the denial of qualified immunity. *Id*. at 878-89.

The parallels between *Waugh* and this case are clear. In both cases, an officer led private, armed persons to believe that they could act as law enforcement. *Id*. at 869-70. In both cases, the officer "had enough time . . . for actual deliberation" before empowering the private citizens. *Id*. at 873. In fact, here Defendant Rash had much more time for deliberation than the officer in *Waugh*. In both cases, the officer claimed that "he did not know" one of the private persons would shoot the person they were after. *Id*. at 878. And in both cases, the private person harmed another individual—in this case, actually killing that person. *Id*. at 870. *Waugh* is therefore materially similar and gave Defendant Rash fair warning that his conduct violated Arbery's due process rights.

Defendant Rash insists that for him to have fair warning, Plaintiff must point to a case where a court held "that a law enforcement officer violated the rights of another by: (1) introducing a property owner to a neighbor and informing the property owner that the neighbor had offered to provide the property owner with assistance and (2) responding to a call regarding a potential crime that was also responded to by the property owner's neighbors." Rash Mot. at 27. At the outset, as explained above, Defendant Rash oversimplifies his misconduct. Further, the Eleventh Circuit has made clear that "[a] judicial precedent with materially identical facts is not essential for the law to be clearly established." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). The facts of *Waugh* are "close enough" to put the "constitutional question beyond debate." *Gaines*, 871 F.3d at 1209-10.

Second, Defendant Rash had fair warning that his conduct was unconstitutional because there are "broader, clearly established principle[s] that should control the novel facts of the

situation." *Gaines*, 871 F.3d at 1208. There are at least two cases setting forth clearly established principles that control Defendant Rash's conduct. The first is *Waugh*—to the extent this Court finds *Waugh* insufficiently similar under the above analysis, it at least serves as evidence of the broader controlling principle that it is a fundamental and conscience-shocking abuse of power for an officer to sanction and encourage private persons to engage in vigilante justice. The second is *Pena*, which made clear that state officials violate substantive due process when they implicitly "communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others." 432 F.3d at 111.

Third, Defendant Rash had fair warning because his conduct "so obviously violate[s] the constitution." *Gaines*, 871 F.3d at 1208; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that it is "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances" if the violation is "obvious"). Defendant Rash does not actually have the authority to bestow policing powers on private individuals. In fact, he himself points out that "there is no allegation that [he] had the authority to authorize the Private Defendants to engage in law enforcement activity." Rash Mot. at 25. This is precisely the point. He did not have such authority because permitting line officers to deputize private individuals carries such obvious risks of harm. Yet that is just what Defendant Rash did when he led Defendant Gregory McMichael to believe that McMichael could intervene with any suspected trespassers and when he passed along Gregory McMichael's contact information to English. Defendant Rash then reiterated that belief when he permitted Gregory McMichael and the other neighbors—who were armed—to help him search for a potential trespasser. "The Due Process Clause was intended to prevent government officials from abusing their power," *Waddell*, 329 F.3d at 1305, and appearing

to convey state power to private individuals with no training and with their own motives is a clear and obvious abuse of that power.

Accordingly, Defendant Rash is not entitled to qualified immunity on Plaintiff's substantive due process claim.

## V.     Plaintiff Has Properly Alleged a Monell Claim (Count VIII)

Defendant Glynn County ("the County") seeks dismissal of Count VIII, contending that Plaintiff has failed to state a Section 1983 claim against it for failure to supervise, discipline, and train.  County Mot. at 23-29.  The County's argument lacks merit.

To state a Section 1983 claim against Defendant Glynn County under *Monell*, Plaintiff must allege that Arbery suffered an injury caused by the Glynn County Police Department's policies or customs.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  "To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quotation marks and citation omitted); *see also Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice.").  A failure to train or supervise police officers is a policy or custom that can serve as the basis for municipal liability when the failure amounts to "deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  To establish deliberate indifference, a plaintiff must show that the municipality had either actual or constructive notice of constitutional violations that

evidenced a need for improved training or supervision and yet took no action. *Gold*, 151 F.3d at 1351; *Young v. City of Augusta, Ga*, 59 F.3d 1160, 1172 (11th Cir. 1995).

Plaintiff alleges that the County was deliberately indifferent to the rights of its citizens, including Arbery, because it ignored a widespread pattern of constitutional violations within the Police Department caused by failures in training, discipline, and supervision. It is reasonable to infer from Plaintiff's allegations that the County had notice of the constitutional violations within the Police Department that evidenced a need for training, supervision, and discipline of its officers, and nonetheless failed to take any action. Plaintiff alleges the International Association of Chiefs of Police conducted an audit of the Glynn County Police Department in September 2018 and found that the Department's policies were not reflective of contemporary police best practices, specifically citing concerns about "accountability." Plaintiff also alleges that in 2018, the Police Department lost its accreditation from the Georgia Police Accreditation Coalition because of mismanagement of evidence and missing disciplinary records. Plaintiff further alleges that in response to a Grand Jury report that detailed extensive misconduct in the Glynn County Police Department, Glynn County Manager Alan Ours produced a report on November 8, 2019, finding that there was an "ongoing culture of cover-ups, failure to supervise, abuse of power, and lack of accountability" within the Police Department. The report found, *inter alia*, that there was a systemic failure to report complaints against police officers and that supervisors were unwilling to investigate, report, or discipline the misconduct of police officers. Plaintiff alleges that despite the audit and County report detailing the cronyism, outdated policies, lack of appropriate training, and lack of officer accountability, neither Ours nor the Glynn County Commissioners made any changes in policy or procedures.

In addition to the audit, County report, and loss of accreditation that put the County on notice of the need to train, supervise, and discipline officers, Plaintiff also sets out specific past incidents in which the Police Department was on notice of the police misconduct and yet failed to supervise and discipline its officers. Regarding Defendant Officer Rash in particular, Plaintiff alleges that the Police Department failed to discipline him in 2018 for attempting to cover up the violent conduct of a fellow officer who assaulted his wife in front of Rash and then later went on to kill his wife, her paramour, and himself. Plaintiff also alleges that Glynn County police officer Robert Sasser was repeatedly permitted to escape accountability for his actions. The Police Department failed to investigate Sasser's use of deadly force against a person in 2005, and participated in the cover-up of his and Officer Michael T. Simpson's killing of Caroline Small in 2010. Plaintiff additionally alleges that the Police Department engaged in a cover-up when one of its officers became involved in a sexual relationship with a confidential informant and began using and providing illegal narcotics to informants; this cover-up resulted in a criminal indictment of Police Chief Powell. These incidents illustrate a Department culture in which officers are not held accountable for either constitutional violations or other reckless and illegal conduct.

Plaintiff further alleges that the lack of supervision, discipline, and training in the Police Department allowed Defendant Rash to engage in reckless and dangerous conduct, including deputizing and encouraging armed citizens to engage in law enforcement activity, without fear that he would be investigated, reported, disciplined, or otherwise held accountable. Plaintiff's allegations therefore plausibly suggest that the Glynn County Police Department's failure to train, supervise, and discipline officers caused the deprivation of Arbery's constitutional rights.

Plaintiff's allegations are more than sufficient to "permit the reasonable inference that [the County] is liable for the misconduct alleged." *Hoefling v. City of Miami*, 811 F.3d 1271, 1281

(11th Cir. 2016) (quotation marks and citation omitted). Indeed, other district courts in the Eleventh Circuit have allowed plaintiffs' *Monell* claims to proceed past the motion to dismiss stage based on less detailed factual allegations than Plaintiff's. *See, e.g.*, *Glover v. City of Atlanta*, No. 1:20-cv-04302-SDG, 2021 WL 3055267, at *4 (N.D. Ga. July 20, 2021) (holding that substantive examples of officers using excessive force "show that the City of Atlanta was on notice of the need to train officers" and "sufficiently demonstrate that the City was, at the very least, deliberately indifferent to the need to train APD officers on the use of force"); *Tompkins-Holmes v. Gualtieri*, No. 8:17-cv-52-T-33AEP, 2017 WL 519307, at *7 (M.D. Fla. Feb. 8, 2017) (holding that plaintiff's allegations regarding the sheriff's "failure to train sufficiently state a claim" where plaintiff alleged previous "incidents of excessive force, supposedly caused by inadequate training on the use of force"); *Rogers v. City of Atlanta*, 214 F. Supp. 3d 1314, 1317-18 (N.D. Ga. 2016) (holding that plaintiff sufficiently stated a *Monell* claim against the City where plaintiff alleged that the officer's use of excessive force was the result of policies, customs, and practices of the City, including maintaining an ineffective system of police conduct review and failing to train and supervise officers); *Jackson v. City of Homewood*, No. 2:12-cv-4199-KOB, 2013 WL 2352430, at *2, 5 (N.D. Al. May 29, 2013) (finding allegations that the city failed to discipline or prosecute known incidents of misconduct and refused to investigate claims of misconduct were sufficient for the plaintiff's *Monell* claim to a motion to dismiss); *Murdock v. Cobb County, Georgia*, No. 1:12-CV-01743-RWS, 2013 WL 2155465, at *5 (N.D. Ga. May 17, 2013) (finding plaintiff's allegations "sufficient, at the motion to dismiss stage of the litigation, to establish an informal County policy or custom that is actionable under section 1983" where plaintiff alleged that no criminal charges were brought against the officer who had committed misconduct, that the officer

had been the subject of previous complaints, and that the Police Department failed to adequately supervise and train the officer).

The County argues that Plaintiff's claim must be dismissed because "none of the four incidents alleged by Plaintiff" are "substantially similar" to the misconduct alleged here. County Mot. at 28. However, this same argument has been rejected by multiple courts who have held that evidence of substantially similar incidents is not necessary at the pleading stage. *See, e.g.*, *Glover*, 2021 WL 3055267, at *4 ("Defendants assert that the examples are random occurrences, dissimilar to the conduct at issue, that do not show the City was on notice of a need to train its officers . . . but precedent doses not support narrowing the scope of similar conduct to the level of specificity Defendants suggest."). Rather, it is "at the summary judgment stage, after the plaintiffs ha[ve] the benefit of discovery to establish a pattern of similar incidents," that "the importance of similar incidents" becomes more essential. *Tompkins-Holmes*, 2017 WL 519307, at *7. Ultimately, the County seeks to impose an inappropriately heavy evidentiary burden on Plaintiff at this early stage of litigation. *See Rogers*, 214 F. Supp. 3d at 1317-18 (emphasizing that the defendants ought not "conflate the differing standards governing motions to dismiss and motions for summary judgment"). The cases the County cites in support of its argument all involve decisions at summary judgment, rather than the motion to dismiss stage. County Mot. at 24-25 (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *Denno v. Sch. Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1278 (11th Cir. 2000)).

The County also mistakenly argues that Plaintiff "must identify more than three or four previous violations" to establish a pattern of misconduct. County Mot. at 25. Again, the cases the County cites in support of this argument were decided at the summary judgment stage. *Id.* (citing *Denno*, 218 F.3d at 1277; *Clark v. Evans*, 840 F.2d 876, 885 (11th Cir. 1988)). More importantly,

even a "single incident"—"as opposed to [a] volume of violations"—can "plausibly establish…" a pattern where the incident "should have apprised the defendant of a need to train." *D.H. ex rel. Dawson v. Clayton Cnty. School Dist.*, 904 F. Supp. 2d 1301, 1307-08 (N.D. Ga. 2012) (finding two relevant court cases holding strip searches of students unconstitutional, including just one case related to the school district defendant, were sufficient to put school district on notice that they had to train employees on the legality of strip searches).  In addition, Plaintiff is unaware of any court in the Eleventh Circuit holding that a plaintiff must allege a specific number of previous instances of unconstitutional conduct in order to adequately plead a claim of municipal liability, and the County has not cited one.  *See, e.g.*, *Fundiller v. Cooper City*, 777 F.2d 1436, 1442-43 (11th Cir. 1985) (reversing the grant of a motion to dismiss a claim of municipal liability where plaintiff alleged that "the City adopted a custom of acting with gross indifference to the conduct engaged in by its police officers" by failing to "investigate the background of its police applicants before hiring them," and by failing "to adequately train its officers," without discussion of how many allegations of misconduct were in the complaint); *Rogers*, 214 F. Supp. 3d at 1318 (finding allegations that the municipality maintained an ineffective system of police conduct review, allowed officers to use unreasonable and deadly force without justification, and failed to train and supervise officers, without any specific references to prior instances, was sufficient for plaintiff's *Monell* claim to survive a motion to dismiss); *Tompkins-Holmes*, 2017 WL 519307, at *6 (finding allegation that there were "multiple reports" of similar police misconduct plausibly alleged a pattern of similar misconduct that could give rise to municipal liability).[13]

---

[13]  Even the cases the County cites do not stand for the proposition that a plaintiff must identify more than three or four previous violations to prove a widespread practice.  The determining factor in those cases was not the quantity or frequency of violations shown, but whether the defendant received adequate notice of a pattern of constitutional violations.  In *Clark v. Evans*, the court held that because the four purported constitutional violations occurred at such a low administrative level, the commissioner of the Georgia Department of Corrections could not have had either actual or constructive notice of the violations.  840

Instead, the focus of the Court's analysis at the motion to dismiss stage is whether plaintiff has adequately alleged that the defendant had notice of past constitutional violations, and chose not to take action. *See Glover*, 2021 WL 3055267, at *4 (holding that plaintiff adequately stated a *Monell* claim against the City of Atlanta where plaintiff's allegations were sufficient to "show that the City of Atlanta was on notice of the need to train officers on pursuing suspects fleeing in vehicles"); *Jackson*, 2013 WL 2352430, at *5 (denying the City's motion to dismiss plaintiff's *Monell* claim where plaintiff alleged "that the City knew about previous incidents of police officers using excessive force and permitted, encouraged, or even ratified such conduct"). Here, as described in detail above, Plaintiff has sufficiently alleged that the County had notice of an ongoing culture of cover-ups, failure to supervise, abuse of power, and lack of accountability in the Police Department, including specific previous incidents where police officers who engaged in misconduct were not disciplined, and failed to take any action to train, supervise, and discipline officers to prevent constitutional violations.

Accordingly, Plaintiff's *Monell* claim against Defendant Glynn County should not be dismissed.

## VI.     Plaintiff Has Properly Alleged a Section 1983 Access to Courts Claim (Count IX) Against Defendants Johnson and Barnhill.

The Eleventh Circuit has recognized that "[a]ccess to the courts is clearly a constitutional right, grounded in the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." *Chappell v. Rich*, 340 F.3d 1279, 1282 (11th

---

F.2d at 885 (violations were "handled at lower administrative levels and would not have come to the attention of [the defendant]"). In *Denno v. School Bd. of Volusia Cnty., Fla*., the three alleged constitutional violations in question took place *after* the incident spawning the lawsuit, and thus the court held that these violations could not have provided the Board with notice of a widespread practice. 218 F.3d at 1277-78.

Cir. 2003)." It has outlined the standard for denial of access to the courts claims in a civil rights action involving officials who conceal facts from the public, as follows:

> [D]efendants need not literally bar the courthouse door or attack plaintiffs' witnesses. This constitutional right is lost where, as here, police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress. A contrary interpretation of the right to due process would encourage police officials to conceal the circumstances relating to unlawful killings committed under color of state law and other deprivations of federal rights which Section 1983 was designed to remedy.

340 F.3d at 1283 (quoting *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984)).

Plaintiff has pled just that. She alleges that prosecutors "Jackie Johnson and George Barnhill intentionally concealed from the public and Plaintiff the true facts about Arbery's death and the deputization of the neighbors." The Complaint also describes several specific instances in which the Prosecuting Defendants concealed evidence from the public. It alleges that Defendant Johnson worked directly with law enforcement in the wake of the murder and "worked quickly" to orchestrate a cover-up before she was recused, based on her 20-year relationship with Gregory McMichael. She "handpicked" Defendant Barnhill to oversee the case, despite "knowing that he too had a personal connection to Defendant Gregory McMichael" and with an understanding between the two that Barnhill would "continue to not pursue charges despite the overwhelming evidence." *See* O.C.G.A. § 15-18-5 (requiring the district attorney to notify the Attorney General when s/he must be recused from a matter, and that it is the duty of the *Attorney General* to assign the substitute district attorney) (emphasis added). Defendant Barnhill then concealed the truth by making false statements to the press regarding Arbery—none of which "would have been discovered but for video footage leaked to the media, which showed the horrific and brutal murder of [Arbery.]" The release of this video—which Prosecuting Defendants had concealed and which proved that Prosecuting Defendants had instructed the police to also conceal true facts in their

investigation—is what led to Defendants Gregory McMichael, Travis McMichael, and William Bryan's arrests. Only then did Plaintiff become aware of even the present claims.

The Prosecuting Defendants do not contest that the Complaint alleges specific facts supporting an orchestrated cover-up, by directing law enforcement actions and concealing information. Instead, Prosecuting Defendants argue that information they have concealed is not frustrating or impeding Plaintiff's ability to prepare or file claims in this suit. They premise their arguments almost exclusively on cases in which uncounseled prisoners filed access to courts claims, and the relationship between their access to courts claim and their past or pending litigation was unclear. Johnson Mot. at 7-8 (citing only denial of access to the court claims in the prisoner context); Barnhill Mot. at 13-15 (citing Supreme Court and out-of-circuit cases pertaining to detainment and prisoners' rights). That context bears little resemblance to this case. Rather, the Eleventh Circuit's analysis in *Chappell v. Rich* itself is instructive. There, plaintiffs brought a civil rights action after their mother was killed by four white men in a racially-motivated drive-by shooting. 340 F.3d 1279, 1281 (11th Cir. 2003). Although the Plaintiffs "knew the identity of" the four men and could have sued them for wrongful death, the Plaintiffs brought an access to courts claim decades later, claiming that their wrongful death claim would have been prejudiced by the Sheriff's Office's interference and failure to investigate. *Id*. at 1281-82. The Eleventh Circuit recognized that "the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under 42 U.S.C. §§ 1983 and 1985." *Id*. at 1283. The critical problem, however, was that the plaintiffs knew the relevant facts needed to assert their wrongful death action against the private individuals they wanted to sue—including what had happened and "who the alleged perpetrators were"—and essentially sought evidence that "might have strengthened their case." *Id*. at 1283-84.

Plaintiff's access to courts claim is not about "strengthening" existing claims against private individuals. Here, there are specific facts and conspiracies alleged against the Prosecuting Defendants themselves, who intentionally concealed the information, and numerous other state actors, including several whose identities to this day are unknown. *See* Compl. ¶ 11 (alleging claims against unknown defendants). The Complaint alleges that the Prosecuting Defendants worked directly with, and gave directions to, law enforcement as they worked quickly to cover-up what occurred. Indeed, the recent public record indicting one of the Prosecuting Defendants already makes clear specific facts about their conduct, unknown to Plaintiff at the start of this case, that have impeded Plaintiff's claims.[14] This includes facts that Defendant Johnson "knowingly and willfully hinder[ed] Stephanie Oliver and Stephan Lowrey, law enforcement officers with Glynn County Police Department," two officers not included in the Complaint, appearing to support additional unlawful action and conspiracy by Defendant Johnson. Moreover, supporting a count of "Violation Of Oath Of Public Office," the indictment reveals an additional conspiracy between Defendant Johnson and Gregory McMichael, based on facts of her "showing favor and affection to Greg McMichael." Indictment at 1. Like in *Chappell*, Prosecuting Defendants' orchestrated cover up has shielded "from the public and the victim's family key facts *which would form the basis of* the family's claims for redress." *Chappell*, 340 F.3d at 1283. Contrary to the Prosecuting Defendants' argument, this is very much a claim concerning "roadblocks" to bringing unknown claims against the Private Defendants or additional, unknown state actors who the Prosecuting Defendants have protected in their cover up. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see also Chappell*, 340 F.3d at 1283; *Bell v. Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), *overturned on other grounds*, (finding denial of access to the courts claim viable where family's

---

[14] Superior Court of Glynn County Indictment # CR-2100168 is a public record which can be viewed on the Georgia Office of the Attorney General website.

attempt to seek redress for decedent's wrongful death was thwarted by the false police representation that the killing was in self-defense); *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) (finding denial of access to the courts claim viable where parents did not know that a crime had been committed because the police had concealed their daughter's murder as a suicide).

## VII. Plaintiff Has Properly Alleged Conspiracy to Obstruct Justice Under Section 1985(2) (Count X) Against Defendants Johnson and Barnhill.

Section 1985(2) states that an obstruction of justice occurs where "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2).[15]

Prosecuting Defendants argue that Plaintiff fails to adequately allege an agreement, overt acts by Defendant Johnson, injury, and race-based animus. *See* Johnson Mot. at 8-10; Barnhill Mot. at 16-18. They further argue that the intracorporate conspiracy doctrine bars the claim because Prosecuting Defendants both purportedly worked under Brunswick County. *See* Johnson Mot. at 10-12, Barnhill Mot. at 18-19. Each of their arguments fail.

### A. Plaintiff Adequately Alleged An Agreement, Injury, and Race-Based Animus.

Plaintiff adequately alleged an agreement between Prosecuting Defendants. Plaintiff alleged that Defendant Johnson "worked quickly to orchestrate a cover up" and "handpicked Defendant Ware County District Attorney George Barnhill to take over the investigation … with the understanding that he would continue to not pursue charges despite the overwhelming

---

[15] Defendant Johnson misunderstands this claim. Although she acknowledged that Count X pled a claim for conspiracy to obstruct justice under Section 1985(2), she incorrectly believes that provision to only cover conspiracies to intimate a party, witness, or juror from attending or testifying in federal court. Johnson MTD at 8. That may be true for a claim under Clause 1 of Section 1985(2), but Plaintiff pled a claim under Clause 2, which contains no such restrictions.

evidence." In support of these allegations, Plaintiff recounted how the Georgia Attorney General's office "was made aware" that Defendant Johnson had *already* contacted Defendant Barnhill and that he had "agreed to accept the case" when it received Defendant Johnson's recusal notice. Moreover, Plaintiff noted that Defendant Barnhill advised Glynn County police that Arbery's murder was "justifiable homicide," *before* his assignment as acting prosecutor, but *after* his conversation with Defendant Johnson. A few days after, Barnhill made false statements about Arbery to the press. These allegations are more than sufficient to establish an agreement between the parties at this stage of litigation.

As to injury, Plaintiff was prejudiced in her current litigation and impeded in pursuing further claims as set forth in greater detail above. *See supra* Part VI. As the Complaint puts it: Prosecuting Defendants' orchestrated cover up has shielded "from the public and the victim's family key facts which would form the basis of the family's claims for redress." Compl. ¶¶ 269, 273; *see also* Indictment; *Chappell*, 340 F.3d at 1283.

Finally, Plaintiff also alleges that Prosecuting Defendants acted with racial animus. The allegations make clear that the Prosecuting Defendants conspired with notorious racists, Defendants McMichaels and Bryan, and then ratified their conduct. *See* Compl. ¶¶ 45-48, 51-52 (noting Travis McMichael and Bryan's open and extensive history of racism); Compl. ¶¶ 80, 107 (alleging that neither McMichael observed Arbery engage in criminal conduct, but Gregory McMichael had a "gut feeling" that Arbery was responsible for previous thefts); Compl. ¶¶ 34-36 (Defendant Johnson exempting Gregory McMichael from state mandated training ); Indictment at 1 (providing that Defendant Johnson showed "favor and affection to Greg McMichael," who was notoriously known for his racism). Allegations showing that the Prosecuting Defendants conspired to cover up a racially-motivated killing is far from "a formulaic recitation of the

element[.]" Barnhill Mot. at 17; *see also Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017)

("an allegation of class-based animus is an essential requirement of a claim under the second clause

of § 1985(2)") (quoting *Bretz v. Kelman*, 773 F.2d 1026, 1029 (9th Cir. 1985)). What is more, it is

plausible to infer that the Prosecuting Defendants' decision to cover up the murder of a Black man

by a group of known racist white men was itself racially motivated.

## B. The Intracorporate Conspiracy Doctrine Does Not Bar Plaintiff's § 1985(2) Claim.

Prosecuting Defendants are incorrect in arguing that the intracorporate conspiracy doctrine

applies at all to Plaintiff's § 1985(2) claim. As detailed in Part I(C), *supra*, this conspiracy to

obstruct justice is premised on the same facts as the indicted obstruction charge against Defendant

Johnson. *See* Indictment. The Eleventh Circuit has conspicuously provided that "just as the

intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the

federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal

wrongdoing, from civil liability arising under 42 U.S.C. § 1985(2)." *McAndrew v. Lockheed

Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000).

In any case, this is no intracorporate conspiracy at all. Contrary to Prosecuting Defendants'

claim that they both worked for Brunswick County, *see* Johnson Mot. at 10-11; Barnhill Mot. at

18, they were in fact employed by different counties, which the law considers different entities.

That is, even after the temporary appointment to Brunswick County, Defendant Barnhill remained

employed by Ware County. The Order granted Defendant Barnhill permission to "service"

Brunswick County as acting prosecutor for the Arbery matter, but, importantly, it continues to list

Barnhill as the prosecuting attorney of "Waycross Judicial Circuit." *See* Barnhill Mot. at 19, Exh.

A ("That under the authority contained in O.C.G.A. 15-18-5, George Barnhill, District Attorney,

Waycross Judicial Circuit"). The Order further provides that Defendant Barnhill "shall receive no

additional compensation for such services except that actual expenses incurred shall be reimbursed by Glynn County[.]"  So, far from being an agent employed under Brunswick County, Defendant Barnhill was, and is, employed by Ware County while Defendant Johnson was employed by Brunswick County.  Put simply, the intracorporate conspiracy doctrine does not apply because separate government entities employed Prosecuting Defendants.  *Steffens v. Nocco*, Case No. 8:19-cv-01940-KKM-AAS, 2021 U.S. Dist. LEXIS 50013, at *9 (M.D. Fla. Mar. 17, 2021) (holding that the intracorporate conspiracy doctrine applied because the allegations included "members only within the Pasco County Sherriff's Office, their actions are attributed to a single entity and therefore fall within the intracorporate conspiracy doctrine").

And even if Defendant Barnhill's temporary appointment to Brunswick County for Arbery's case did change his employment status for purposes of this doctrine, that change in Barnhill's role did not take place until days after Prosecuting Defendants agreed to conspire. Johnson Mot. at 11, Exh. 1; Barnhill Mot. at 19, Exh. A.  The Complaint alleges that upon deciding to recuse herself, Defendant Johnson had a conversation with Defendant Barnhill.  It then goes on to say that *before he was officially assigned to the case*, Defendant Barnhill "met with Glynn County detectives to tell them he had concluded that 'the act was justifiable homicide.'"  The facts clearly plead that Defendant Barnhill was assigned to prosecute the case in Brunswick County only *after* he had agreed to act in concert with Defendant Johnson to cover up the murder.

As a final matter, Defendant Barnhill's Brunswick County assignment was made *for the purpose of* Defendant Johnson assigning him the case.  Barnhill Mot. at 19 ("In other words, as of the AG letter, Mr. Barnhill became the district attorney for the Brunswick Judicial Circuit *for the purpose of the* Arbery prosecution") (emphasis added).  Prosecuting Defendants cannot conspire to have Barnhill oversee the case in Brunswick County then attempt to hide behind the

intracorporate conspiracy doctrine. Doing so would permit Prosecuting Defendants to shield themselves from liability through their own malfeasance.

### C. Prosecutorial Immunity Does Not Bar Plaintiff's Claims Against Defendants Johnson and Barnhill.

Contrary to the Prosecuting Defendants' argument, prosecutorial immunity does not apply here, where Prosecuting Defendants' actions were not limited to prosecutorial duties intimately associated with the judicial process. *See* Johnson Mot. at 3-6, Barnhill Mot. at 6-13; *Hart v. Hodges*, 587 F.3d 1288, 1296 (11th Cir. Ga. 2009) ("[p]rosecutorial immunity does not apply when the prosecutor acts outside the ambit of activities 'intimately associated' with the judicial process."); *see also id.* at 1298 ("the determination of absolute prosecutorial immunity depends on the nature of the function performed"). Indeed, absolute immunity is inapplicable where "a prosecutor is not acting as an officer of the court but is instead engaged in certain investigative or administrative tasks." *Id.* (citing *Van de Kamp*, 129 S. Ct. at 861). These activities include: "conducting investigative work before an arrest," "making statements to the press," and "providing legal advice to police regarding pre-indictment investigation techniques." *Id.* at 1296 (citations omitted). Furthermore, "[t]he Supreme Court's decision in *Buckley v. Fitzsimmons* categorically forecloses absolute prosecutorial immunity for statements to the media." *Id.* at 1297 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993)).

Prosecuting Defendants argue that their actions in "the initiation of a criminal prosecution, decisions about the criminal prosecution, [Barnhill's] appointment to act as prosecutor, and [their] recusal[s]" were "quintessential prosecutorial function[s]" that enjoy absolute immunity. *See* Barnhill Mot. at 7; Johnson Mot. at 5-6. However, Prosecuting Defendants conveniently omit the functions they performed that were outside of their prosecutorial roles.

Here, the Complaint specifically alleges that Defendant Johnson's conduct went well beyond prosecutorial functions and involved direct interference with the *investigation* of the murder and potential suspects. This includes directly instructing law enforcement not to arrest Defendant Gregory McMichael. Moreover, separate and apart from her own prosecutorial decisions, she instructed *the police* not to pursue charges against the Private Defendants. The Complaint also alleges that Defendant Johnson made efforts to cover-up what had happened, in order to protect Defendant Gregory McMichael—conduct which is purely obstructive to investigation and bears no relation to prosecutorial responsibilities. The recent public-record indictment further describes Defendant Johnson's interference with the investigation, including that she "did knowingly and willfully hinder" law enforcement officers from their investigation, including "directing that Defendant Travis McMichael should not be placed under arrest." Indictment at 2. Indeed, far from describing her conduct as with the responsibilities of a prosecutor, the indictment states her conduct was sufficient to warrant charges for *violation of her oath of office as a prosecutor.* Indictment at 1. Moreover, Defendant Johnson informed Defendant Barnhill of her pre-arrest investigation days prior to recusing herself. Indeed, immediately following his conversation with Defendant Johnson, *and before he was even appointed interim prosecutor*, Defendant Barnhill "met with Glynn County detectives to tell them he had concluded that 'the act was justifiable homicide.'" Finally, and in furtherance of Prosecuting Defendants' conspiracy to conceal the racially-motivated murder, Defendant Barnhill "spoke to the press on February 28, 2020, and falsely conveyed that the investigation centered on the burglary of a home" and a toxicology report.

It follows that Prosecuting Defendants do not enjoy absolute immunity because they both performed investigative functions before the arrests and provided legal advice to police regarding

their investigation, Defendant Johnson performed administrative tasks prior to engaging Defendant Barnhill in aid of the conspiracy, and Defendant Barnhill made false statements to the press. Additionally, the Georgia Supreme Court has held that actors in a conspiracy are liable for the actions of their co-conspirators whether those actions occurred before or after joining the conspiracy. *Savannah College of Art & Design v. Sch. of Visual Arts*, 464 S.E.2d 895, 896-97 (Ga. App. 1995) (citing *Peoples Loan Co.*, 34 S.E.2d 811, 824 (Ga. 1945) ("While it is alleged that the original conspiracy was formed in August, 1943, and Peoples Loan Company is not shown to have been incorporated until May 18, 1944, its entrance into the conspiracy after its inception would equally bind it as to any wrongful act done by any one of the conspirators in pursuance of the general design. . . .")). "The rationale is that the latecomer shares in the intended fruit of the conspiracy, the purpose of it." *Id.*

In this instance, Defendant Barnhill agreed to act in concert with Defendant Johnson, which consisted of covering for Private Defendants. Thus, upon taking the torch from Defendant Johnson, Defendant Barnhill made public comments about Arbery to disparage his character and divert attention away from Private Defendants. This all came after and in furtherance of the conversation Defendant Barnhill had with Defendant Johnson. Therefore, Defendant Johnson is as liable as Defendant Barnhill for his statements to the press, which were made in part to her direction. *Savannah College*, 464 S.E.2d at 896-97 (citing *Peoples Loan*, 34 S.E.2d at 824).

It follows that no ambiguity exists as to whether prosecutorial immunity bars the claims against Prosecuting Defendants: it simply does not. As such, and similar to what the Eleventh Circuit has previously held: the tragic death of Mr. Arbery "and the inexcusable conduct of the Defendants, as alleged, are sad reminders of the damage done to the integrity of our justice system and to our society by racial hatred and strife." *Chappell*, 340 F.3d at 1284. Prosecuting Defendants

do not enjoy the benefit of absolute immunity, and accordingly their motions to dismiss should be denied.

**VIII.  Plaintiff Has Properly Alleged a Wrongful Death/Survival Action (Count XI) Against Defendants Robert Rash, and John Doe Police Officials**

Defendant Rash seeks dismissal of Count XI of Plaintiff's Complaint (herein referred to simply as a wrongful death claim), contending that: (1) Rash did not owe a duty to Arbery and (2) Rash is entitled to official immunity.  Rash Mot. at 28-31.  Defendant Rash's arguments are unavailing.

**A.  Defendant Rash Breached a Duty Owed to Arbery**

As with other tort actions, wrongful death requires four elements: a duty, a breach of that duty, causation and damages.  *See Central of Ga. Ry. v. Sharpe*, 62 S.E.2d 427, 431 (Ga. Ct. App. 1950) (stating that the "real question" in a wrongful death case "is whether, under the facts as alleged . . . there was any duty of care owing the deceased by the defendant that was violated, and whether the violation of such duty was the proximate cause of the death of the deceased.") (citing *Vickers v. Ga. Power Co.*, 54 S.E.2d 152, 155 (Ga. Ct. App. 1949)); *see also Campeau v. United States*, 2015 U.S. Dist. LEXIS 36046, at *30-31 (N.D. Ga. Mar. 23, 2015) (stating that a wrongful death claim differs from a personal injury claim only in "the measure of damages, and the party with standing to bring an action to recover them.") (citing *Mixon v. United States*, 58 F.Supp.3d 1355 (M.D. Ga. 2014)).  Defendant Rash contends that he did not breach a duty owed to Arbery.  Rash Mot. at 28-29.  He is wrong.

While police authorities generally cannot be liable for failing to protect a particular member of the public at large, as a person does not typically have a duty to prevent a tortfeasor from harming a third person, Georgia law recognizes two critical exceptions based on well-established

tort principles. A person has a duty to control another's conduct and prevent that person inflicting harm where: "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the tortfeasor's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." *Associated Health Systems v. Jones*, 366 S.E.2d 147, 151 (Ga. Ct. App. 1988) (quoting Restatement (2d) of Torts, § 315 (1965)). These exceptions apply to Rash's actions here.

By authorizing and encouraging the Private Defendants to act as law enforcement, Defendant Rash created a "special relationship" between himself and the Private Defendants. Simply put, Defendant Rash empowered the group of armed neighbors who ultimately killed Arbery to handle the policing of English's property in response to reports of trespassing and remained actively involved in working with them. *See supra*, Part IV. This constitutes a "special relation," distinct from Rash's interactions with other members of the public, under Georgia law. *Associated Health Systems*, 366 S.E.2d at 151 (citation omitted).

Moreover, because the nature of the relationship here was that Defendant Rash empowered unqualified civilians to act as armed vigilantes in place of police officers, Rash naturally and foreseeably owed a duty to those who might suffer at the hands of the individuals he empowered, due to excessive force, false arrest, or any other hazard that one would reasonably expect when untrained individuals act as police. Indeed, the situation can be concisely summarized by the black-letter tort principle that one who creates a dangerous situation owes a duty to those who foreseeably interact with it, such that it is fair to hold the creator accountable for the harmful results. *See*, *e.g.*, *Gilbert Corp. v. Yetman*, 464 S.E.2d 822, 823 (Ga. Ct. App. 1995) (holding contractors liable for a driver's death because their actions created the dangerous road condition that caused his fatal accident). In empowering the Private Defendants, Defendant Rash created an

extremely dangerous situation, leading directly to Arbery's murder. It is well within the bounds of tort law to hold Rash accountable.

Rash contends, citing *Dep't of Labor v. McConnell*, 828 S.E.2d 352, 358 (Ga. 2019), that there is no "general legal duty 'to all the world'" and that "[a] police officer, like Rash, does not owe a generalized duty to the public to prevent private violence." Rash Mot. at 19. This is not responsive to Plaintiff's claim, and therefore presents no basis to dismiss it, because Plaintiff alleges a specific duty rather than a generalized one. As set forth *supra*, neither Arbery nor the individuals who killed him were generic third parties relative to Defendant Rash: on the contrary, Rash deliberately created a hazard, and a special relationship for tort purposes, by authorizing and encouraging the Private Defendants to act as law enforcement.

### B.    Defendant Rash is Not Entitled to Official Immunity

Defendant Rash next argues Plaintiff's wrongful death claim should be dismissed because he is entitled to official immunity. Defendant Rash is incorrect. Official immunity does not apply and officers remain liable "for [1] ministerial acts negligently performed or [2] for ministerial or discretionary acts performed with malice or an intent to injure." *Woodard v. Laurens Cty.*, 456 S.E.2d 581, 583 (Ga. 1995) (quoting *Gilbert v. Richardson*, 452 S.E.2d 476, 483 (Ga. 1994)). Both exceptions apply in this case, and thus official immunity does not bar Plaintiff's wrongful death claim against Defendant Rash.

First, Defendant Rash's liability for Arbery's wrongful death does not arise from his performance of discretionary functions, as he characterizes the claim, but from his violation of clear ministerial duties by authorizing and empowering the Private Defendants to act as law enforcement. The touchstone of ministerial functions, as contrasted with discretionary acts, is that ministerial functions are "simple, absolute and definite" and generally require adherence to

specific laws, rules, or policies that must be followed. *McDowell v. Smith*, 678 S.E.2d 922, 924 (Ga. 2009) (concluding that a teacher's actions "mandated by school policy" are ministerial in nature); *Clark v. Prison Health Servs.*, 572 S.E.2d 342, 347 (Ga. Ct. App. 2002) (reversing trial court's grant of summary judgment because defendant's actions "were governed by clear, definite, and certain procedures or instructions[,]" and were therefore ministerial and not subject to official immunity). "The determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." *McDowell*, 678 S.E.2d at 925 (quoting *Reece v. Turner*, 643 S.E.2d 814, 817 (Ga. Ct. App. 2007)). Here, the specific actions complained of giving rise to Plaintiff's claim are Defendant Rash's conduct in outsourcing the powers and responsibilities of law enforcement to the Private Defendants—not, as Rash would have it, generically "facilitating communication between neighbors in response to reported crimes and responding to the scene of a reported crime." Rash Mot. at 30. The defendant's framing of what conduct is at issue to be labeled as ministerial or discretionary does not govern. *See Clark*, 572 S.E.2d at 347 (correcting trial court's determination that certain of defendant's actions were discretionary, because those were not the actions that plaintiff contended were negligent).

Defendant Rash violated ministerial duties by purporting to deputize the Private Defendants. As a threshold matter, Plaintiff is not aware of any contemporary, on-point legal authority permitting a county police officer in Defendant Rash's position to validly deputize private citizens in any circumstance. Moreover, Georgia law is abundantly clear that law enforcement officers are required, by statute, to meet specific requirements and qualifications in order to exercise the powers that their job requires. *See, e.g.*, O.C.G.A. §§ 35-8-8; 35-8-21; 36-8-1. The conditions Georgia requires for individuals to assume the duties and powers of law

56

enforcement further reinforce that a police officer may not assign those duties and powers to unqualified civilians on an ad hoc basis. To be sure, there is no suggestion that Rash attempted to comply with any such formalities or conditions in making McMichael and the other Individual Defendants responsible for policing English's property.

Consequently, in outsourcing the responsibilities of policing to the Private Defendants, Defendant Rash violated clear Georgia law—a prohibition "so clear, definite and certain" as to be entirely outside the scope of professional discretion. A black-and-white, straightforward principle that unqualified civilians may not be deputized at will by a police officer, which applied here, is precisely the sort of clear directive that supports a ministerial duty under Georgia law, albeit a clear requirement *not* to do something rather than an affirmative duty to perform an act. *Cf. Nelson v. Spalding Cty.*, 290 S.E.2d 915 (Ga. 1982) (county prison warden had a ministerial duty to repair and replace stop signs that were missing or in disrepair using inmate labor); *Lincoln Cty. v. Edmond*, 501 S.E.2d 38 (Ga. Ct. App. 1998) (road superintendent had a ministerial duty to remove a tree blocking a road); *Joyce v. Van Arsdale*, 395 S.E.2d 275 (Ga. Ct. App. 1990) (road superintendent had a ministerial duty to erect a road barricade where he was acting on the direction of the county commission). In sum, Rash violated a ministerial duty by purporting to deputize the Private Defendants. As he did so at least negligently, official immunity does not shield him from the injuries to Arbery and Plaintiff that resulted from his improper deputization.

Defendant Rash attempts to frame the matter as Plaintiff challenging his discretionary actions: namely, responding to crime reports and otherwise investigating crime, which call for a police officer's "personal deliberation and judgment[.]" *Murphy v. Bajjani*, 647 S.E.2d 54, 57 (Ga. 2007). Seeking to downplay the recklessness and unprofessionalism of his actions, Rash submits that all he did was "facilitate[e] communication between neighbors in response to reported

crimes and respond[] to the scene of a reported crime," purportedly classic investigative—and thus, discretionary—functions. Rash Mot. at 30. But again, Plaintiff's claim does not rest on Rash exercising professional judgment within the bounds of discretion that police enjoy. It rests on Rash acting completely outside law and policy by assigning life-and-death police power to a posse of unqualified civilians.

Second, official immunity does not shield Defendant Rash because his actions were so extremely reckless and indifferent to the risk to human life as to preclude the application of immunity even if he was performing a discretionary function. Georgia law has long held that "willful or wanton" conduct falls outside the scope of state actors' immunity. *Truelove v. Wilson*, 285 S.E.2d 556, 559 (Ga. Ct. App. 1981) (citing *Hennessy v. Webb*, 264 S.E.2d 878 (Ga. 1980); *Holloway v. Dougherty Cty. Sch. Sys.*, 277 S.E.2d 251 (Ga. Ct. App. 1981)); *see also Heller v. City of Atlanta*, 659 S.E.2d 617, 620 (Ga. Ct. App. 2008) (stating that a public official "is immune from damages caused by his discretionary acts unless such acts are wilful, wanton, or outside the scope of his authority."). This arises from the principle that even where malicious intent in the typical sense may not be present, some conduct is "so reckless or so charged with indifference to the consequences . . . as to justify the jury in finding a wantonness equivalent in spirit to actual intent." *Truelove*, 285 S.E.2d at 559 (quoting *Hawes v. Central of G. R. Co.*, 162 S.E.2d 14, 15 (Ga. Ct. App. 1968)).[16]

As discussed more fully above with regard to Count XIII, Plaintiff's standalone claim for willful and wanton misconduct, Rash acted willfully and wantonly in outsourcing the

---

[16] It is true that some authority postdating the 1991 amendment to Art. I, Sec. II, Par. IX of the Georgia Constitution which codifies official immunity therein has found that actual malice is required to pierce official immunity, such that "implied malice" will not suffice. However, *Truelove* has not been overruled nor disapproved, and remains good law; and the Georgia Court of Appeals has continued to affirm that willful and wanton actions are not subject to official immunity, even if discretionary in nature, well after the 1991 amendments. *See Heller*, 659 S.E.2d at 620.

responsibilities of law enforcement to the Private Defendants, because of the deliberate indifference to danger inherent in doing so. Police, by the nature of their duties, are empowered to use lethal force if necessary, and must be prepared to face life-and-death situations themselves. *See Fussell v. Ga. Ports Auth.*, 906 F.Supp. 1561, 1574 (S.D. Ga. 1995); *Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1100 (11th Cir. 2018). In order to be qualified to bear the power to take life, and to exercise all their duties—including the duty to use lethal force where lawful and proper to do so—police are required to act with sound judgment and responsibility, and are expected to undergo extensive training to teach them to do so. *Jordan v. City of Union City*, 94 F.Supp.3d 1328, 1339 (N.D. Ga. 2015).

Rash placed this awesome responsibility in the hands of armed, unqualified, untrained individuals. He continued to allow them free rein to act as police officers even after responding to English's February 11 report, and thereby seeing the Private Defendants react to the situation, which should have reminded a reasonable person of how dangerous it is to permit unqualified civilians to exercise the powers of police. The potentially lethal consequences of his outsourcing were eminently foreseeable, and the fact that this quasi-deputization led directly to Arbery's murder proves the severity of the risk, yet Defendant Rash disregarded those obvious dangers. In doing so, he acted with extremely reckless disregard for safety and human life "as to justify the jury in finding a wantonness equivalent in spirit to actual intent." *Truelove*, 285 S.E.2d at 559 (quoting *Hawes*, 162 S.E.2d at 15). Official immunity does not protect conduct that is done willfully and wantonly to the point of being done maliciously, and therefore official immunity does not bar Plaintiff's wrongful death claim against Rash.

Accordingly, Count XI should not be dismissed.

## IX. Count XIII Adequately Pleads Willful and Wanton Misconduct as to Rash, and Official Immunity Does Not Shield Rash

Plaintiff's Count XIII alleges "willful and wanton misconduct" against the defendants who stalked and shot Arbery, as well as Officer Rash and Glynn County, on the grounds that law enforcement "encouraged and ratified" the conduct of Arbery's murderers through conduct that was both "reckless" and "consciously indifferent" to the value of Arbery's life. Rash has moved to dismiss, arguing that Count XIII is invalid generally, fails to adequately plead a claim, or is barred by immunity. Each argument is meritless, and Rash's motion should be denied as to Count XIII.

### A. Georgia Law Recognizes a Cause of Action for Willful and Wanton Misconduct

As a threshold matter, both Rash and Glynn County seek dismissal of Count XIII on the mistaken premise that no such claim exists under Georgia law. This is false. Georgia courts have recognized "willful and wanton misconduct," describing it as "conduct such as to evidence a wilful intention to inflict the injury, or else was so reckless or so charged with indifference to the consequences . . . as to justify the jury in finding a wantonness equivalent in spirit to actual intent." *McClelland v. Riffle*, 970 F. Supp. 1053, 1055 (S.D. Ga. 1997) (quoting *Martin v. Gaither*, 466 S.E.2d 621, 625 (Ga. Ct. App. 1995)). Moreover, in at least one recent case, a Georgia court confronted a freestanding cause of action for willful and wanton misconduct—as distinct from an allegation that other tortious conduct was done with willful and wanton intent—and sustained it against a motion to dismiss. *Muqbill v. Nationstar Mortg.*, *LLC*, 2014 U.S. Dist. LEXIS 191357, at *17 (N.D. Ga. Nov. 25, 2014); *see also id.* at *1 ("Plaintiff's First Amended Complaint [9] asserts the following claims against defendant . . . (d) willful and wanton misconduct.").

In short, Rash and Glynn County's initial argument that Count XIII is not recognized by Georgia law is simply incorrect. And beyond this threshold point, Rash's particular theories as to why Plaintiff's claim must be dismissed as a matter of law are equally invalid.

**B. Plaintiff Has Validly Pled Willful and Wanton Misconduct as to Rash**

Rash also argues that Count XIII must be dismissed as against him for two reasons: (1) his conduct as pled in the Complaint does not rise to the level of willful and wanton misconduct, and (2) he is entitled to official immunity. Rash Mot. at 31-32. Both theories fail for the same reason: the Complaint does, in fact, allege willful and wanton misconduct by Rash, which pierces his official immunity under Georgia law.

The Complaint alleges that Rash personally made and implemented the decision to outsource policing of Larry English's reports of suspicious activity to Travis McMichael, Gregory McMichael, Diego Perez, and William Bryan, resulting in three of these men murdering Arbery. Rash received multiple reports of potential criminal activity from English, including at least one that he personally responded to and one that English texted to him specifically. Eventually, Rash instructed English to contact Gregory McMichael "day or night" to respond to any incidents at English's property, on the explicit grounds that McMichael was a former law enforcement officer. Rash knew that McMichael was retired. Indeed, McMichael had not been a Glynn County police officer since 1989, and as an investigator he had failed basic training requirements so consistently that he lost arrest powers in 2006—which he only discovered in 2014.

Moreover, on February 11, 2020, Rash personally witnessed how McMichael and his cohorts treated the responsibility he conferred on them. After receiving a report from English, both McMichaels, Perez, and possibly Bryan armed themselves and pursued the individual (unknown to them) who they believed to be trespassing on the Construction Lot—because they believed they had full authority from the Glynn County Police Department to do so. Rash was

among the officers who responded to this incident, who worked in direct conjunction with the McMichaels, Perez, and Bryan; and thereafter, English texted Rash footage from his security camera, indicating Rash's continued personal involvement.

These allegations sufficiently plead willful and wanton misconduct by Rash. The Complaint sets forth that Rash ceded the role of law enforcement, with its accompanying life-or-death stakes, to unprepared civilians with complete disregard for the consequences and weight of that decision. Rash continued in that course even after witnessing firsthand the overzealous and life-threatening armed vigilantism of the individuals he unleashed. His actions as pled in the Complaint are "so reckless or so charged with indifference to the consequences" as to constitute willful and wanton misconduct under Georgia law. *McClelland*, 970 F. Supp. at 1055.

Courts in this Circuit agree that policing inherently involves responding to and managing "life-and-death situations." *Fussell v. Ga. Ports Auth.*, 906 F. Supp. 1561, 1574 (S.D. Ga. 1995); *Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1100 (11th Cir. 2018) (stating that police officers "will" face "life-and-death stakes" as part of their occupation). Courts nationwide have echoed this consensus, and have spoken of the "awesome responsibility" borne by police officers. *McCraven v. Chicago*, 109 F.Supp.2d 935, 945 (N.D. Ill. 2000); *see also Milan v. City of Evansville*, 2015 U.S. Dist. LEXIS 750, at *22 (S.D. Ind. Jan. 6, 2015) ("Police officers face unknown dangers every day, and they are often forced to make life or death decisions in an instant."). Corresponding to this power and responsibility, police officers are expected to exercise sound judgment and react calmly even in highly stressful situations. *See Jordan v. City of Union City*, 94 F.Supp.3d 1328, 1339 (N.D. Ga. 2015) (adopting report and recommendation's statement that "it is essential for [police] officers to be able to exercise sound independent judgment in

emergency or stressful situations and react quickly and calmly in emergencies.") (Internal punctuation omitted).

These principles demonstrate the extreme danger Rash ignored in letting an unqualified civilian respond (with arms) to law enforcement calls, and therefore, Rash's recklessness. Rash outsourced the job of policing to Gregory McMichael, Travis McMichael, and William Bryan knowing that they were wholly unqualified, incapable, and dangerous. While Gregory McMichael had relationships with Glynn County law enforcement, Rash knew that he was retired; had not been a police officer for decades; fell far short of the rigorous training, restraint, and superior judgment expected of police officers, and who was therefore utterly unprepared for the life-or-death responsibility Rash assigned to him. Indeed, nothing demonstrates the gravity of Rash's cession of responsibility more clearly than what actually happened: the tragic consequence of Arbery's murder. Moreover, Rash "encouraged and ratified" the behavior that directly caused Arbery's killing by maintaining the McMichaels' and Bryan's deputization even after seeing this "posse" at work on February 11, 2020.

In short, bypassing responsibility to responding to English's security alerts to the neighborhood men, Rash vested life-or-death responsibility in people completely unqualified to exercise it properly. He thus consciously disregarded, or intentionally accepted, an extreme risk that the men would endanger the life or limb of others—a risk that was realized within weeks. This, as pled in the Complaint, is precisely how Georgia law defines willful and wanton misconduct. *See McClelland*, 970 F. Supp. at 1055 (citing *Gaither*, 466 S.E.2d at 625). Rash cites no authority to the contrary. Instead, he downplays the significance of his actions, and insists that his supposedly minor and indirect involvement, without allegations of specific malice toward Arbery, cannot constitute willful and wanton misconduct. Rash Mot. at 32. This conclusory

position is contradicted by the facts alleged, which show Rash was pivotal to the events that led to Arbery's killing; and by Georgia law, which is clear that severe recklessness or indifference to risk establishes willful and wanton misconduct without need for direct malice. As such, Plaintiff has stated a valid claim and Rash's motion should be denied as to Count XIII.

### C. Rash's Immunity Argument Fails Because Officials Are Not Immunized for Willful and Wanton Misconduct

The same conclusion also disposes of Rash's official immunity argument. As Rash concedes, Georgia law recognizes that "an officer has no immunity to the extent [he] acted with malice or an intent to injure." Rash Mot. at 29 (quoting *Eshleman v. Key*, 774 S.E.2d 96, 98 (Ga. 2015), *overruled in part on other grounds by Rivera v. Washington*, 784 S.E.2d 775, 780 (Ga. 2016)). Willful and wanton misconduct, by definition, entails either deliberate intent or such extreme recklessness as to be <u>equivalent to intent</u>. *Truelove*, 285 S.E.2d at 559 (quoting *Hawes*, 162 S.E.2d at 15). Thus, a validly-pled claim for willful wanton misconduct necessarily also pleads malicious intent, piercing official immunity. *Heller v. City of Atlanta*, 659 S.E.2d 617, 620 (Ga. Ct. App. 2008) (stating that a public official "is immune from damages caused by his discretionary acts unless such acts are wilful, wanton, or outside the scope of his authority."); *cf. Truelove*, 285 S.E.2d at 559 ("Proof of wilful or wanton conduct will remove the shield of sovereign immunity.") (citations omitted). Rash's argument that Count XIII must be dismissed due to official immunity is therefore meritless.

### X.    Plaintiff Adequately Pleads Libel Against Prosecuting Defendant George Barnhill (Count XIV)

To state a claim of defamation under Georgia law, plaintiff must allege: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Hanchard v. Dollar Gen.*, CV418-271, 2020 U.S.

Dist. LEXIS 257588, at \*12 (S.D. Ga. Sept. 3, 2020) (Ray, J.) (citing *Smith v. DiFrancesco*, 802 S.E.2d 69 (Ga. App. 2017)).

### A. Barnhill's Statements Constitute Libel Under the Applicable Standard.

When it comes to matters "concerning the plaintiff," this Court has implied and other jurisdictions have held that the mere mention of the surviving plaintiff in the publication at issue, and plaintiff's relationship thereof to the deceased, is sufficient to establish a defamation action. *Gray v. Mayberry*, 2019 U.S. Dist. LEXIS 18478, at \*\*2, 10 (S.D. Ga. February 5, 2019) (finding a defendant liable for defamation where defendant's statements not only defamed plaintiff but also "defame[d] Plaintiff's mother and grandmother, both of whom are deceased").

Barnhill cites a state appellate case for the proposition that a defamation claim cannot be raised after the death of the person defamed. *See* Barnhill Mot. at 20. But as the above law establishes, Plaintiff may raise such a claim on her own behalf because the statements concern *her*. *See Van Wiginton v. Pulitzer Pub. Co.*, 218 F. 795, 797 (8th Cir. 1914) (explaining that a plaintiff mentioned in a libelous publication against a family member may also face injury because "it is commonly recognized that the disgrace of a criminal is not infrequently visited upon members of his family, who have gained no independent position for themselves); *Merrill v. Post Pub. Co.*, 83 N.E. 419, 422 (Mass. 1908) ("To write of a man that he is the brother of a sister arrested for larceny might well be thought by a jury 'to impair his \* \* \* standing in the community"). Furthermore, the Georgia Supreme Court provided in dicta that "[w]hile the right of privacy is personal, and *may* die with the person, we do not desire to be understood as assenting to the proposition that the relatives of the deceased cannot, in a proper case, protect the memory of their kinsman, *not only from defamation*, but also from an invasion into the affairs of his private life after his death." *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 76 (Ga. 1905) (Gray, J.) (emphasis added).

As such, Plaintiff properly pleads the elements of a libel action: First, Plaintiff alleges that Barnhill made defamatory statements about Arbery to the press. And although slander, rather than libel, addresses oral defamatory statements, this Court has held that "the distinction is largely superfluous as '[t]he definition of slander in Georgia has been incorporated into the definition of libel.'" *Hanchard*, 2020 U.S. Dist. LEXIS 257588, at *12 (citing *Smith v. First Nat. Bank of Atlanta*, 837 F.2d 1575, 1580 (11th Cir. 1988)).

Barnhill also published a writing that likewise defamed Arbery. Compl. ¶ 158-164; *("[i]t appears Travis McMichael, Greg McMichael, and Bryan William were following, in pursuit burglary suspect" and that "Arbery s mental health records & prior convictions help explain his apparent aggressive nature and his possible thought pattern to attack an armed man").* In that same publication, Barnhill mentioned Plaintiff—the decedent's mother. And although this mention is enough for Plaintiff's defamation claim in her individual capacity, Barnhill went on to suggest Plaintiff was improperly interfering in the case and supported the alleged criminal activity of her son. *See* Barnhill Publication[17] (Barnhill publishing that "since we were initially requested to handle the case, the victim's mother has clearly expressed she wants myself and my office off the case. She sees a conflict in that my son works in the Brunswick District Attorney's Office where Greg McMichael retired some time ago. She believes there are kinships between the parties [there are not] and has made other unfounded allegations of bias[es]"). Applicable to Barnhill's direct statements against Plaintiff, the Eleventh Circuit has provided that:

> Defamation by implication arises where the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, even though the particular facts stated are true. It may also arise where the defendant "creates a defamatory implication by omitting

---

[17] Barnhill's publication is a public record which can be viewed at the New York Times: https://int.nyt.com/data/documenthelper/6916-george-barnhill-letter-to-glyn/b52fa09cdc974b970b79/optimized/full.pdf.

facts. In other words, it allows impos[ing] liability upon the defendant who has the details right but the "gist" wrong.

*Parekh v. CBS Corp.*, 820 Fed. Appx. 827, 835 (11th Cir. 2020) (internal citations and quotation marks omitted). It follows that Barnhill's statements defaming Arbery likewise defamed Plaintiff.

Prosecuting Defendants do not contest that the Complaint alleges facts supporting the second, third, and fourth elements of libel for a simple reason: they cannot. "The second element requires that the allegedly false statement was not privileged and was published to a third party." *Hanchard*, 2020 U.S. Dist. LEXIS 257588, *12. This Court has held that "[t]he reporting of a crime is a conditionally privileged communication; however, the availability of the privilege as a defense is *dependent on the intention with which the communication was made and is a question of fact for the jury*." *Id.* at *12-13 (emphasis added). Plaintiff properly pleads libel because the communication was published to the public. Furthermore, Plaintiff pleads that the publication was made with a false intent to paint "[Arbery] as a violent and unstable criminal who had attacked the McMichaels." *Id.* And even if Barnhill argues that he did not have false intent (he did), *Hanchard* provides that discovery is required to establish otherwise.

Third, Plaintiff has alleged much more than the requisite negligence. She has alleged that Barnhill intentionally issued communications "based on a multitude of demonstrably false statements" to "hide the circumstances surrounding [Arbery]'s death." *Chandler Telecom, LLC v. Burdette*, 797 S.E.2d 93, 97 (Ga. 2017) ("Wilful misconduct is much more than mere negligence, or even than gross negligence").

Lastly, Plaintiff pleads special damages "in excess of One Million Dollars." *Hanchard*, 2020 U.S. Dist. LEXIS 257588, at *13 ("Though special harm is limited to pecuniary damages and cannot include the reputational loss alleged, the Court understands that the monetary amounts

claimed include damages related to the defamation claim"). It follows that Plaintiff has adequately pled a libel claim against Barnhill.

### B. Absolute Immunity Does Not Apply to the Libel Claim Against Barnhill.

Barnhill claims that *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976) "recognized that prosecutors are 'absolutely immune at common law from suits for defamatory remarks made…relevant to a judicial proceeding.'" Barnhill Mot. at 6. But as mentioned above, Barnhill made statements to the media, and "*Buckley v. Fitzsimmons* categorically forecloses absolute prosecutorial immunity for statements to the media." *Hart*, 587 F.3d at 1297 (citing *Buckley*, 509 U.S. at 278).

Further, and likewise stated in Part VII(C), *supra*: Absolute immunity does not apply when "a prosecutor is not acting as an officer of the court but is instead engaged in certain investigative or administrative tasks." *Hart*, 587 F.3d at 1296 (citing *Van de Kamp*, 129 S. Ct. at 861). These activities include: conducting investigative work before an arrest and providing legal advice to police regarding pre-indictment investigation. *Id.* at 1296 (citations omitted).

Here, Barnhill's statements found in the Barnhill Publication are based on both his investigations made prior to his assignment as interim prosecutor and the advice he provided to police to end their investigation. *Hart*, 587 F.3d at 1296. Accordingly, Barnhill's defamatory statements do not enjoy the benefit of absolute immunity.

### XI. Plaintiff's Complaint is Not Subject to Dismissal as a Shotgun Pleading

Defendants argue—all but Defendant Barnhill in a footnote—that Plaintiff's Complaint should be dismissed because it is a "shotgun pleading." *See* Rash Mot. at 4 n.1; County Mot. at 8 n.4; Johnson Mot. at 6 n.1; Barnhill Mot. at 23-24. "Shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of all preceding counts; (2) conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate

each cause of action or claim for relief into distinct counts; or (4) combining multiple claims against multiple defendants without specifying which defendant is responsible for which act." *McDonough v. City of Homestead*, 771 F. App'x. 952, 955 (11th Cir. 2019) (citing *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015)). The key feature of shotgun pleadings is that they fail to give defendants "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323). Dismissal on this basis is appropriate only where "it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief." *Id.* at 1325 (citation omitted). This is not the case here.

While each count in Plaintiff's Complaint does incorporate the preceding paragraphs, the Complaint certainly gives the Defendants adequate notice of the claims being brought against them and the supporting factual allegations for each claim. Each count in the Complaint specifies to which Defendants it is directed and includes the immediately relevant conduct. Additionally, the Complaint's factual allegations are organized into sections corresponding to the claims for relief. For example, the sections entitled "The Deputization of Neighbors Deigo Perez, Gregory McMichael, Travis McMichael, And William Bryan In Response To Recent Trespass Incidents," Compl. ¶¶ 17-52, "The Deputized Neighbors Pursue a Stranger," *id.* ¶¶ 53-65, and "Arbery's Murder," *id.* ¶¶ 65-121, include factual allegations supporting Plaintiff's federal claims of excessive force and unlawful seizure (Count I), failure to intervene (Count II), conspiracy to violate Fourth Amendment rights (Count III), conspiracy to interfere with civil rights (Count IV), failure to prevent harm (Count V), substantive due process (Count VII), as well as her state law claims of wrongful death (Count XI), conspiracy/battery (Count XII), and willful and wanton misconduct (Count XIII). The following section entitled, "The Cover-Up of [Arbery's] Murder," *id.* ¶¶ 122-

173, includes factual allegations supporting Plaintiff's federal claims of denial of access to courts (Count IX) and conspiracy to obstruct justice (Count X), as well as her state law claim of libel (Count XIV). The following sections entitled, "The Glynn County Police Department's Unconstitutional Practices," *id.* ¶¶ 174-193, and "Prior Incidents of Cover-Up, Corruption, and Lack of Accountability in Glynn County Law Enforcement," ¶¶ 194-209, clearly describe facts supporting Plaintiff's *Monell* claim against Glynn County (Count VIII). Plaintiff's Complaint therefore provides a sufficient roadmap for the Defendants and the Court to determine which allegations of fact are intended to support which claims for relief. *See Weiland*, 782 F.3d at 1325 (finding that the district court abused its discretion when it dismissed two of plaintiff's claims under Rule 8(a)(2) where the organization of the factual allegations adequately put the defendants on notice of the specific claims against them and the factual allegations that support those claims); *Rice v. James*, No. CV117-039, 2018 WL 2164885 at *3 (S.D. Ga. May 10, 2018) (refusing to dismiss plaintiff's complaint as a shotgun pleading because even though each count in the complaint "adopts the allegations of the preceding counts," plaintiff "provides a detailed factual basis for her claims," and the "failure to more precisely parcel out . . . the facts relevant to each claim" did not materially increase "the burden of understanding the factual allegations underlying each count").

Further, courts in this district have routinely used defendants' accurate summarization of the relevant claims and underlying factual support in their motions to dismiss as evidence that a shotgun pleading was not so unclear as to merit dismissal. *See Bivens v. Coffee County*, 2021 WL 3173598, at *4 (S.D. Ga. July 26, 2021) (denying motion to dismiss complaint as a shotgun pleading where "Defendants clearly understand the claims against them and which facts underpin those claims, as is demonstrated by the remaining arguments in their motion to dismiss"); *Rice*,

2018 WL 2164885, at *3 ("[T]he City's contention that it cannot understand the factual basis for Plaintiff's claims is belied by the accurate recitation of those facts in the City's motion to dismiss."). Here, Defendants have shown in their motions to dismiss that they comprehend the claims against them and the underlying factual allegations. Accordingly, Plaintiff's Complaint should not be dismissed as a shotgun pleading.

## CONCLUSION

For the forgoing reasons, this Court should deny Defendants' motions to dismiss.

Respectfully submitted,

*/s/ J. Kyle Califf, Esquire*
J. Kyle Califf, Esquire
GA Bar No.: 276248
Califf Law Firm
3540 Wheeler Road# 603
Augusta GA, 30909
phone: (706) 399-9660
kcaliff@califflawfirm.com

*/s/ S. Lee Merritt, Esquire*
S. Lee Merritt, Esquire
McEldrew, Young, Purtell & Merritt
123 South Broad Street
Philadelphia, PA 19109
*Pro Hac Vice*

*/s/ Mark V. Maguire, Esquire*
Mark V. Maguire
McEldrew, Young, Purtell & Merritt
123 South Broad Street
Philadelphia, PA 19109
*Pro Hac Vice*

*/s/ Daniel N. Purtell, Esquire*
Daniel N. Purtell, Esquire
McEldrew, Young, Purtell & Merritt
123 South Broad Street
Philadelphia, PA 19109
*Pro Hac Vice*

*/s/ John J. Coyle, Esquire*
John J. Coyle, Esquire
McEldrew, Young, Purtell & Merritt
123 South Broad Street
Philadelphia, PA 19109
*Pro Hac Vice*

*/s/ Rizwan Qureshi, Esquire*
Rizwan Qureshi, Esquire
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005
*Pro Hac Vice*

*/s/ William Weltman, Esquire*
William Weltman, Esquire
Reed Smith LLP
10 South Wacker Drive,
40th floor
Chicago, IL 60606
*Pro Hac Vice*

**_/s/ John P. Kennedy, Esquire_**
John P. Kennedy, Esquire
Reed Smith LLP
599 Lexington Avenue
22nd Floor
New York, NY 10022
*Pro Hac Vice*

**_/s/ Amir H. Ali, Esquire_**
Amir H. Ali, Esquire
Roderick & Solange
MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
*Pro Hac Vice* pending

**_/s/ Megha Ram, Esquire_**
Megha Ram, Esquire
Roderick & Solange
MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
*Pro Hac Vice* pending

**_/s/ Tia M. McClenney, Esquire_**
Tia M. McClenney, Esquire
Reed Smith LLP
Reed Smith Centre,
225th Avenue
Pittsburgh, PA 15222
*Pro Hac Vice*

**_/s/ Devi M. Rao, Esquire_**
Devi M. Rao, Esquire
Roderick & Solange
MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
*Pro Hac Vice* pending

**_/s/ Vanessa del Valle, Esquire_**
Vanessa del Valle, Esquire
Roderick & Solange
MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
*Pro Hac Vice* pending

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| WANDA COOPER in her individual capacity and as administrator of the estate of the decedent AHMAUD ARBERY | : : : : | |
| Plaintiff | : | |
| | : | **Civil Action** |
| v. | : | **2:21-CV-20-LGW-BWC** |
| | : | |
| TRAVIS McMICHAEL et al., | : | |
| | : | **The Honorable Lisa G. Wood** |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I hereby certify that I will make a true and correct copy of Plaintiff's Omnibus Response in Opposition to Defendants' Motions to Dismiss available on the PACER ECF system which will send an electronic notice to all participating counsel of record.

*/s/ Mark V. Maguire, Esquire*
Mark V. Maguire
McEldrew, Young, Purtell & Merritt
123 South Broad Street
Philadelphia, PA 19109
*Pro Hac Vice*