IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| WANDA COOPER, individually and as Administrator of the Estate of Decedent Ahmaud Arbery, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO.: 2:21-CV-20-LGW-BWC |
| v. | ) ) | |
| Robert Rash, *et al.*, | ) ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF DEFENDANT ROBERT RASH'S MOTION TO DISMISS

COMES NOW Robert Rash ("Rash"), named as a defendant in the above-styled action, and hereby files this reply in support of his motion to dismiss the claims that are being asserted against him in this matter by plaintiff Wanda Cooper ("Plaintiff"), individually and in her capacity as administrator of the Estate of Ahmaud Arbery ("Arbery"), showing the Court as follows:

**I.      Plaintiff cannot amend her complaint by way of her response to Rash's motion to dismiss.**

It is axiomatic that "[w]hen considering a motion to dismiss for failure to state a claim, [the Court] may only look to the facts alleged in the complaint and not beyond." *Malowney v. Federal Collection Deposit Group*, 193 F.3d 1342, 1348 n.5 (11th Cir.1999); *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984).  Accordingly, a plaintiff cannot amend or re-plead her claim through a response to a motion to dismiss.  *See Burgess v. Religious Tech. Ctr., Inc.,* 600 Fed. Appx. 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss*.*"); *cf. Dunn v. Hart*, 2015 WL 1032959, at *8 (S.D. Ga. Mar. 9, 2015) (stating that a plaintiff could not amend his complaint through his objection and relying on cases stating that plaintiffs "may not rely on new facts in submissions in response to a motion to dismiss to defeat the motion").  And yet, that is exactly what Plaintiff attempts to do here.  Two egregious examples of Plaintiff's attempts to amend her complaint in

her response to Rash's motion to dismiss (Doc. 84 – "Response") are the arguments Plaintiff makes with respect to the conspiracy claims she has asserted pursuant to 42 U.S.C. §§ 1983 and 1985 and her claim for wrongful death.

In Plaintiff's complaint, her conspiracy claims are based almost entirely on her proffered theory that Rash "deputized" Defendants Gregory McMichael ("Gregory"), Travis McMichael ("Travis"), and William Bryan ("Bryan"), collectively referred to as the "Private Defendants." (Doc. 1, p. 33 ¶ 225, p. 34 ¶ 233.)  Because those conspiracy claims were grounded on the idea of deputization, in addition to his other arguments in favor of dismissing Plaintiff's conspiracy claims, in his memorandum filed in support of his motion to dismiss (Doc. 63-1 - "Memorandum"), Rash pointed out that, not only do the facts not show that he "deputized" the Private Defendants, but also that it was impossible for him to do so as a matter of law.

Changing course mid-stream, Plaintiff now claims that deputization is a "red herring." (Doc. 84, p. 11.)  If so, Plaintiff's complaint contains an entire school of red herring as it is replete with references to Rash's supposed deputization of the Private Defendants.  Indeed, with respect to the conspiracy claims that Plaintiff is asserting against Rash pursuant to §§ 1983 and 1985, deputization is the sole allegation of overt conduct on the part of Rash. (Doc. 1, pp. 33-34, ¶¶ 222-234.)  In particular, Plaintiff alleges that "Defendant Police Officer Robert Rash deputized [Gregory] to engage in law enforcement activity and confirmed such deputization over text message to English on December 20, 2019." (*Id*., p. 33 ¶ 225.a, p. 34 ¶ 233.e.)[1]  Nonetheless, when it comes to the claims she is asserting against Rash, Plaintiff now artfully attempts to pivot away from deputization and argues that joint action between Rash and the Private Defendants supports her conspiracy claims.  As discussed below, this argument also fails.

A second example of Plaintiff's attempt to amend her complaint through her Response is the argument she makes in regard to her wrongful death claim.  In her complaint, there is no

---

[1] Interestingly, despite the fact that Plaintiff refers to deputization as a "red herring" in her Response, the remaining portions of Plaintiff's Response are also replete with references to deputization.  (*See, e.g.* Doc. 84, pp. 35, 38, 56.)  Indeed, "deputization" is the basis for Plaintiff's assertion that Rash violated a ministerial duty regarding her state law claims.  (*Id*., p. 56.)

allegation of any duty that Rash owed to Arbery.  (*Id.*, p. 42 ¶¶ 277-28, p. 43 ¶¶ 279, 1-4.)  In fact, Plaintiff does not even mention the word "duty."  Thus, in his Memorandum, Rash pointed out that he did not owe a specific duty to Arbery or a general duty to the public and, therefore, Plaintiff's claim for wrongful death is subject to dismissal.  (Doc. 63-1, pp. 28-29.)   In her Response, Plaintiff completely ignores the allegations in her complaint and argues that she has a viable claim because there was a "special relationship" between Rash and Arbery.  (Doc. 84, pp. 54-55.)  But a "special relationship" is not mentioned in Plaintiff's complaint, and the factual allegations contained in the complaint do not support a finding of a special relationship.

Despite Plaintiff's attempts to amend her claims through her Response, the law is clear that, "[w]hen considering [Rash's motion], [the Court] may only look to the facts alleged in the complaint and not beyond."  *Malowney*, 193 F.3d at 1348 n.5; *Milburn*, 734 F.2d at 765. And Plaintiff's claims may move forward only if the ***facts alleged in her complaint*** "nudge [her] claims across the line from conceivable to plausible," which they do not.  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In other words, regarding Rash's motion to dismiss, what matters is Plaintiff's complaint – red herring and all.

## II.     Plaintiff distorts the facts alleged in the complaint.

In addition to her attempts to amend her complaint, throughout her Response, Plaintiff also distorts the facts alleged in her complaint to reach unsupported conclusions.  Plaintiff masks these distortions in the guise of "reasonable inferences."  But a plaintiff may not avoid dismissal by building upon inferences, devoid of factual support, to reach a desired conclusion.  *See Iqbal*, 556 U.S. at 678; *Gunter v. Advanced Correctional Healthcare, Inc.*, 844 Fed. Appx. 189, 192-93 (11th Cir. 2021).   Relying on inference upon inference in such a manner is nothing more than speculation, and, "[t]o survive dismissal, [a plaintiff] must allege facts sufficient to raise a right to relief that is beyond the speculative level"—a plaintiff must state a plausible and not just possible claim.  *Gunter*, 844 Fed. Appx. at 192–93 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To state a plausible claim for relief, plaintiffs must go beyond merely pleading the 'sheer

3

possibility' of unlawful activity by a defendant; plaintiffs must offer '*factual content that allows the court to draw the reasonable inference* that the defendant is liable for the misconduct alleged.'" *Id*. at 192-93 (emphasis added) (quoting *Iqbal*, 556 U.S. at 662). Thus, "reasonable inferences" must be supported by ***facts*** so as not to amount to mere speculation or possibility. As discussed, a plaintiff's allegations must "nudge[ ] [her] claims across the line from conceivable to plausible." *Am. Dental*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 679). Here, Plaintiff distorts the facts to argue that they support the supposed "inferences" she reaches in three critical instances: (1) Rash's introduction of Gregory via text to Larry English ("English"), the owner of the property located at 220 Satilla Drive in Brunswick, Georgia (the "Construction Site"); (2) Rash's response to the Construction Site on February 11, 2020; and (3) Rash's "relationship" with Gregory.

### A.    Rash's introduction of Gregory to English via text.

Plaintiff alleges that Rash introduced Gregory to English through a text message on December 20, 2019. (Doc. 1, p.7 ¶ 30.) But that is the only ***fact*** that Plaintiff alleges with respect to that communication. All other allegations regarding this communication between Rash and English—including those relevant to the underlying communication between Rash and Gregory— are based on nothing more than conjecture and speculation masked as "reasonable inference." Plaintiff claims that Rash "over-simplifies" this communication by describing it as an "introduction." (Doc. 84, p. 34.) But that is all the facts show. No fact alleged allows Plaintiff to reasonably infer from this communication that Rash did anything more than introduce English to a neighbor who could assist him at the Construction Site. More particularly, nothing in this communication permits the inference that Rash authorized Gregory to act as a law enforcement officer, and the communication certainly does not permit an inference that Rash authorized Travis or Bryan to act as law enforcement officers. While it can certainly be inferred from the text that Rash had communicated with Gregory, no other reasonable inferences can be made from this— and certainly not the leaps in logic that Plaintiff attempts. *Oyedeji v. Landmark at Bella Vista, L.P.*, 521 F. Supp. 3d 1304, 1306 (N.D. Ga. 2021) ("Although a court is required to accept well-pleaded facts as true and make reasonable inferences in favor of the plaintiff, it is not required to

accept the plaintiff's legal conclusions or unwarranted deductions of fact." (citing *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (per curiam)).

### B.      Rash's response to the Construction Site on February 11, 2020.

Plaintiff tries to paint the events of February 11 as evidence of joint action between Rash and the Private Defendants—that the Private Defendants and Rash worked in conjunction to provide a law enforcement response to the Construction Site as some sort of "posse."[2]  But the facts in Plaintiff's complaint do not support such an inference.  According to the alleged *facts*, on February 11, 2020, English was alerted that someone had entered the Construction Site, and, in response, he contacted Diego Perez through text message.  (Doc. 1, p. 11 ⁋⁋ 53-55.)  Perez then responded to the Construction Site as did Travis who said he had seen the suspected trespasser and tried to confront him.  (*Id.*, p. 11 ⁋ 56.)  Thereafter, four armed neighbors allegedly responded to the Construction Site and searched for the suspected trespasser; these neighbors were "Perez, [Travis], [Gregory], and possibly [Bryan]."  (*Id.*, p. 11 ⁋ 58.)  Plaintiff also alleges that "English texted the footage from his security camera to [Rash]" and that Rash responded to the Construction Site.  (*Id.*, p. 12 ⁋ 60.)  Plaintiff also alleges that Rash searched for the suspected trespasser along with the Private Defendants based on a text message from Perez to English in which Perez stated that "[t]he police showed up and we all searched for a good while."  (*Id.*, p. 12 ⁋ 61.)  In summary, the only ***facts*** regarding Rash's actions on February 11 are that he responded to the Construction Site—any other conclusions about Rash's actions must be reached through inference.

First, even accepting, based on Perez's text to English, that Rash searched for the suspected trespasser with the Private Defendants, this is not enough to infer an agreement or understanding between Rash and the Private Defendants to violate Arbery's Constitutional rights, which is required to state a conspiracy claim.  *Wilson on behalf of Wilson v. McFadden*, 703 Fed. Appx. 822, 824 (11th Cir. 2017) ("To prove a § 1983 conspiracy, a plaintiff must show the parties reached

---

[2] In Plaintiff's complaint, she argues that Rash "deputized [the Private Defendants] to engage in law enforcement activity on February 11, 2020."  (Doc. 1, p. 34 ⁋ 225.b., p. 35 ⁋ 233.e.)  But of course, Plaintiff has now disavowed this as a red herring.

an understanding to deny the plaintiff his or her rights."); *Sheppard v. City of Blackshear, Ga.*, 2015 WL 300458, at *12 (S.D. Ga. Jan. 22, 2015) (same), *aff'd sub nom. Sheppard v. Pierce Cty., Ga.*, 631 Fed. Appx. 718 (11th Cir. 2015).  Furthermore, the facts do not support that Rash was placed on notice of future wrongful conduct.  In that regard, Plaintiff contends that Rash was on notice that the Private Defendants would commit a Constitutional violation.  But the actions of the Private Defendants on February 11 were neither wrongful nor unlawful.  It was certainly not wrongful or illegal for neighbors, including the Private Defendants, to respond to the Construction Site, at the request of the property owner, and search the grounds after becoming aware of a potential trespasser.  Thus, Plaintiff's contention that the events of February 11 placed Rash on notice of future Constitutional violations is simply not supported by the facts.  *See Bond Safeguard Ins. Co. v. Wells Fargo Bank, N.A.*, 2011 WL 13187054, at *2 (S.D. Ga. Oct. 21, 2011) ("[T]he Court is not required to accept the plaintiff's legal conclusions or 'unwarranted deductions of fact' as true."), *aff'd*, 502 Fed. Appx. 867 (11th Cir. 2012).

## C.    Rash's "relationship" with Gregory.

In her Response, Plaintiff relies heavily on a presumed pre-existing relationship between Rash and Gregory that is based on the fact that Rash and Gregory were both law enforcement officers and that Rash communicated with Gregory about English.[3]  But Plaintiff's presumptions do not withstand scrutiny.

As discussed, Plaintiff presumes there was a relationship because both Rash and Gregory worked in law enforcement in Glynn County.  But the facts show that Rash was a member of the Glynn County Police Department while Gregory retired in 2019 after working as an investigator with the Brunswick District Attorney's Office since 1995.  Prior to 1995, Gregory worked for the Glynn County Police Department.  But there is no allegation regarding when Rash started working

---

[3] There are no facts alleged regarding communication between Rash and Gregory.  But based on Rash's text to English, it is reasonable to conclude that there was communication between Rash and Gregory.  This is a rare reasonable inference reached by Plaintiff.  Nonetheless, this is not enough to support the remaining conclusions reached by Plaintiff.

for the Glynn County Police Department.  So, there are no facts that support the contention that Rash and Gregory ever worked together or were familiar with each other.

In addition, based on the text that Rash sent to English that suggested that Rash and Gregory had communicated, and in which Rash referred to Gregory as "former law enforcement," Plaintiff presumes (1) a pre-existing relationship between Rash and Gregory; and (2) that Rash was aware of the details of Gregory's employment with the Brunswick District Attorneys' Office. With respect to that employment, Plaintiff alleges that, while working for the District Attorney, Gregory failed to complete his training required by the Peace Officer Standards and Training Council ("P.O.S.T.") and, as a result, his law enforcement certification was ultimately suspended by P.O.S.T.  (Doc. 1, pp. 8-9, ¶¶ 34-38.)  Plaintiff also alleges that Gregory "had a practice of engaging in law enforcement conduct after his retirement" and that he, and his son Travis, had "informed the Glynn County Police Department that they 'made contact' with people they suspected of crimes."  (Doc. 1, pp. 9-10, ¶¶ 41-42.)  Despite the absence of facts regarding the extent of Rash's "relationship" and familiarity with Gregory and his law enforcement career, if any, in her Response, Plaintiff speculates about both.  For instance, Plaintiff suggests that Rash was aware that "as an investigator [Gregory] had failed basic training requirements so consistently that he lost arrest powers in 2006 - which he only discovered in 2014." (Doc. 84, p. 61.)  But there are no facts that support any contention that Rash was aware of these "issues" — only speculation and conjecture on the part of Plaintiff.  *Menut v. Fla. Comm'n on Offender Rev.*, 754 Fed. Appx. 809, 811 (11th Cir. 2018) ("Factual allegations must be enough to raise a right to relief above the speculative level."  (quoting *Twombly*, 550 U.S. at 555)).  Indeed, the only ***fact*** concerning Rash's knowledge of Gregory and his career in law enforcement is Rash's statement to English that Gregory was "former law enforcement."

Plaintiff's most egregious distortion of the facts is made in support of her § 1985(3) claim. Plaintiff speculates that, because of Rash's supposed relationship with Gregory, it can be inferred that: (1) Rash knew about racial animus purportedly held by Gregory; (2) Rash further knew about racial animus held by both Travis and Bryan (despite there being no allegation of a relationship

7

between Rash and those two); and, even worse, (3) that Rash harbored racial animus himself despite no facts to support such speculation.  (Doc. 84, pp. 21-22.)  Plaintiff "infers" all of this from: (a) Rash and Gregory working as law enforcement officers in the same county, despite no allegation they ever worked together; and (b) Rash's statement that Gregory was "former law enforcement."  These are not reasonable inferences but wild speculation.  *See Vaughan v. City of Sandy Springs*, 2010 WL 11508351, at *13 (N.D. Ga. May 25, 2010) ("[W]hat *Twombly* and *Iqbal* teach is that where there are other plausible explanations, it is not sufficient to speculate in a complaint and particularly to base that speculation on no facts at all.").

In summary, instead of being reasonable, Plaintiff's inferences are mere speculation and possibility based on Plaintiff's distortion of the facts.  As explained below, the facts contained in Plaintiff's complaint, as opposed to the unwarranted speculation contained in Plaintiff's Response, do not support the claims that Plaintiff is asserting against Rash.

### III.    Plaintiff does not allege facts that support a conspiracy.

In Counts III and IV of her complaint, Plaintiff asserts conspiracy claims against Rash pursuant to 42 U.S.C. §§ 1983 and 1985(3).  As discussed, in her Response, Plaintiff attempts to pivot away from her contention that Rash's involvement in the alleged conspiracy was the deputization of the Private Defendants.  Instead, Plaintiff now claims that joint action between Rash and the Private Defendants shows the existence of a conspiracy.  But "[t]o sustain a conspiracy action under Section 1983, the plaintiff must show that the parties 'reached an understanding' to deny the plaintiff his or her rights." *Malloy v. Peters,* 617 Fed. Appx. 948, 950 (11th Cir. 2015) (citing *Grider v. City of Auburn,* 618 F.3d 1240, 1260 (11th Cir. 2010)).  Similarly, a claim under § 1985(3) requires "an *agreement* between two or more persons to deprive [the plaintiff] of [her] civil rights." *Wilbourne v. Forsyth Cty. Sch. Dist.*, 306 Fed. Appx. 473, 478 (11th Cir. 2009) (emphasis added).  Here, there are no facts alleged from which an agreement between Rash and the Private Defendants can be inferred. Furthermore, Rash is entitled to qualified immunity with respect to Plaintiff's § 1983 conspiracy claims.

**A.      There are no facts alleged from which an agreement between Rash and the Private Defendants can be inferred.**

The Eleventh Circuit has noted that "the linchpin for conspiracy is agreement." *Bailey v. Bd. of Cnty Comm'rs of Alachua Cnty,* 956 F.2d 1112, 1122 (11th Cir. 1992).  Thus, in order to succeed, Plaintiff must demonstrate that Rash and the Private Defendants reached an agreement to deny Arbery his rights.   As noted in Rash's Memorandum, an agreement presupposes communication.  (Doc. 63-1, pp. 8-9 (citing *Pittman v. State Farm Fire & Cas. Co.*, 662 Fed. Appx. 873, 880 (11th Cir. 2016) ("The linchpin for conspiracy is agreement, which presupposes communication.")).)   Here, Plaintiff has alleged facts from which one can infer that Rash communicated with Gregory, but Plaintiff has not alleged any facts from which it can be inferred that there was an agreement between Rash and the Private Defendants that would support a conspiracy claim. *Robinson v. McNeese*, 2020 WL 6566174, at *7 (M.D. Ga. Nov. 9, 2020) ("[C]ommunication is not an agreement.").

Instead, with respect to Rash, Plaintiff has alleged two facts: (1) that, on December 20, 2019, Rash sent a text message to English that introduced English to Gregory; and (2) that Rash responded to the Construction Site on February 11, 2020 after receiving a call from English and the Private Defendants were on scene when Rash arrived.   From these two facts, Plaintiff makes an incredible leap in logic.   In particular, Plaintiff contends that "[i]t is reasonable to infer . . .  that Defendant Rash reached an understanding with the Private Defendants that they would unlawfully seize Arbery . . . ." (Doc. 84, p. 14.)   Notably, no such "understanding" is alleged in the complaint, and the factual allegations in the complaint do not support that conclusion.  *Harrington v. Wells*, 2016 WL 113063, at *3 (S.D. Ga. Jan. 8, 2016), *report and recommendation adopted*, 2016 WL 439001 (S.D. Ga. Feb. 3, 2016) ("A plaintiff does not have to produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy, but must show some evidence of agreement between the defendants. . . .  [And] [m]erely string[ing] together alleged acts of individuals is not sufficient to establish the existence of a conspiracy." (quotations

omitted)); *see also Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992); *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990).

Plaintiff also claims that the "inference" of an agreement between Rash and the Private Defendants "is further supported by Plaintiff's allegation that, on February 23, 2020, Gregory recognized Arbery from previous video footage from the Construction Site and so decided to pursue Arbery with guns—even though he did not see Arbery on the Construction Site that day— to unlawfully seize him by force or threat of force." (Doc. 84, p. 14.)  But Plaintiff fails to explain how Gregory's knowledge of video footage captured by a camera at the Construction Site connects Rash to an agreement with the Private Defendants.  Presumably, Plaintiff is assuming that Rash provided the video footage to Gregory, but there is no factual basis for that assumption.  Moreover, even if Rash showed video of a suspected trespasser to Gregory, that does not support an inference that Rash and the Private Defendants agreed that the Private Defendants (or any one of them) would "unlawfully seize [Arbery] by force or threat of force." (*Id.*, p. 14.)

It is also important to recognize that the inferences suggested by Plaintiff require the timeline of events to be perverted.  Plaintiff first asserts, without support, that Rash's presence at the Construction Site on February 11 while the armed Private Defendants searched for Arbery leads to the reasonable inference that Rash knew that the Private Defendants would unlawfully seize Arbery on a later date.  Then Plaintiff retroactively applies this theoretical knowledge to Rash by stating that Rash "encouraged [the Private Defendants] by telling English to call [Gregory]" despite allegedly knowing "that the Private Defendants would seize Arbery with force the next time they saw him." (*Id.*, p. 15.)  On its face, this is nonsensical.  Even if it could be inferred that Rash knew the Private Defendants would seize Arbery when they next saw him because of the events of February 11 (which it cannot), it certainly cannot be inferred Rash had that knowledge when he communicated with English six weeks earlier on December 20, 2019.

In summary, there are no factual allegations in the complaint that demonstrate that Rash and the Private Defendants "reached an understanding" to deny Arbery his rights.  Because such an understanding is necessary to sustain a conspiracy claim under § 1983 and § 1985(3), the

conspiracy claims Plaintiff is asserting against Rash in Count III and IV of her complaint are subject to dismissal.

### B.    Rash is entitled to qualified immunity with respect to Plaintiff's § 1983 conspiracy claims.

Rash is entitled to qualified immunity with respect to Plaintiff's § 1983 conspiracy claims because Plaintiff has not alleged that Rash, through the actions alleged in the Complaint, violated a clearly established Constitutional right.[4]   Plaintiff argues that "[o]n the alleged facts, appropriately construed, it would have been clear to a reasonable office in Defendant Rash's position that he entered into an agreement." (Doc. 84, p. 19.)  First, it is important to note that, although the Court is required to construe reasonable inferences from the alleged facts, it is not required to reach the inferences proffered by Plaintiff.  *See Oyedeji*, 521 F. Supp. 3d at 1306 ("[A] court . . . is not required to accept *the plaintiff's* legal conclusions or unwarranted deductions of fact." (emphasis added)).  Instead, the Court need only reach the inferences supported by the facts alleged in Plaintiff's complaint.  *See id.*  And, here, as discussed, Plaintiff has not alleged facts that plausibly show Rash reached any sort of agreement with the Private Defendants.  Moreover, to the extent it could be said that Rash did reach an agreement, it would only be that, through the December 20 text, Rash reached an agreement with Gregory to assist English, Gregory's neighbor. Plaintiff has pointed to no authority that would have put Rash on notice that sending this text would constitute an agreement to violate Arbery's Constitutional rights.  Accordingly, Plaintiff has failed

---

[4] Plaintiff's contention that Rash's qualified immunity argument is perfunctory and conclusory and therefore waived is entirely baseless.  That argument is based on a footnote in *National Mining Association v. United Steel Workers*, 985 F.3d 1309 (11th Cir. 2021).  There, the Eleventh Circuit stated that a party's argument was waived because the party "raise[d] [the argument] in a perfunctory and conclusory manner."  *Id.*, 1327 n.16.  But, in that case, the Eleventh Circuit was addressing the consideration of issues at the appellate level, which has no bearing on whether the Court may consider an argument at the motion to dismiss stage.  Further, although Rash raised this argument in a footnote, he did not do so in a "perfunctory and conclusory manner."  Instead, the argument was made with citation to authority, discussion, and reference to discussion in the body of the Memorandum.  (Doc. 63-1, pp. 12 n.2, 19 n.5.)  Accordingly, Rash has not waived the argument that he is entitled to qualified immunity in regard to Plaintiff's § 1983 and § 1986 claims.

to allege that Rash violated Arbery's clearly established Constitutional rights, and Rash is entitled to qualified immunity as it relates to Plaintiff's § 1983 conspiracy claims.

**IV.   There are no facts from which it can be inferred that Rash bore racial animus or knew of the Private Defendants' racial animus, and, as a result, Plaintiff has not alleged a § 1985(3) claim.**

As stated, in Count IV, Plaintiff asserts a conspiracy claim against Rash pursuant to 42 U.S.C. § 1985(3).[5]  (Doc. 1, pp. 33-34, ¶¶ 228-234.)  In Rash's Memorandum, Rash showed that Plaintiff has failed to state a § 1985(3) claim against him because, in addition to failing to show a requisite agreement between Rash and the Private Defendants, Plaintiff has not alleged any facts to show that Rash was motivated by racial or class-based animus.  (Doc. 63-1, pp. 12-15.); *see also Park v. City of Atlanta*, 120 F.3d 1157, 1162 (11th Cir. 1997) (racial animus required to state § 1985(3) claim).  In response, Plaintiff states that the "allegations make clear that . . . Defendant Rash at worst . . . harbored racial animus or at best acquiesced to the Private Defendants' racial-animus based motivation to seize and arrest Arbery." (Doc. 84, p. 22.)  This is patently false.  And the logic used by Plaintiff to reach this conclusion may be the most egregious instance of her perversion of the "reasonable inference" concept.  In reality, Plaintiff asserts no facts to support an inference that Rash knew of racial animus on the part of the Private Defendants.  And Plaintiff has alleged no facts that support an inference that Rash harbored or was motivated by racial animus.  *See Jallali v. Sun Healthcare Grp.*, 667 Fed. Appx. 745, 746 (11th Cir. 2016) (affirming dismissal of plaintiff's claim that was not "supported by anything other than conjecture or inference").

Plaintiff's assertion that she has sufficiently alleged racial animus on the part of Rash is based wholly on her allegation that Rash "had a relationship with [Gregory]."  (Doc. 84, p. 21.)  From this, Plaintiff extrapolates that Rash must have known about the racial animus harbored by

---

[5] A § 1985(3) claim requires (1) a conspiracy; (2) to deprive "any person or class of persons of the equal protection of the laws[ ] or of equal privileges and immunities under the laws"; (3) an act in furtherance thereof; and (4) an injury or deprivation of a right.  *Lucero v. Operation Rescue,* 954 F.2d 624, 627 (11th Cir. 1992).

Gregory, his son, Travis, and Bryan, Gregory's friend.  Even more outrageous is the contention that, because of Rash's supposed relationship with Gregory, Rash himself must have harbored racial animus towards Arbery.  Put simply, this argument is indefensible.

First, Plaintiff does not in fact allege that there was a relationship between Rash and Gregory.  Instead, Plaintiff infers such a relationship from the following facts: (1) Gregory was a former law enforcement officer; (2) Rash and Gregory discussed [Gregory] assisting English; and (3) Rash and Gregory were at the same place on February 11.  Even accepting that these allegations could support a relationship between Rash and Gregory, Plaintiff's complaint does not include any facts regarding the depth and character of this relationship.  Indeed, there are no facts regarding any interaction between Rash and Gregory other than the threadbare allegations concerning February 11.  Further, there are no facts contained in the complaint that support an inference that Rash and Gregory had such a relationship that it would be reasonable to assume that Rash was aware that Gregory bore racial animus toward African Americans.

Moreover, Plaintiff alleges no interaction between Rash and Travis or Rash and Bryan until the night of February 11, and the facts alleged regarding that interaction are bare to say the least. Nonetheless, Plaintiff asks the Court to infer from the "relationship" between Rash and Gregory that Rash also had a relationship with Gregory's son, Travis, and also with Gregory's friend Bryan. But there are no facts upon which to base such an inference.  What Plaintiff is actually asking the Court to do is to assume that a relationship existed between Rash and Travis and Bryan.  And, what's more, Plaintiff asks the Court to then build on this assumption and from it infer that Rash was aware of racism exhibited by Travis and Bryan.  Notably, it is the overt racism of Travis and Bryan that Plaintiff relies on for the "inference" that Rash was aware of the Private Defendants' racial animus.  (Doc. 84, p. 21; Doc. 1, p. 10 ¶¶ 45-48.)  But again, there are no facts upon which an inference of a relationship between Rash and Travis or Rash and Bryan can be based.

Lastly, the assertion that Rash bore some sort of racial animus merely because he had a "relationship" with Gregory is simply ludicrous.  Under the facts, Rash was, at most, merely acquainted with Gregory because they both worked in law enforcement in the same county.

Simply put, there are no facts asserted from which it can reasonably be inferred that Rash bore any racial animus towards Arbery (or other African Americans) or that his conduct was motivated by racial animus. *See Arrington v. Miami Dade Cty. Pub. Sch. Dist.*, 835 Fed. Appx. 418, 420 (11th Cir. 2020) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."). In short, Plaintiff again attempts to build a conspiracy upon faulty inferences, but there are no facts alleged that suggest Rash entered into an agreement with the Private Defendants to violate Arbery's Constitutional rights because Arbery was African-American, which is required for a § 1985(3) claim. *See Park*, 120 F.3d at 1162. For that reason, the § 1985 claim that Plaintiff is asserting against Rash is subject to dismissal.

## V.   Plaintiff does not allege a viable claim pursuant to 42 U.S.C. § 1986.

In Count V of her complaint, Plaintiff asserts a claim against Rash pursuant to 42 U.S.C. § 1986, which "provides a cause of action against anyone who has 'knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do . . . .'" *Walke v. Malone*, 2018 WL 4568639, at *4 (S.D. Ga. Sept. 24, 2018) (quoting 42 U.S.C. § 1986). Rash moved to dismiss Plaintiff's § 1986 claim because the facts alleged in Plaintiff's complaint do not support such a claim in that: (1) they do not show that Rash had knowledge of a § 1985(3) conspiracy among the Private Defendants because there are no facts that show Rash was aware of discriminatory animus on the part of the Private Defendants; and (2) even if Rash was aware of such a conspiracy, the facts alleged do not show that he was in a position to stop the implementation of the conspiracy. (Doc. 63-1, pp.15-19.)

In her Response, Plaintiff argues that Rash was aware of a conspiracy on the part of the Private Defendants to violate Arbery's Constitutional rights. In doing so, Plaintiff doubles down on her assertion that, because of some relationship between Rash and Gregory, Rash must have known about the racial animus behind the Private Defendants' actions and thus their conspiracy to violate Arbery's rights. But again, Plaintiff provides no facts in support of that contention.

Indeed, the speculation proffered in support of Plaintiff's § 1986 claim highlights the issues with her claims and arguments in total—they are based on inferences without foundation, i.e. speculation.  Plaintiff asserts that her "allegations plausibly suggest that Defendant Rash would have been exposed to the Private Defendants' racist attitudes when they all searched for Arbery . . . on February 11, 2020." (Doc. 84, p. 24.)  Plaintiff goes on to postulate that "[g]iven [Travis's] and [Bryan's] openness with sharing their racist attitudes, it is plausible both that they would have used racial slurs or otherwise betrayed their racist attitudes the night of February 11, 2020, and that their racist attitudes would previously have been known to [Rash] based on his relationship with [Gregory], [Travis's] father and Bryan's friend."  (*Id.*, p. 24.)  This is not a reasonable inference but pure speculation.  Rather than presenting a plausible conclusion, Plaintiff is relying on the mere possibility that the Private Defendants ***may*** have "betrayed their racist attitudes" on the night of February 11 and that Rash ***may*** have been exposed to these views due to his acquaintance with Gregory.  But there is no allegation of such.  Instead, Plaintiff seeks to rely on the type of mere possibility that *Twombly* and *Iqual* clarified was insufficient to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678 (plausibility requires "more than a sheer possibility that a defendant has acted unlawfully").

Additionally, there is no factual allegation that supports the contention that Rash was aware of a plan to violate Arbery's Constitutional rights or in a position to stop such a violation. Regardless of the absence of such, in an effort to establish awareness on the part of Rash, Plaintiff relies on Rash's presence at the Construction Site on February 11, when the Private Defendants arrived to search for an alleged trespasser (which, unbeknownst to Rash, was in fact Arbery). Certainly, Rash was aware that the Private Defendants responded to English's call for assistance on that night, but this in itself is not a Constitutional violation.  In fact, the Private Defendants did not commit any Constitutional violation—or engage in any wrongful or illegal conduct—when they responded to the Construction Site on the night of February 11.  And thus, Rash's knowledge of the Private Defendants' actions on February 11 does not get Plaintiff where she needs to be: this does not show Rash knew of a plan to violate Arbery's Constitutional rights.

Plaintiff further argues that Rash was in a position to stop the Constitutional violation because he was present at the Construction Site on February 11.  Again, there was no wrongful or unlawful conduct in Rash's presence on that night and, therefore, no reason for Rash to intercede. The fact remains that the only alleged Constitutional violation occurred on February 23, when Arbery was seized and murdered by the Private Defendants.  The Private Defendants did not notify police, including Rash, that they were pursuing Arbery on February 23, and Rash was not present when that violation occurred and was not in a position to stop the violation.  (Doc. 1, p. 15 ¶ 81)*; see Park,* 120 F.3d at 1160 (defendants may be liable under § 1986 only if they are "in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it").

Moreover, Rash is entitled to qualified immunity as it relates to Plaintiff's § 1986 claim. Because there is no factual allegation from which it can reasonably be inferred that Rash was aware of the Private Defendants' racial animus, or that Rash was in a position to intercede, Plaintiff has failed to allege that Rash violated Arbery's clearly established Constitutional rights by failing to thwart the alleged § 1985 conspiracy amongst the Private Defendants.

In summary, the § 1986 claim that Plaintiff is asserting against Rash is subject to dismissal because (1) Plaintiff has failed to state a viable claim and (2) Rash is entitled to qualified immunity from any such claim.

## VI.   Rash is entitled to qualified immunity with respect to Plaintiff's substantive due process claim.

In Count VII, Plaintiff asserts a § 1983 claim against Rash due to an alleged violation of Arbery's right to substantive due process. (Doc. 1, pp. 37-38 ¶¶ 245-51.)  As noted in his Memorandum, Rash is entitled to qualified immunity with respect to that claim because Plaintiff has not alleged a violation of a clearly established Constitutional right. (Doc. 63-1, pp. 19-27.)

In her Response, Plaintiff argues that she is in fact asserting a Fourteenth Amendment claim and not a Fourth Amendment claim as Rash argued in his Memorandum.  In what reads like a re-pleading of her now defunct state-created danger claim, Plaintiff argues that Rash's alleged encouragement and authorization of the Private Defendants' conduct amounts to a violation of

substantive due process because it is arbitrary and conscience-shocking in the Constitutional sense. For the reasons set forth below, those arguments do not carry the day.

First, despite Plaintiff's arguments to the contrary, her claim is properly analyzed under the Fourth Amendment and not the Fourteenth Amendment. As discussed in Rash's Memorandum, Plaintiff's claims are ultimately based on the seizure of Arbery by the Private Defendants, and such a claim is governed directly by the Fourth Amendment. (Doc. 63-1, pp. 22-23 (citing *Jordan v. Mosely*, 298 Fed. Appx. 803, 805 (11th Cir. 2008) ("If an Amendment provides an explicit textual source of constitutional protection against the sort of conduct complained of, that Amendment—and not the more generalized notion of substantive due process under the Fourteenth Amendment—is the guide for analyzing the claim.")).)

Further, Plaintiff has not alleged facts to show that Rash's conduct was arbitrary or conscience-shocking in the Constitutional sense so as to amount to a violation of substantive due process. "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Waddell v. Hendry Cty. Sheriff's Off.*, 329 F.3d 1300, 1305–06 (11th Cir. 2003). And "[d]eterminations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision." Id.* (emphasis in original). Thus, Rash's actions must not be judged through the prism of hindsight—i.e., with the knowledge of Arbery's murder by the Private Defendants. The only actions taken by Rash, and the actions that form the basis of the claims that are being asserted against him, are (1) Rash's introduction of English to Gregory and (2) Rash's response to the Construction Site on February 11. As discussed below, neither one of those actions is arbitrary or conscience-shocking.

The fact that Rash introduced English to Gregory certainly does not shock the conscience as the two owned property in the same neighborhood. Further, Plaintiff has not shown that Rash had any sort of knowledge from which he should have foreseen the later heinous conduct by the Private Defendants. For instance, there are no facts that suggest that, when Rash introduced English to Gregory via text, Rash should have foreseen Gregory acting outside the manner

referenced in the text, much less foreseen the later seizure and murder of Arbery.  Furthermore, there are no facts that authorize the conclusion that Rash was familiar with the Private Defendants, their racial animus, or that they were likely to cause harm.  And thus, Rash's introduction of English to Gregory simply cannot support a substantive due process claim.

The events of February 11 also do not provide a basis for any contention that Rash acted in an arbitrary or conscience-shocking manner.  There are few facts alleged concerning Rash's actions on February 11, but Plaintiff alleges that Rash responded to the Construction Site after being contacted by English and, following his arrival, Rash searched for a suspected trespasser. The Private Defendants were also at the Construction Site, apparently responding to the suspected trespass as well.  But under the facts alleged, Rash did not witness any illegal conduct by the Private Defendants on February 11.   As a result, nothing that Plaintiff alleges with respect to the events of February 11 would have put Rash on notice that the Private Defendants would go beyond simply responding to the Construction Site and conducting a search of the grounds.  What Rash witnessed was neighbors assisting at the behest of a fellow neighbor regarding a suspected trespasser, which is not illegal.  As such, to the extent Plaintiff's claims rely on some inference that Rash should have affirmatively acted to quash illegal conduct on the part of the Private Defendants, the allegations do not show that he would have had knowledge of the need to do so. Accordingly, when viewed not with hindsight, but from the perspective of Rash at the time, it cannot be said that Rash's actions (or inaction) were arbitrary or conscience-shocking.

Further, like Rash argued in his Memorandum, Plaintiff can point to no case that would have put Rash on notice that his actions were "arbitrary or conscience-shocking" so as to violate the substantive due process clause of the Fourteenth Amendment.  (Doc. 63-1, pp. 26-27.)  Plaintiff points to two out-of-circuit cases, *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005) and *Waugh v. Dow*, 617 Fed. Appx. 867, 878 (10th Cir. 2015), which she argues should have put Rash on notice that his conduct was violative of the Due Process Clause.  But, when it comes to qualified immunity, decisions from other circuits do not clearly establish the law in this circuit.  *Hansen v. Soldenwagner,* 19 F.3d 573, 578 n. 6 (11th Cir. 1994) ("[T]he case law of one other circuit cannot

settle the law in this circuit to the point of it being 'clearly established.'"); *Banks v. Bostic*, 2018 WL 1158306, at *3 (11th Cir. Jan. 10, 2018) ("[O]ut-of-circuit and unpublished decisions" are "incapable of clearly establishing law for qualified-immunity purposes."). Indeed, courts in this Circuit have stated that a plaintiff's citation to out-of-circuit precedent is not only "unavailing in showing that the law at the time was clearly established" but "in fact highlights the lack of binding, clearly established law." *Ruch v. McKenzie*, 2019 WL 1407012, at *10 (N.D. Ga. Mar. 28, 2019). Nonetheless, out-of-circuit cases that are also distinguishable are certainly insufficient to show the law to be clearly established. *See See Kelly v. Curtis*, 21 F.3d 1544, 1551 n.6 (11th Cir. 1994); *Banks*, 1018 WL 1158306, at *3. And the cases Plaintiff cites are certainly distinguishable.

In *Pena*, a New York City police officer, Joseph Grey, a known alcoholic, and who was known to be intoxicated at the time, was permitted to work a shift as a police officer and struck a civilian with his patrol car, killing the pregnant driver, her son, and her sister. 432 F.3d at 102-105. Further, there were allegations that off-duty patrol officers communicated to Grey that he would not be punished for driving while intoxicated. *Id*. at 110-111. Thus, the facts showed that the defendants knew of the danger posed by the police officer and failed to take the steps necessary to prevent the ultimate harm. *See id*. at 112-114. Based on this, the Court found that the defendants' actions violated substantive due process because they "shock[ed] the contemporary conscience." *Id*. Unlike *Pena*, here, there are no facts alleged to plausibly show that Rash was aware that the Private Defendants posed a danger to Arbery or to the public at large. And there are no facts that Rash informed the Private Defendants that they would not be subject to punishment for misconduct. Further, the conduct of Rash—texting a property owner to inform him of a neighbor who could assist him and responding to a suspected crime—is incomparable to failing to prevent a visibly intoxicated officer from driving a police patrol car.

The other case Plaintiff relies on—*Waugh*—is similarly distinguishable. In *Waugh*, a Sheriff's deputy, Dow, responded to a call for assistance from another deputy to detain the plaintiff, who was wanted on an arrest warrant. 617 Fed. Appx. at 869. At the time he responded, Dow was off-duty and driving his personal vehicle with his brother as a passenger. *Id*. Dow stopped

near an area where the plaintiff had been spotted, gave his brother a badge and his backup service weapon, and told his brother to locate the plaintiff. *Id*. Dow's brother did locate the plaintiff and shot him in the leg. *Id*. The Tenth Circuit affirmed the district court's application of the "deliberate indifference" version of the "shock the conscience" standard, holding that Dow's conduct was sufficient to support a claim—specifically a substantive due process claim under a "state created danger" theory. *Id*. at 872-78. But the facts and holding in *Waugh* are not applicable here. First, the claims asserted in *Waugh* were based on a legal theory authorized by Tenth Circuit precedent. Moreover, the facts in *Waugh* involved a police officer arming a citizen and instructing him to attempt to apprehend a suspect, which is not what is alleged here. There are no facts alleged that show Rash either armed the Private Defendants or instructed them to apprehend Arbery. Rash's actions—texting English that he could reach out to Gregory and responding to the Construction Site when the Private Defendants were on scene and searching for a suspected trespasser—in no way put Arbery in the type of direct and foreseeable danger as arming a private citizen in the circumstances addressed by *Waugh*.

Accordingly, because Plaintiff has not shown that Rash violated clearly established law, Rash is entitled to qualified immunity as it relates to Plaintiff's substantive due process claim.

**VII.   Plaintiff alleges no duty upon which to base a wrongful death claim.**

In Count XI of her complaint, Plaintiff asserts a claim against Rash for the wrongful death of Arbery. (Doc. 1, pp. 42-43, ¶¶ 277-279.) In his Memorandum, Rash showed that Plaintiff's wrongful death claim is subject to dismissal because Rash did not owe a duty to Arbery and because Rash is entitled to official immunity. (Doc. 63-1, pp. 28-31.) In response, like she did with her conspiracy claim, Plaintiff tries to amend and re-plead her wrongful death claim. But as discussed, Plaintiff cannot do so in order to avoid dismissal; what matters at the motion to dismiss stage is the facts alleged in Plaintiff's complaint. *Malowney*, 193 F.3d at 1348 n.5. And Plaintiff's complaint falls far short of alleging the requisite facts to support a wrongful death claim.

Because Plaintiff failed to allege a specific duty, in his Memorandum, Rash argued that he owed no general duty to the public which could support a wrongful death claim. (Doc. 63-1, pp.

28-31.)  In response, Plaintiff alleges that dismissal of her wrongful death claim would be improper because she has alleged a duty arising from a special relationship.   But that argument is a misrepresentation of the allegations contained in Plaintiff's complaint.  Plaintiff's allegations state nothing about the source of any duty that Rash owed to Plaintiff.  Indeed, Plaintiff's allegations in support of her wrongful death claim do not even use the word "duty" or the term "special relationship."  Moreover, Plaintiff has not alleged facts that support a "special relationship" under Georgia law.

The "special relationship" doctrine establishes a duty where there is a particularized threat to an individual.  *See Holcomb v. Walden*, 270 Ga. App. 730, 732 (2004).  In order to establish a "special relationship," a plaintiff must satisfy the following requirements: "(1) an explicit assurance by the [defendant], through promises or actions, that [the defendant] would act on behalf of the injured party; (2) knowledge on the part of the [defendant] that inaction could lead to harm; and (3) justifiable and detrimental reliance by the injured party on the [defendant's] affirmative undertaking." *Id*. at 732 (citing *City of Rome v. Jordan,* 263 Ga. 26, 28 (1993)).  Applying this standard to Plaintiff's arguments with respect to Rash, Plaintiff's allegations fall short of establishing a special relationship.

As an initial matter, there is no allegation that Rash provided an explicit assurance to Arbery that he (Rash) would protect Arbery.  In fact, there is no allegation that Rash ever communicated with Arbery or was even aware of a particularized threat to Arbery.  Furthermore, there are no facts to show that Rash knew that Arbery was the suspected trespasser prior to Arbery's death.  In addition, there is no allegation that Arbery relied on an affirmative undertaking by Rash. For instance, there is no allegation that Arbery went jogging on the day that he was murdered because he believed that he was being protected by Rash.  Because Rash did not make any promises or engage in any action that would lead Arbery to believe that Rash was acting on his behalf, and because there is no allegation that Arbery relied on any such promises or action, there was no special relationship between Rash and Arbery.

Furthermore, as discussed, there are no facts alleged to show that Rash had any knowledge that inaction on his part could lead to harm.  Plaintiff relies heavily on the February 11 search of the Construction Site and Rash's "relationship" with Gregory to argue that Rash should have known that the Private Defendants could cause harm.  But as discussed, (1) nothing on February 11 could have put Rash on notice that the Private Defendants would later seek out, seize, and murder Arbery; and (2) there are no facts to show that Rash had any knowledge of dangerous propensities on the part of the Private Defendants.

In short, the allegations in Plaintiff's complaint do no establish a special relationship between Rash and Arbery.  Because no such relationship existed, Rash did not owe a duty to Arbery, and, for that reason, the wrongful death claim that Plaintiff is asserting against Rash is subject to dismissal.

## VIII.   Plaintiff does not allege willful and wanton misconduct on the part of Rash sufficient to support a stand-alone claim for relief.

In Count XIII of her complaint, Plaintiff asserts a claim against Rash for "willful and wanton misconduct."  (Doc. 1, pp. 44-45, ¶¶ 9-13.)  However, instead of a stand-alone claim, "willful and wanton" misconduct is a measure of establishing a defendant's degree of fault.  For example, in *McClelland v. Riffle*, 970 F. Supp. 1053 (S.D. Ga. 1997), which Plaintiff cites, this Court looked at whether a police officer was barred from recovering damages based on the conduct of a wrongdoer under the "Fireman's Rule."   The police officer argued the "Fireman's Rule" did not extend to willful and wanton misconduct, which this Court defined as conduct that "evidence[d] a willful intention to inflict the injury, or else was so reckless or so charged with indifference to the consequences . . . as to justify the jury in finding a wantonness equivalent in spirit to actual intent."  *Id*. at 1055 (quotations omitted).  The Court went on to state "[t]here is an element of intent, actual or imputed, in 'willful and wanton conduct' which removes such conduct from the range of conduct which may be termed negligent."  *Id*.  As discussed further below, Plaintiff does not allege that Rash acted with a "willful intention to inflict the injury."  Therefore, Plaintiff must demonstrate "wantonness equivalent in spirit to actual intent," which requires that

Rash either had knowledge or was charged with knowledge that the Private Defendants would ultimately seek out, seize, and murder Arbery.  *See id.* (finding the defendant's actions constituted "willful and wanton misconduct" because she had knowledge of the harm her actions could cause and yet disregarded this risk).  Setting aside whether willful and wanton misconduct can serve as a stand-alone claim under Georgia law, Plaintiff has simply not alleged that Rash's conduct - sending a text message to English and responding to the Construction Site - amounted to willful and wanton misconduct.

IX.    **Plaintiff's state law claims are barred by official immunity because Plaintiff has not alleged actual malice on the part of Rash.**

As discussed, Plaintiff is asserting two claims against Rash pursuant to Georgia law:  a wrongful death claim and a "willful and wanton misconduct" claim.  (Doc. 1, p. 42-3 ¶¶ 277-79, p. 43¶¶ 1-4, p. 44  9-13.) In addition to the reasons previously stated, in his Memorandum, Rash showed that he is entitled to official immunity with respect to those claims.  (Doc. 63-1, p. 32.) "As a general rule, a county law enforcement officer enjoys official immunity from a lawsuit alleging that [he] is personally liable in tort for [his] performance of official functions." *Eshleman v. Key,* 297 Ga. 364, 365 (2015), *overruled in part on other grounds by Rivera v. Washington,* 298 Ga. 770, 784 S.E.2d 775 (2016).  There are only two exceptions:  "First, an officer has no immunity to the extent [he] acted with malice or an intent to injure.  Second, an officer has no immunity for negligence in the performance of a ministerial function." *Id.*  Here, Rash is entitled to official immunity because: (1) he was not engaged in the performance of a ministerial duty; and (2) Plaintiff has not alleged that Rash acted with actual malice.

A.    **Rash was not engaged in the performance of a ministerial duty.**

In her Response, Plaintiff asserts that Rash was acting pursuant to a ministerial duty. (Doc. 84, pp. 55-58.)  However, the allegations in Plaintiff's complaint do not identify a ministerial duty on the part of Rash or allege the breach of any such duty.  Thus, like with her conspiracy and wrongful death claims, Plaintiff seeks to amend her complaint via her Response so as to allege the

existence and breach of a ministerial duty.  In an effort to do so, Plaintiff turns again to the red herring:  the concept of deputization.

As discussed in Rash's Memorandum, a ministerial duty may be established by: (1) a written policy; (2) an unwritten policy; (3) a supervisor's specific directive; or (4) a statute.  (Doc. 63-1, pp. 29-3 (citing *Wyno v. Lowndes County,* 305 Ga. 523, 527 (2019)).)  As a result, Plaintiff claims that Rash violated ministerial duties established by statutes when he "deputized" the Private Defendants.  (Doc. 84, pp. 55-58.)  Specifically, Plaintiff argues that Rash's alleged "deputization" of the Private Defendants runs afoul of O.C.G.A. §§ 35-8-8; 35-8-2; and 36-8-1.  (*Id*.)  Those statutes, however, do not place a ministerial duty, or any duty, on Rash or any other individual police officer.  Instead, those statutes state the qualifications for peace officers (§ 35-8-8), establish the annual training that peace officers are required to receive (§ 35-8-21), and set forth the procedure by which a county may hire police officers (§ 36-8-1).  Further, even if the statutes applied to Rash, they are not applicable in these circumstances because no deputization occurred. As explained in the memorandum filed in support of the motion to dismiss of Glynn County, because Rash was not Glynn County's highest ranking law enforcement officer, he did not have the authority to "deputize" the Private Defendants.  (Doc. 67, pp. 12-14.)

Finally, it is important to focus on the actual conduct at issue and not how it is characterized.  In Rash's Memorandum, he characterized his conduct as a response to a report of a crime and an effort to prevent crime.  (Doc. 63-1, p. 30.)  In contrast, Plaintiff characterizes the conduct at issue as "outsourcing the powers and responsibilities of law enforcement to Private Defendants . . . ." (Doc. 84, p. 56.)  But as Plaintiff notes in her Response, when determining whether a duty is ministerial or discretionary, the Court is not obligated to accept a party's characterization of the relevant conduct.  (*Id*.)  And this rings especially true here, where the conduct in question, regardless of the parties' characterizations, plainly does not invoke a ministerial duty.  As previously discussed, with respect to Rash, the conduct that forms the basis of Plaintiff's claim is the text he sent to English and his response to the Construction Site on February 11.  Plaintiff has not pointed to any policy, directive, or statute that prohibited Rash from

sending a text to English or that governed the content of that text. Similarly, Plaintiff has not pointed to any policy, directive, or statute that governed the manner in which Rash responded to the Construction Site. For instance, Plaintiff has not pointed to any policy, directive, or statute that instructed Rash to take any specific action after arriving at the scene of a reported trespass and finding that neighbors had already responded. Rather, upon his arrival, Rash was required to exercise personal deliberation and judgment with respect to the actions he should take. *See Grammens v. Dollar,* 287 Ga. 618, 619 (2010) ("A discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed."). Because Rash's conduct was not governed by a policy, directive, or statute, when he sent the text and when he responded to the Construction Site, Rash was engaged in discretionary duties - not ministerial duties.

**B.      Plaintiff does not allege that Rash acted with actual malice.**

In order to overcome the doctrine of official immunity, a plaintiff must allege that the defendant acted with actual malice. *See Merritt v. Gay,* 2016 WL 4223687, *13 (S.D. Ga. Aug. 9, 2016) ("[A] public official must not be subject to suit for the performance of a discretionary function unless he act[s] with actual malice or with actual intent to cause injury." (quotations omitted). Here, Plaintiff fails to allege that Rash acted with the requisite intent; thus, Rash is entitled to official immunity.

"In the context of official immunity, 'actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact.'" *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1144 (N.D. Ga. 2016). "The Georgia Supreme Court has held that the terms 'actual malice' or 'malice in fact' are distinguished from 'implied malice,' a term which has been defined to mean conduct exhibiting a 'reckless disregard' for the rights or safety of others." *Id.* "In other words, a 'deliberate intention to do wrong' such as to constitute actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." *Id.* at 1145. "The phrase 'actual intent to cause injury' refers to 'an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" *Id.* at 1144

(quoting *Kidd v. Coates*, 271 Ga. 33, 518 S.E.2d 124, 125 (1999) (quotations omitted).   Here, Plaintiff has not alleged that Rash intended for Arbery to be murdered by the Private Defendants. As a result, Plaintiff cannot show "actual malice" on the part of Rash.

Because Rash was not engaged in a ministerial duty, and because he did not act with actual malice, he is entitled to official immunity with respect to Plaintiff's state law claims.

## <u>CONCLUSION</u>

For the reasons set forth herein and in his Memorandum, Rash respectfully requests that the Court dismiss the claims that Plaintiff is asserting against him with prejudice.

This 7th day of October, 2021.

*s/Raleigh Rollins*
Raleigh W. Rollins (Ga. Bar No. 613860)
Email: rrollins@alexandervann.com
H. Thomas Shaw (Ga. Bar No. 593166)
Email: tshaw@alexandervann.com
ALEXANDER & VANN, LLP
411 Gordon Avenue
Thomasville GA 31792
Telephone:    (229) 226-2565
Facsimile:    (229) 228-0444
*Attorneys for Defendant Robert Rash*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have furnished a copy of the foregoing through the Court's CM/ECF system to all registered parties on this 7th day of October, 2021.

*s/Raleigh W. Rollins*
Raleigh W. Rollins