**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **WANDA COOPER in her individual capacity and as administrator of the estate of the decedent AHMAUD ARBERY** : **Plaintiff** | : : : : |
| **v.** | : **Civil Action No.** : **2:21-CV-20-LGW-BWC** : |
| **TRAVIS McMICHAEL and GREGORY McMICHAEL and WILLIAM BRYAN and POLICE OFFICER ROBERT RASH and POLICE OFFICER RICKY MINSHEW and GLYNN COUNTY and JACKIE JOHNSON and GEORGE BARNHILL Defendants.** | : : : : : : : : |

## FIRST AMENDED COMPLAINT

Plaintiff Wanda Cooper, in her individual capacity and as independent Administrator of the Estate of the Decedent, Ahmaud Arbery, for her complaint against Defendants Travis McMichael, Gregory McMichael, William Bryan, Police Officer Robert Rash, Police Officer Ricky Minshew, Glynn County, Jackie Johnson, and George Barnhill, alleges as follows:

### INTRODUCTION

1.     On the afternoon of February 23, 2020, Ahmaud Arbery, a young Black man, laced up his running shoes and went for a jog. An avid runner, Ahmaud frequently jogged around his neighborhood and surrounding areas in Brunswick, Georgia, including Satilla Shores. But February 23, 2020 was different. That day three armed white men, Defendants Gregory McMichael, Travis McMichael and William Bryan—entrusted by local law enforcement to respond to recent trespasses in the area, and armed with a Police-Department-issued revolver and

1

a 12-gauge shotgun—hunted Ahmaud down in their trucks. Based on a "gut feeling" that Ahmaudwas responsible for prior thefts in the neighborhood, these Defendants shot Ahmaud three timesat close range with their shotgun and killed him. As Ahmaud lay bleeding out on the pavement, Defendant Travis McMichael stood above him and said, "fucking Nigger."

2.        Police Officer Ricky Minshew arrived seconds after Ahmaud was shot. It was obvious that Ahmaud had suffered serious life-threatening injuries but he was alive and could be heard gasping for breath. Officer Minshew deliberately disregarded Ahmaud's obvious injuries. Instead of attempting to save Ahmaud's life, he engaged in casual conversation with Ahmaud's murderers.

3.        Consistent with the Glynn County Manager's 2019 report describing the Glynn County Police Department's "ongoing culture of cover-up, failure to supervise, abuse of power and lack of accountability," when Glynn County police officers arrived on the scene, they did not arrest their former colleague Gregory McMichael, his son Travis McMichael, or William Bryan, despite the fact that all three had just participated in the gruesome execution of an unarmed person. Having previously authorized retired officer Gregory McMichael to stand in as law enforcement and respond to recent neighborhood trespasses "day or night," the Department declined to meaningfully investigate the circumstances surrounding Ahmaud's murder.

4.        The effort to cover up what the McMichaels and Bryan had done continued in the Brunswick County District Attorney's office. Defendant DA Jackie Johnson had known Gregory McMichael personally for years when he served as her investigator, and had previously intervened to try to keep him on the police force after he repeatedly failed to complete state- mandated officer training. In the immediate wake of the murder and before recusing herself, Johnson instructed law enforcement not to arrest her former colleague, his son, or Bryan. Upon recusing herself, Johnson

2

handed the case to her colleague in neighboring Ware County, Defendant George Barnhill, knowing, but not disclosing, that he too had a personal connection with Gregory McMichael. When this connection was discovered, Barnhill, too, was forced to recuse himself, but not before issuing a letter intended to justify the murder of Ahmaud as "perfectly legal," based on a multitude of demonstrably false statements. This included painting Ahmaud as a violent and unstable criminal who had attacked the McMichaels.

5.     For nearly three months, Glynn County police officers, the chief of police, and two prosecutors conspired to hide the circumstances surrounding Ahmaud's death and to protect the men who murdered him. And none of this would have been discovered but for video footage leaked to the media, which showed the horrific and brutal murder of Ahmaud. Two days after the video was released to the public and drew national attention and outrage, law enforcement finally arrested Defendants Travis McMichael, Gregory McMichael, and William Bryan for murder.

## PARTIES

6.     Ahmaud Arbery, the Decedent, was a 25-year-old Black man and a resident of Brunswick, Georgia. Ahmaud was murdered in broad daylight, while he was unarmed and jogging. Plaintiff Wanda Cooper is Ahmaud's mother and a resident of Brunswick Georgia. Wanda Cooper sues on behalf of herself and as the personal representative of the Estate of Ahmaud Arbery.

7.     Defendant Travis McMichael is a person of full age and majority and a resident of Georgia. At all relevant times Travis McMichael acted within the scope of authority granted to him by the law enforcement structure of Glynn County. At all relevant times Travis McMichael acted in concert and conspiracy with the law enforcement structure of Glynn County. At all relevant times Travis McMichael acted under color of law. He is sued in his individual capacity.

8.     Defendant Gregory McMichael is a person of full age and majority and a resident

3

of Georgia. At all relevant times Gregory McMichael acted within the scope of authority granted to him by the law enforcement structure of Glynn County. At all relevant times Gregory McMichael acted in concert and conspiracy with the law enforcement structure of Glynn County.At all relevant times Gregory McMichael acted under color of law. He is sued in his individual capacity.

9.      Defendant William Bryan is a person of full age and majority and a resident of Georgia. At all relevant times William Bryan acted within the scope of authority granted to him by the law enforcement structure of Glynn County. At all relevant times William Bryan acted inconcert and conspiracy with the law enforcement structure of Glynn County. At all relevant timesWilliam Bryan acted under color of law. He is sued in his individual capacity.

10.      Defendant Police Officer Robert Rash was at all relevant times a duly appointed Glynn County Police Officer acting within the scope of his employment and under color of law.He is sued in his individual capacity.

11.      Defendant Police Officer Ricky Minshew was at all relevant times a duly appointed Glynn County Police Officer acting within the scope of his employment and under color of law.He is sued in his individual capacity.

12.      Defendant Glynn County is a county of the State of Georgia. It oversees the Glynn County Police Department.

13.      Defendant Jackie Johnson was at all relevant times the District Attorney for the Brunswick Judicial Circuit acting within the scope of her employment and under color of law. She is sued in her individual capacity.

14.      Defendant George Barnhill was at all relevant times the District Attorney for the Waycross Judicial Circuit acting within the scope of his employment and under color of law. Heis sued in his individual capacity.

## JURISDICTION AND VENUE

15.      Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the First, Fourth and Fourteenth Amendment rights of the Decedent Ahmaud Arbery. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

16.      Venue is proper in this Honorable Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred within the Southern District of Georgia.

## FACTUAL ALLEGATIONS

### I.      The Deputization Of Neighbors Diego Perez, Gregory McMichael, Travis McMichael, And William Bryan In Response To Recent Trespass Incidents.

17.      Over the course of at least several months and in response to reported trespasses by various visitors on a neighborhood construction site, Glynn County law enforcement officials authorized their former colleague Defendant Gregory McMichael, his son Defendant Travis McMichael, Defendant William Bryan, and Diego Perez to act as law enforcement officers.

18.      As of February 23, 2020, Larry English owned property located at 220 Satilla Drive in the Satilla Shores neighborhood in Brunswick, Georgia ("the Construction Lot"). English was in the process of building a house on the Construction Lot. The structure, which had been under construction since 2019, was not fully enclosed and had no doors. English did not reside on the Construction Lot; he lived approximately two hours away, in Coffee County.

19.      English was aware of a months-long pattern of curious people entering the construction lot.

20.      English recognized that it was "normal" for people to come in and out of the property and that it occurred frequently.

21.     Despite English's recognition that entering his unsecured construction lot was normal, common, and ongoing, English failed to post signs, erect fences, install doors, or otherwise make any indication that he sought to exclude curious persons from entering the lot.

22.     English maintained several motion-sensor security cameras on the Construction Lot and he received alerts to his cell phone when there was activity therein. The security camera also made short video recordings when the motion sensor was tripped, which were automatically saved to English's phone.

23.     From October 2019 to February 2020, English received at least eleven alerts with corresponding clips of different individuals of varying ages and races on the Construction Lot. The various visitors included several children and a white couple. English reported multiple of these alerts to the Glynn County Police Department using the non-emergency line.

24.     On October 25, 2019, Glynn County police officers, including Defendant Police Officer Robert Rash, responded to the Construction Lot after English called the non-emergency line. On or around that day, Defendants Rash and English exchanged phone numbers.

25.     On November 17, 2019, English's camera captured a white couple entering the structure on the Construction Lot and English again notified police.

26.     The next day, on November 18, 2019, English's camera captured a different person entering the structure on the Construction Lot and English again reported the intrusion to Glynn County Police using the non-emergency line.

27.     After having to respond to several of these reports from English, the Glynn County Police Department authorized certain of English's neighbors to respond on law enforcement's behalf, including former Glynn County police officer Defendant Gregory McMichael, his son Defendant Travis McMichael, Defendant William Bryan, and Diego Perez. On information and

belief, this included the Glynn County Police Department passing the information that English reported to the Department on to the neighbors. The Glynn County Police Department also told English that he should call the neighbors "day or night" in the event of further trespasses on his property.

### a. *Diego Perez*

28.     On November 19, 2019, the day after the second November alert, English met Diego Perez for the first time. Perez lives at 224 Satilla Drive, near the Construction Lot.

29.     Perez revealed to English that he was aware that English had called the police when someone entered the structure on the Construction Lot on October 25, 2019. Perez was aware that English had called the police because Defendant Officer Rash and Glynn County Police Department officials authorized Perez, Defendant Travis McMichael, Defendant Gregory McMichael, and Defendant Bryan to act as law enforcement officers and provided them with information to assist in law enforcement activity.

30.     During their November 19, 2019 meeting, English and Perez exchanged phone numbers and English texted Perez the November 18 video of someone entering the structure.

31.     In response to the video, Perez texted English the following:

> "Goodness. If you catch someone on your cameras, let me know right away. I can respond in mere seconds. It's totally up to you. Our yards connect in the back and I can go either way, through the front or back, with your permission.
>
> Thank you for texting me. I'll put up another camera facing that way so I can keep an eye out in real time. I watch the camera's pretty often."

### b. *Defendant Gregory McMichael*

32.     On or around December 20, 2019, English texted Defendant Rash a clip of

7

someone entering the structure on the Construction Lot on December 17, 2019.

    33.    On December 20, 2019, Defendant Rash texted back:



    34.    Defendant Rash's text message informing English that he should contact Defendant Gregory McMichael "day or night" reflected the Glynn County Police Department's deputization, ratification, and endorsement of Defendant Gregory McMichael acting as a law enforcement agent under color of law. The text message also reflects that Defendant Rash had communicated with Defendant Gregory McMichael to confirm his willingness to respond to English's complaints of trespassers entering his structure.

    35.    In being authorized to respond on law enforcement's behalf, Defendant Gregory McMichael became closely intertwined with the Glynn County Police Department and acted under color of law when he subsequently participated in the pursuit and murder of Ahmaud.

    36.    Prior to being called upon by law enforcement in this case, Defendant Gregory McMichael was a police officer with the Glynn County Police Department for seven years, from 1982 to 1989. From 1995 until his retirement in 2019, he worked as an investigator for the Brunswick District Attorney's office.

8

37.     During his tenure with the Brunswick District Attorney's office, Defendant Gregory McMichael repeatedly failed to complete his state mandated Peace Officer Standards Training ("P.O.S.T."). His failure to complete these basic trainings in 2005, 2006, 2007, 2009, and 2010 left him unqualified to carry out the duties of his position.

38.     Defendant Gregory McMichael's personnel file shows that in 2014 he "discovered that he ha[d] not had arrest powers since 2006" due to his failure to complete these trainings.

39.     Defendant Jackie Johnson, the Brunswick District Attorney, worked on Defendant Gregory McMichael's behalf in order for him to receive an "exemption" from his state mandated training.

40.     Yet in 2018, Defendant Gregory McMichael again failed to complete training, and on February 1, 2019, his basic law enforcement certification was suspended by the Georgia P.O.S.T. Council.

41.     On February 27, 2019, Defendant Gregory McMichael was reassigned to the Camden County DA's office, and a memo was circulated noting that he had "relinquished his P.O.S.T. certification . . . and that he plans to retire effective June 1, 2019." The memo also stated that Defendant Gregory McMichael would "not engage in any activity that would be construed as being law enforcement in nature."

42.     At the time Defendant Rash called upon Defendant Gregory McMichael to act on behalf of law enforcement and directed English to contact Defendant Gregory McMichael, McMichael had been retired for six months, and had not been officially working as law enforcement in any capacity for nearly a year.

43.     Defendant Rash was aware that Defendant Gregory McMichael was no longer law enforcement. He noted in his text message to English that Defendant Gregory McMichael was

"retired."

44.     Defendant Gregory McMichael had a practice of engaging in law enforcement conduct after his retirement.

45.     On at least one prior occasion, Defendant Gregory McMichael, along with Defendant Travis McMichael, informed the Glynn County Police Department that they "made contact" with people they suspected of crimes.

46.     The Glynn County Police Department in no way discouraged or attempted to stop Defendant Gregory McMichael from conducting investigations or confronting suspects, thus ratifying his law enforcement conduct.

c.  *Defendant Travis McMichael*

47.     Defendant Travis McMichael is Defendant Gregory McMichael's adult son and a former U.S. Coast Guard Boarding Officer. At the time of the events in this case, he ran a company that gave custom boat tours.

48.     Defendant Travis McMichael has an extensive history of racist and anti-Black behavior, including on Internet social media and in correspondence with friends.

49.     When he was in the Coast Guard, Defendant Travis McMichael once told a friend that he loved his job because he was "on a boat and there weren't any Niggers anywhere."

50.     In response to another social media post, Defendant Travis McMichael wrote, "That would have only been better if that had blown that fucking Nigger's head off."

51.     Zachary Langford, a friend of Defendant Travis McMichael, testified that he had a text exchange in which Defendant Travis McMichael discussed shooting a "black coon with gold teeth that had a high point .45." Langford said that Defendant Travis McMichael "was referring to a

10

raccoon" and "being facetious" when he made those comments.

52.     Defendant Travis McMichael responded to an internet video of a black man pulling a prank on a white man by stating "I'd kill that fucking nigger"

53.     Defendant Travis McMichael responded to an internet video of a group of black teenagers by stating "shoot all of them. Fuck those Goddam Monkeys".

54.     Defendant Travis McMichael publicly referred to black people as "animals, monkeys, and subhuman savages."

### d. *Defendant William Bryan*

55.     Defendant Bryan also lived in the Satilla Shores neighborhood.

56.     Defendant Bryan is a friend of Defendant Gregory McMichael. Gregory McMichael has referred Bryan as "an ally" of his.

57.     Like Defendant Travis McMichael, Defendant Bryan had a history of making racist and anti-Black comments in correspondence with friends.

58.     In one text message, Defendant Bryan stated that he was glad to be at the airport when there were "no Niggers."

59.     Defendant William Bryan responded to his daughter dating a black man by stating "she has her a nigger now".

60.     Defendant William Bryan referred to a Martin Luther King Day parade as "the monkey parade".

### II.     The Deputized Neighbors Pursue a Stranger.

61.     On the evening of February 11, 2020, English was again alerted that someone entered the structure on the Construction Lot.

62.     The person that entered the structure on February 11, 2020, was Ahmaud. Nothing

11

was taken from the construction lot and no damage was done to any property.

63.     English did not call the police. Instead, English contacted Perez via text message. In response, Perez armed himself and walked over to the Construction Lot. When Perez arrived, he encountered Defendant Travis McMichael driving up to the Construction Lot in his truck.

64.     Defendant Travis McMichael told Perez that he had seen a man entering the Construction Lot as he drove by and attempted to confront the man, but the man ran through the structure and left the Construction Lot.

65.     At 7:27 p.m. on that day, after he had unsuccessfully pursued the man, Defendant Travis McMichael called 911 to report that he "just caught a guy run into a house being built," but that the guy "took off running inside the house." He confirmed that "about four" people from the neighborhood were attempting to find and stop the man on the Construction Lot.

66.     The four people were Perez, Defendant Travis McMichael, Defendant Gregory McMichael, and possibly Defendant Bryan, and all four men had armed themselves and searched for Ahmaud with the intent to confront and arrest him by force or threat of force.

67.     These men believed that they had authority to pursue the man on the Construction Lot because they had been deputized by the Glynn County Police Department, including Defendant Officer Rash.

68.     After contacting Perez, and after Perez and Defendant Travis McMichael engaged in their armed pursuit, English texted the footage from his security camera to Defendant Officer Rash. Glynn County police officers, including Defendant Officer Rash, responded to the Construction Lot.

69.     Perez later responded to English's text alerting him to a trespasser at the Construction Lot, saying:

"The police showed up and we all searched for a good while. I think he got spooked and ran after Travis confronted him. Travis says the guy ran into the house. Let me know if he shows up or if they find him. I appreciate you letting me know."

70.     The Glynn County police officers who responded, including Defendant Officer Rash, worked in conjunction and in conspiracy with the armed neighbors to search for Ahmaud, reflecting the earlier deputization of the neighbors to act as law enforcement and respond when a suspected trespasser entered the structure.

71.     In conducting this joint search, the neighbors were closely intertwined with the Glynn County Police Department and were acting under color of law.

72.     Defendant Officer Rash endorsed and encouraged Diego Perez and Travis McMichael to search for Ahmaud with firearms and flashlights.

73.     Defendant Officer Rash had extensive conversations with Travis McMichael and Gregory McMichael wherein he shared information related to the investigation and the video from inside English's construction site.

74.     Defendant Rash discussed all of the "blacks" that lived in Satilla Shores with Travis McMichael and Gregory McMichael as being potential suspects.

75.     Defendant Rash shared information related to additional crimes that had occurred in Satilla Shores with Travis McMichael and Gregory McMichael.

76.     Travis McMichael explicitly informed Officer Rash that he had armed himself and searched for Ahmaud.

77.     The conduct of Defendant Officer Rash and the other officers who engaged in joint law enforcement activity with the neighbors established Glynn County's authorization, ratification, and endorsement of Perez and Defendants Travis McMichael, Gregory McMichael, and

Bryan, acting as law enforcement agents under color of law.

### III.    Ahmaud Arbery's Murder

78.      Around 1:00 p.m. on the afternoon of February 23, 2020, Ahmaud left his house to go for a jog.

79.      The Construction Lot was on his jogging route, approximately 1.8 miles from his home.

80.      Ahmaud stopped at the Construction Lot during his jog and entered the structure to get a drink of water from a spigot within the structure or to rest.

81.      Twelve minutes later, Ahmaud was dead.

82.      Ahmaud did not do any damage to the structure and he did not take anything from the Construction Lot.

83.      At or around the time that Ahmaud was in the structure, Mathew Albenze, a resident of Satilla Shores, called 911 and reported: "There's a guy in a house right now. It's at ahouse under construction."

84.      When the 911 operator asked Albenze whether he observed the individual break into the house, Albenze said, "No, it's all open, it's under construction."

85.      While Albenze was still on the phone with the 911 operator, Ahmaud exited the Construction Lot and jogged down the street.

86.      As Ahmaud continued with the rest of his jog down the street, he passed Defendant Gregory McMichael, who was working in his front yard.

87.      The demonstrative aid below provides a visual approximation of the stalking and murder of Ahmaud that followed.





88.     Defendant Gregory McMichael did not see Ahmaud enter or leave the Construction Lot on February 23, 2020.

89.     Defendant Gregory McMichael later claimed that he recognized Ahmaud from previous video footage from inside the Construction Lot.

90.     The previous video footage that Defendant Gregory McMichael referred to does not show anyone damaging or removing anything from the Construction Lot.

91.     After seeing Ahmaud run down the street, Defendant Gregory McMichael ran inside his home and told Defendant Travis McMichael that "the guy" from the previous videos was running down the street.

92.     Defendant Gregory McMichael told Defendant Travis McMichael to get their guns to pursue Ahmaud.

93.     Neither Defendant Gregory McMichael nor Defendant Travis McMichael observed Ahmaud engage in any criminal conduct. Defendant Gregory McMichael later claimed he had a "gut feeling" that Ahmaud was responsible for previous thefts in the neighborhood.

94.     Neither Defendant Gregory McMichael nor Defendant Travis McMichael called the police to report this "gut feeling" or to report that they believed they had seen a trespasser.

95.     Rather, Defendants Gregory McMichael and Travis McMichael armed themselves to carry out duties they had been entrusted with by the Glynn County Police Department in response to recent trespasses at the Construction Lot.  Defendants Gregory McMichael and Travis McMichael had been authorized and encouraged to take such law enforcement action by the Glynn County Police Department and Defendant Officer Rash.

96.     Defendant Gregory McMichael armed himself with the same Smith and Wesson 686 .357 Magnum revolver he carried when he was a Glynn County Police Officer. The revolver is stamped "GC PD" (Glynn County Police Department.

16

97.     Defendant Travis McMichael armed himself with a Remington 870 pump 12 gauge shotgun.

98.     Defendants Gregory McMichael and Travis McMichael got in a white pickup truck and, with Travis McMichael driving, began to pursue Ahmaud heading south on Satilla Drive.

99.     Upon seeing these armed men chase him, Ahmaud consistently tried to escape them, at times running backwards and changing direction.

100.    The pursuit continued east on Burford Road where it passed Defendant Bryan's house.

101.    Defendant Bryan did not observe Ahmaud engage in any criminal conduct.

102.    Seeing the McMichaels chasing Ahmaud, Defendant Bryan yelled, "Do you got him?"

103.    Without needing a response, Defendant Bryan ran into his house to get his keys and then got into his own truck to join Defendants Gregory McMichael and Travis McMichael in the pursuit.

104.    Defendant Bryan told police that he pulled out of his driveway to attempt to block Ahmaud in, but Ahmaud kept going around him.

105.    Defendant Bryan also told police that he made multiple "moves" at Ahmaud with his truck but Ahmaud did not stop.

106.    Still trying to escape for his life, Ahmaud doubled back to get away from Defendants Gregory McMichael and Travis McMichael, running west on Burford Road.

107.    Defendant Gregory McMichael jumped out of the truck and tried to confront Ahmaud, but Ahmaud was able to get away safely.

108.    Defendant Gregory McMichael climbed into the bed of the truck and he and

17

Defendant Travis McMichael continued east on Burford to loop around on Zellwood Drive and Holmes Road in an attempt to intercept Ahmaud on his retreat back into the neighborhood. Ahmaud was headed west on Burford Road back toward Defendant Bryan's house.

109.     Defendant Bryan saw Ahmaud heading westbound towards him on Burford Road and, pursuant to his conspiracy with Defendants Gregory and Travis McMichael, pulled his truck into Ahmaud's path in an attempt to "block him in." (See "1" on demonstrative aid)

110.     Ahmaud was able to avoid Defendant Bryan's truck and continued west on Burford Road, then turned northeast onto Holmes Road.

111.     Defendant Bryan turned around and followed Ahmaud on Holmes Road, pulling ahead of Ahmaud and again attempting to prevent his escape.

112.     Defendant Bryan struck Ahmaud with his truck, forcing him into a ditch. (See "2" on demonstrative aid)

113.     Ahmaud managed to avoid serious injury and get past Defendant Bryan's truck. Seconds later, however, Ahmaud saw that Defendants Gregory McMichael and Travis McMichael had circled around and were now heading toward him.

114.     Ahmaud again made a U-turn and ran southwest on Holmes Road, away from Defendants Bryan and the McMichaels, toward the intersection with Satilla Drive.

115.     Defendant Travis McMichael followed with his truck, passing Ahmaud and pulling ahead of him on Holmes Road.

116.     Defendant Bryan turned his truck around and followed in pursuit.

117.     At this point, when Defendant Bryan began a video recording of the encounter, Ahmaud had been running from armed men pursuing him in their vehicles for almost four minutes.

118.     Defendant Travis McMichael stopped the truck at the southern end of Holmes Road where it intersects Satilla Drive.

18

119.     Defendant Travis McMichael got out of the truck and stood on Holmes Road with his shotgun, waiting as Ahmaud ran toward him. (See "3" on demonstrative aid)

120.     At approximately this time, 1:14 p.m., Defendant Gregory McMichael, still standing in the bed of the truck, called 911 and told the operator: "I'm out here at Satilla Shores. There's a black male running downthe street. … I don't know what street we're on."

121.     Ahmaud made one final attempt to escape the armed men menacing him. He did not know where to run—the video of the encounter shows him veering right, then left, and then running around the right side of the McMichaels' vehicle.

122.     On the 911 recording, Defendant Gregory McMichael is heard ordering Ahmaud: "STOP RIGHT THERE DAMN IT! STOP!"

123.     As Ahmaud came around the front of the truck, Defendant Travis McMichael met him there, leaned toward Ahmaud, and raised his shotgun.

124.     Without provocation, Defendant Travis McMichael fired a shotgun blast into Ahmaud's body.

125.     The first shot hit Ahmaud in the chest. The sound of the gunshot was captured on Defendant Gregory McMichael's 911 call.

126.     Ahmaud attempted to grab the shotgun from Defendant Travis McMichael, to prevent McMichael from shooting him again, but he was unable to, and McMichael shot him asecond time at close range.

127.     A heavily bleeding Ahmaud made another grab for the shotgun, and Defendant Travis McMichael fired a third—and final—shot into Ahmaud's left upper chest.

128.     Ahmaud staggered, and fell to the ground.

129.     Defendant Travis McMichael walked away from the dying Ahmaud, holding his shotgun. Defendant Gregory McMichael hopped out of the bed of the truck, with his handgun aloft.

130.     Defendant Gregory McMichael rolled Ahmaud over, confirming, as they had known, that Ahmaud had been unarmed during the whole encounter.

131.     Defendant Travis McMichael then returned to Ahmaud's body and stood over him as he lay dying. He said only, "fucking Nigger."

132.     Defendant Officer Ricky Minshew arrived seconds after Ahmaud was shot. It was obvious that Ahmaud had suffered serious life-threatening injuries but he was alive and could be heard gasping for breath.

133.     Defendant Officer Minshew deliberately disregarded Ahmaud's obvious injuries.

134.     Despite having the knowledge and training to provide life-saving efforts, Defendant Officer Minshew refused to help Ahmaud.  Instead, engaged in casual conversation with Ahmaud's murderers while allowing them to walk around freely, go into their truck, and interact with each other.

135.     Defendant Officer Minshew provided no medical treatment for Ahmaud and waited over 45 seconds to call for medical assistance as Ahmaud gasped for breath and clung to life.

136.     Ahmaud bled to death there on the street in front of the neighbors and Defendant Officer Minshew.

137.     On information and belief, Defendants Gregory McMichael, Travis McMichael, and William Bryan considered their actions to be authorized, encouraged, solicited, and ratified by Defendant Officer Rash and the Glynn County Police Department.

138.     Defendants Gregory McMichael, Travis McMichael, and William Bryan were acting under color of law when they tracked, shot, and killed Ahmaud.

**IV.     The Cover-Up Of Ahmaud's Murder.**

139.     The cover-up of Ahmaud's murder began the moment that uniformed Glynn County Police Department personnel arrived at the crime scene.

140.     The Glynn County Police Department, through its initial deficient investigation,

20

conspired with Defendants Gregory McMichael, Travis McMichael, and William Bryan to cover up Ahmaud's murder.

141.    The Glynn County Police Department, through its initial deficient investigation, ratified Defendants Gregory McMichael, Travis McMichael, and Bryan's illegal andunconstitutional conduct.

142.    The Glynn County Police Department was aware that Defendants Gregory McMichael, Travis McMichael, and Bryan hunted Ahmaud down without any legal purpose or justification as soon as they arrived on the scene of the murder.

143.    The Glynn County Police Department was given admissions, statements, and video while Ahmaud's body still lay on the street that established that he was murdered.

144.    The Glynn County Police Department knew that Defendants Gregory McMichael, Travis McMichael, and Bryan did not see Ahmaud engage in any criminal conduct but endeavored nonetheless to follow him and seize him, by any means necessary.

145.    The Glynn County Police Department failed to make arrests at the scene of the murder because it had encouraged and ratified Defendants Gregory McMichael, Travis McMichael, and Bryan's illegal and unconstitutional conduct.

146.    The Glynn County Police Investigators called Plaintiff and gave her demonstrably false information regarding her son's murder.

147.    The Glynn County Police Investigators falsely informed Plaintiff that her son had been involved in the commission of a burglary, had been confronted by "the homeowner," and had subsequently been killed.

148.    Local prosecutors soon joined the Glynn County Police Department, Defendants Officer Rash, Gregory McMichael, Travis McMichael, and Bryan in a conspiracy to deprive Ahmaud and Plaintiff of their constitutional rights.

21

149.     The first local prosecutor assigned to review this matter was Defendant Jackie Johnson.  Defendant Johnson has been the Brunswick District Attorney since 2010.

150.     Defendant Gregory McMichael was an investigator in Defendant Johnson's office for her entire tenure as the District Attorney until his retirement in 2019.

151.     When Defendant Gregory McMichael was stripped of arrest powers due to his failure to complete basic training to maintain his certification as an officer, Defendant Johnson intervened on his behalf to get him an "exemption" from state-mandated training.

152.     Defendant Gregory McMichael again failed to complete training for 2018, and on February 1, 2019, his basic law enforcement certification was suspended by the Georgia P.O.S.T. Council.

153.     Basic law enforcement certification was a requirement for Defendant Gregory McMichael's job. However, rather than terminating him for his repeated dereliction, Defendant Johnson again covered for him.

154.     On February 27, 2019, Defendant Johnson's office issued a Memorandum of Understanding reassigning Defendant Gregory McMichael to the Camden County DA's office, stating that McMichael had "relinquished his P.O.S.T. certification effective February 1, 2019, and that he plans to retire effective June 1, 2019."

155.     The Memorandum stated that "it is necessary to redefine his employment classification and duties to align with his current status as a non-sworn employee until his retirement." And it stated: "Mr. McMichael will not engage in any activity that would be construed as being law enforcement in nature. To that end, Mr. McMichael will not carry a firearm or a badge."

156.     Defendant Johnson's actions caused Defendant Gregory McMichael to believe that Johnson would use her authority to assist him in avoiding accountability.

157.     Defendant Johnson's actions caused Defendant Gregory McMichael to believe that

he could act with impunity when engaging in law enforcement conduct.

158.     Defendant Johnson conspired with George Barnhill, the Glynn County Police Department, Rash, Gregory McMichael, Travis McMichael, and Bryan to deprive Ahmaud of his constitutional rights.

159.     Defendant Johnson ratified Barnhill's, Glynn County Police Department's, Rash's, Gregory McMichael's, Travis McMichael's, and Bryan's illegal and unconstitutional conduct.

160.     Defendant Johnson has extensive ties to the Glynn County law enforcement structure, having served as Brunswick District Attorney since 2010, and including having a personal relationship with Defendant Gregory McMichael.

161.     In order to protect Defendant Gregory McMichael and the law enforcement structure of Glynn County, Defendant Johnson directed police officers Stephanie Oliver and Stephan Lowrey to not charge Defendants GregoryMcMichael, Travis McMichael, and Bryan with any crimes related to Ahmaud's murder. Defendant Johnson was later indicted for hindering law enforcement officers in this way.

162.     On February 23, 2020, after the fatal shooting of Ahmaud, Glynn County police officers contacted Defendant Johnson's office regarding potential charges. Johnson's office told Glynn County detectives that the Ware County District Attorney's office would get back to themthe following day, but that there was no need to arrest the McMichaels at the time.

163.     Knowing that she was going to have to recuse herself because of both her relationship and her office's 20-plus year relationship with Defendant Gregory McMichael, Defendant Johnson worked quickly to orchestrate a cover-up.

164.     Defendant Johnson handpicked Defendant Ware County District Attorney George Barnhill to take over the investigation, knowing that he too had a personal connection to Defendant Gregory McMichael and with the understanding that he would continue to not pursuecharges despite

the overwhelming evidence.

165.     On February 27, 2020, Defendant Johnson officially recused herself based on her relationship with Defendant Gregory McMichael.

166.     Although her letter was addressed to the Assistant Attorney General and requested that the Attorney General assign counsel, Defendant Johnson had already unilaterally decided that Defendant Barnhill would handle the investigation.

167.     The Georgia Attorney General's office received Defendant Johnson's recusal notice and simultaneously "was made aware" that Defendant Johnson had contacted Defendant Barnhill and he had "agreed to accept the case."

168.     Defendant Johnson was later indicted for recommending that Defendant Barnhill take over the investigation without disclosing that she had previously sought his assistance on the case.

169.     On February 27, 2020, the Georgia Attorney General's office appointed Defendant Barnhill to prosecute the case.

170.     Defendant Barnhill conspired with Glynn County Police Department, Rash, Gregory McMichael, Travis McMichael, Bryan, and Johnson to deprive Ahmaud of his constitutional rights.

171.     Defendant Barnhill ratified Glynn County Police Department, Rash, Gregory McMichael, Travis McMichael, and Bryan's illegal and unconstitutional conduct.

172.     Defendant Barnhill has extensive ties to the Glynn County law enforcement structure: he has worked as a criminal prosecutor for 36 years—25 in Waycross and Brunswick Circuits alone.

173.     Defendant Barnhill's son works as an Assistant District Attorney for Defendant Johnson, and worked closely with Defendant Gregory McMichael before his retirement.

24

174.     On February 23, 2020, Defendant Barnhill was contacted by Defendant Johnson and agreed to take over the investigation into Ahmaud's murder.

175.     On the morning of February 24, 2020, less than twenty-four hours after Defendants Travis McMichael, Gregory McMichael, and Bryan hunted down and executed Ahmaud, and before he was even officially appointed as prosecutor on the case, Defendant Barnhill met with Glynn County detectives to tell them he had concluded that "the act was justifiable homicide."

176.     Defendant Barnhill spoke to the press on February 28, 2020, and falsely conveyed that the investigation centered on the burglary of a home under construction at Satilla Shores, and that the investigation was "about 70 percent done." He also told the press that he had ordered a toxicology report on Ahmaud, saying, "There's some behavior that warrants explanation."

177.     When Defendant Barnhill's close ties to Glynn County law enforcement and his conflict of interest became known, he was forced to recuse himself.

178.     Defendant Barnhill's recusal came only after he had intervened in the investigation and directed police to not charge Defendants Gregory McMichael, Travis McMichael, and Bryan with any crimes related to Ahmaud's murder.

179.     Defendant Barnhill's intervention at the time of his recusal reveals his determination to protect the interests of the law enforcement structure of Glynn County.

180.     On April 2, 2020, Defendant Barnhill wrote a defamatory memo to support his direction to not charge Defendants Gregory McMichael, Travis McMichael, and Bryan with any crimes related to Ahmaud's murder

181.     Defendant Barnhill included multiple statements that are demonstrably false and skewed to ratify illegal and unconstitutional conduct. Most alarming was his statement that "Travis McMichael, Greg McMichael, and Bryan William were following, in 'hot pursuit', of aburglary suspect, with solid first hand probable cause." "Under Georgia law," Defendant Barnhill wrote, the

25

three men's conduct was "perfectly legal."

182.     Defendant Barnhill further ratified Defendants Gregory McMichael's, Travis McMichael's, and Bryan's illegal and unconstitutional conduct by providing false information to Georgia Attorney General Chris Carr by stating he had "video of Arbery burglarizing a home immediately preceding the chase and confrontation." In fact, Ahmaud entered the open construction site on the Construction Lot, looked around a bit, and left, neither taking nor damaging anything.

183.     After Defendant Barnhill's recusal, on April 14, 2020, the investigation of Ahmaud's murder was assigned to Atlantic Circuit District Attorney Tom Durden.

184.     Durden took no action regarding Ahmaud's murder until a video of Defendants Gregory McMichael's, Travis McMichael's, and Bryan's horrifying conduct was released to the world on May 5, 2020.

185.     Durden then requested that the Georgia Bureau of Investigation (GBI) take over the investigation.

186.     GBI began its investigation on May 6, 2020.

187.     On May 7, 2020, GBI arrested Defendants Gregory McMichael and Travis McMichael for Ahmaud's murder.

188.     On May 21, 2020, GBI arrested Defendant Bryan for Ahmaud's murder.

189.     On November 24, 2021, Gregory McMichael, Travis McMichael, and William Bryan were convicted of murder and subsequently sentenced to life in prison in the Superior Court of Glynn County, Georgia.

190.     The Department of Justice instituted proceedings against Gregory McMichael, Travis McMichael, and William Bryan for violating federal hate crimes statutes stemming from the murder of Ahmaud.

191.     On February 22, 2022, a federal jury found all three men guilty of the hate crimes

charges.

192.     Attorney General Chris Carr initiated an investigation into the manner in which Defendants Johnson and Barnhill intervened in the investigation of Ahmaud's murder and requested that the United States Department of Justice do the same.

193.     If not for the video of Ahmaud's killing being released, the Glynn County Police Department, Rash, Gregory McMichael, Travis McMichael, Bryan, Johnson, and Barnhill wouldhave successfully conspired to deprive Ahmaud of his constitutional rights.

194.     The facts now known show a deliberate effort on the part of law enforcement and district attorneys to cover up Ahmaud's murder.

195.     On September 2, 2021, Defendant Johnson was indicted for Violation of Oath of a Public Officer in violation of O.C.G.A. §16-10-1 and willfully and intentionally violating the terms of her oath of office, to wit, O.C.G.A. §15-8-2, contrary to the laws of Georgia, the good order, peace, and dignity thereof.

196.     Specifically, Defendant Johnson "…violated Article I, Section I, of the Georgia Constitution, a duty required by law, by failing to treat Ahmaud Arbery and his family fairly and with dignity when, after the shooting of Ahmaud Arbery, Defendant Johnson sought the assistance of Defendant Barnhill and, after disqualifying her office, recommended Defendat Barnhill to the Attorney General's Office for appointment as the case prosecutor without disclosing that she had previously sought the assistance of Defendant Barnhill on the case."

197.     On September 2, 2021, Defendant Johnson was also indicted for Obstruction and Hindering a Law Enforcement Officer in violation of O.C.G.A. §16-10-24.

198.     Specifically, Defendant Johnson was indicted of "knowingly and willfully hindering Stephanie Oliver and Stephan Lowrey, law enforcement officers with Glynn County Police Department, in the lawful discharge of their official duties by directing that Defendant Travis

McMichael should not be placed under arrest, contrary to the laws of Georgia, the good order, peace, and dignity thereof."

### V.      The Glynn County Police Department's Unconstitutional Practices

199.      The Glynn County Police Department was the direct cause and moving force of the unconstitutional conduct that ultimately led to Ahmaud's murder.

200.      County Manager Alan Ours made specific conclusions regarding deficiencies within the Glynn County Police Department in a November 8, 2019 Memorandum.

201.      The Memorandum was issued in response to a Grand Jury report that detailed extensive misconduct in the Glynn County Police Department,

202.      The Memorandum also made clear that the Glynn County Police Department did not hold its officers accountable.

203.      In the Memorandum, Ours admitted that historically the Glynn County Police Department had a culture of "cronyism, outdated policies, lack of appropriate training, and loss of State certification."

204.      Ours admitted that within the Glynn County Police Department there is "an ongoing culture of cover-up, failure to supervise, abuse of power, and lack of accountability."

205.      Ours admitted to the following specific deficiencies:

a.  Supervisors were unwilling to investigate, report, or discipline the misconduct of police officers.

b.  Supervisors failed to document instances of officer misconduct.

c.  Supervisors directed officers to falsify reports to protect fellow officers.

d.  Internal Affairs Investigators encouraged officers to change their statements to protect supervisors.

28

e. There is a systemic failure to report complaints against police officers.

206.     Similarly, a September 2018 audit of the Glynn County Police Department by the International Association of Chiefs of Police found that the Department's policies were not reflective of contemporary police best practices in the field.

207.     The audit noted that "[s]everal investigators cited concerns with case follow up and accountability" and that the case management system "is rarely used by investigators and not used by supervisors or commanders." It explained that a "real time centralized case management component would improve accountability."

208.     The audit further noted that the dispatch system required manual inputs "with no apparent checks and balance system in place." It explained that such a system "can result in a failure point for service delivery and appropriate investigation of incidents."

209.     Despite the cronyism, outdated policies, lack of appropriate training, and lack of officer accountability, neither Alan Ours nor the Glynn County Commissioners made changes in policy or procedures.

210.     In 2018, the Glynn County Police Department also lost its accreditation from the Georgia Police Accreditation Coalition (GPAC) because of mismanagement of the evidence room and missing disciplinary records.

211.     Defendant John Powell became chief of the Glynn County Police Department in 2018.

212.     Defendant Powell was made chief, in part, to deal with the "culture of cover-up, failure to supervise, abuse of power, and lack of accountability." Yet the Department continued to operate in such a manner under his leadership.

213.     In February 2020, just days after Ahmaud's murder, Defendant Powell was indicted on charges that include violating the oath of office and criminal attempt to commit a felony for his

role in attempting to protect officers who were the subject of a misconduct investigation.

214.     The Glynn County Police Department's lack of supervision allowed Defendant Officer Rash to engage in reckless and dangerous conduct, including deputizing and encouraging armed citizens to engage in law enforcement activity, without fear that he would be investigated, reported, disciplined or otherwise held accountable.

215.     The Glynn County Police Department's lack of training created an environment in which Defendant Officer Rash did not have adequate recognition of the dangerous environment the created by deputizing and encouraging armed citizens to engage in law enforcement activity.

216.     The Glynn County Police Department's lack of training and supervision created a culture wherein Defendant Officer Rash was not held to constitutional standards.

217.     The ultimate result of the Glynn County Police Department's numerous deficiencies was Defendant Officer Rash deputizing and encouraging Perez and Defendants Gregory McMichael, Travis McMichael, and Bryan to act as law enforcement officers.

218.     Glynn County Police Department's numerous deficiencies previously led Defendant Officer Rash to engage in reckless and dangerous conduct.

**VI.     Prior Incidents of Cover-Up, Corruption, and Lack of Accountability in Glynn County Law Enforcement.**

219.     There is substantial prior conduct that demonstrates how the culture of cover-up, corruption, and lack of accountability in the Glynn County law enforcement structure manifested in unconstitutional conduct.

220.     In 2005, Police Sergeant Robert C. Sasser shot and injured a man in his car at a gas station. He was permitted to remain a police officer.

221.     Subsequently, in 2010, Caroline Small was shot and killed by Robert C. Sasser and Officer Michael T. Simpson.

30

222.     A shocking violent video revealed illegal and unconstitutional conduct on behalf of law enforcement that led to Ms. Small's death.

223.     As in this case, Glynn County Police Department conspired with Defendant Johnson to cover up the murder of Small.

224.     As in this case, Glynn County Police Department interfered with the GBI investigation in an attempt to protect Sasser and Simpson.

225.     As in this case, Defendant Johnson conspired with Glynn County Police Department to deprive a murder victim of their constitutional rights.

226.     Specifically, Defendant Johnson withheld evidence from the grand jury, surreptitiously provided suspect officers with information prior to the grand jury, and cut a highly irregular deal with those officers prior to the Grand Jury convening.

227.     The result of this conspiracy was law enforcement officers not being held accountable for the murder of unarmed citizens.

228.     In 2018, Defendant Officer Rash covered up the violent conduct of a fellow officer. He failed to detain a fellow officer that assaulted his wife in front of Rash.

229.     The fellow officer went on to kill his wife, her paramour, and himself.

230.     Despite the tragic and violent outcome of Defendant Officer Rash's reckless and corrupt conduct, he was permitted to continue to work as a police officer.

231.     On February 4, 2019, a Glynn County police drug task force investigator was involved in a sexual relationship with a confidential informant and using and providing illegal narcotics to the informants.

232.     Concerns about this activity were expressed up the chain of command within the Glynn County Police Department but instead of ending the illegal and unconstitutional conduct, Powell Police Chief John Powell actively tried to shield wrongdoing.

31

233.     Glynn County Manager Ours' produced a report following the revelation of this misconduct and conceded that there was "prior instances of a culture of cover-ups, failure to supervise, abuse of power, and lack of accountability within the Glynn County Police Department."

234.     Based on this history of cover-up and corruption, Defendants Officer Rash, Gregory McMichael, Travis McMichael, and Bryan believed that they could use lethal force with impunity if doing so on behalf of law enforcement.

## COUNT I: EXCESSIVE FORCE AND UNLAWFUL SEIZURE: 42 U.S.C. § 1983
*Defendants Travis McMichael, Gregory McMichael, and William Bryan*

235.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

236.     Defendant Travis McMichael stalked, tracked, and shot Ahmaud Arbery, seizing him and causing him mental anguish, pain, agony, and untimely death.

237.     Defendant William Bryan stalked, tracked, and hit Ahmaud Arbery with his truck, seizing him and causing him mental anguish, pain, and agony.

238.     Defendant Gregory McMichael stalked and tracked, and assisted in cornering Ahmaud Arbery, seizing him, such that Defendant Travis McMichael was able to shoot him.

239.     The actions and force used by Defendants Travis McMichael, Gregory McMichael and William Bryan were intentional, excessive, without legal cause, and objectively unreasonable in light of the facts and circumstances.

240.     Defendant Police Officer Robert Rash affirmatively authorized and encouraged Defendants Gregory McMichael, Travis McMichael, and William Bryan to intercede on behalf of the Glynn County Police Department if a person entered the structure on English's property. In so doing, law enforcement insinuated itself into a position of interdependence with Defendants Travis McMichael, Gregory McMichael, and William Bryan. These three men were therefore acting under

32

color of law at the time that they stalked, tracked, and shot Ahmaud Arbery.

241.     By taking such actions, Defendants Travis McMichael, Gregory McMichael, and William Bryan deprived Ahmaud Arbery of his Fourth Amendment right to be free from excessive force and unreasonable seizure.

242.     Plaintiff seeks all available damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as any other damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. 1988, and any other remedies legally appropriate.

## COUNT II: FAILURE TO INTERVENE: 42 U.S.C. § 1983
*Defendants Travis McMichael, Gregory McMichael, William Bryan*

243.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

244.     Defendants Travis McMichael, Gregory McMichael, and William Bryan observed Ahmaud Arbery as he was stalked, struck with a vehicle, and ultimately shot.

245.     Defendants Travis McMichael, Gregory McMichael, and William Bryan knew that the stalking and violence perpetuated against Ahmaud Arbery was unconstitutional but failed to intervene despite having the opportunity to do so.

246.     The Defendants' actions and omissions were the direct and proximate cause of the violations of Ahmaud Arbery's constitutional rights, of his death, and of the damages suffered by his heirs.

33

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. 1988, and any other remedies legally appropriate.

**COUNT III: CONSPIRACY TO VIOLATE FOURTH
AMENDMENT RIGHTS: 42U.S.C. 1983**
*Defendants Travis McMichael, Gregory McMichael,
William Bryan, and Police Officer Robert Rash*

247.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

248.    Defendants Travis McMichael, Gregory McMichael, William Bryan, and Police Officer Robert Rash, willfully and maliciously conspired to follow, threaten, seize, and kill Ahmaud Arbery in violation of his Fourth Amendment rights.

249.    Defendants Travis McMichael, Gregory McMichael, William Bryan, and Police Officer Robert Rash, conspired to accomplish an unlawful purpose by unlawful means.

250.    Defendants Travis McMichael, Gregory McMichael, William Bryan, and Police Officer Robert Rash, individually and in concert, committed specific overt acts in furtherance of their conspiracy to deprive Ahmaud Arbery of his rights.

   a.    Defendant Police Officer Robert Rash deputized Defendant Gregory McMichael to engage in law enforcement activity and confirmed such deputization over text message to English on December 20, 2019.

   b.    Defendant Police Officer Robert Rash deputized Defendants Travis McMichael, Gregory McMichael, and William Bryan to engage in law enforcement activity on February 11, 2020.

34

c.  Defendants Travis McMichael, Gregory McMichael, William Bryan, acting under color of law, followed, threatened, seized, and killed Ahmaud Arbery.

251.     Each individual Defendant is therefore liable for the violation of Ahmaud Arbery's rights by any other individual Defendant.

252.     As a direct and proximate result of the conspiracy by Defendants Travis McMichael, Gregory McMichael, William Bryan, and Police Officer Robert Rash, Ahmaud Arbery suffered damages, including pain, suffering, mental distress, anguish, humiliation, loss of liberty, and death.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. 1988, and any other remedies legally appropriate.

## COUNT IV: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS: 42 U.S.C. 1985(3) and 42 U.S.C. 1983 (racially-motivated)
*Police Officer Robert Rash, Gregory McMichael, Travis McMichael, and William Bryan*

253.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

254.     Defendants Travis McMichael, Gregory McMichael, William Bryan, Alex English, and Police Officer Robert Rash willfully and maliciously conspired to follow, threaten, detain, and kill Ahmaud Arbery. Their purpose was to prevent Ahmaud Arbery, through such force, violence and intimidation, from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Georgia, including butnot limited to his right to freedom of movement; his right to be secure in his person; and his right not to be enslaved nor deprived of life and liberty other than by due process of law.

35

255.     Defendants Travis McMichael, Gregory McMichael, William Bryan, Alex English, and Police Officer Robert Rash were motivated to deprive Ahmaud Arbery of equal protection of the law and of his rights by racial bias, animus, and discrimination. Defendants Travis McMichael, Gregory McMichael, andWilliam Bryan began the pursuit because Ahmaud Arbery was a Black man. And after killing Ahmaud Arbery, Travis McMichael stood over him and called him a "fucking Nigger."

256.     Defendants Travis McMichael, Gregory McMichael, William Bryan, Alex English, and Police Officer Robert Rash, individually and in concert, each took action in furtherance of their conspiracy to deprive Ahmaud Arbery of his rights.

257.     The result of the conspiracy by Defendants Travis McMichael, Gregory McMichael, William Bryan, Alex English, and Police Officer Robert Rash  was the death of Ahmaud Arbery.

258.     Defendants Travis McMichael, Gregory McMichael, William Bryan, Alex English, and Police Officer Robert Rash, individually and in concert, committed specific overt acts in furtherance of their conspiracy to deprive Ahmaud Arbery of his rights.

a.     Defendant Police Officer Robert Rash deputized Defendant Gregory McMichael to engage in law enforcement activity and confirmed such deputization over text message to English on December 20, 2019.

b.     Defendant Police Officer Robert Rash deputized Defendants Travis McMichael, Gregory McMichael, and William Bryan to engage in law enforcement activity onFebruary 11, 2020.

c.     Defendants Travis McMichael, Gregory McMichael, William Bryan, acting under color of law, followed, threatened, seized, and killed Ahmaud Arbery.

259.     Plaintiff seeks damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all

other damages available under the law.

 **WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1985(3), in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. 1985 and 1988, and any other remedies legally appropriate.

<u>**COUNT V: FAILURE TO PREVENT HARM: 42 U.S.C. § 1986**</u>
*Defendant Police Officer Robert Rash*

260.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

261.    Defendant Police Officer Robert Rash had knowledge of the wrongs that Defendants Gregory McMichael, Travis McMichael, and William Bryan conspired to commit in response to being authorized to engage in law enforcement conduct.

262.    Defendant Police Officer Robert Rash had the power and opportunity to prevent Defendants Gregory McMichael, Travis McMichael, and William Bryan from violating Ahmaud Arbery's civil rights and killing him, but refused to do so.

263.    Plaintiff seeks damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available damages available under the law.

 **WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendant in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law.

## COUNT VI: SUBSTANTIVE DUE PROCESS: 42 U.S.C.§ 1983
*Defendant Police Officer Robert Rash*

264.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

265.     Defendant Police Officer Robert Rash affirmatively authorized and encouraged Defendants Gregory McMichael, Travis McMichael, andWilliam Bryan to intercede on behalf of the Glynn County Police Department if a person entered the structure on Larry English's property.

266.     Defendant Police Officer Robert Rash affirmatively authorized and encouraged Defendant Gregory McMichael despite subjective knowledge that Gregory McMichael was not qualified, certified, or capable of appropriate law enforcement conduct.

267.     Defendant Police Officer Robert Rash and affirmatively authorized and encouraged Defendant Gregory McMichael despite subjective knowledge that Gregory McMichael was no longer a law enforcement officer based on his inadequate training, inadequate supervision, and a history of misconduct.

268.     Defendant Gregory McMichael's ineffective, violent, and unconstitutional attempts at law enforcement were foreseeable to Defendant Police Officer Robert Rash and, based on his past conduct. Defendants Travis McMichael's and William Bryan's ineffective, violent, and unconstitutional attempts at law enforcement were foreseeable to Defendant Police Officer Robert Rash, based on their status as private persons.

269.     Defendant Police Officer Robert Rash's authorization and encouragement of Defendant Gregory McMichael—despite his well-documented failures as a law enforcement officer and present status as a private person—is egregious and conscience-shocking. Defendant Police Officer Robert Rash's authorization and encouragement of Defendants Travis McMichael and William Bryan—despite their status as private persons—is egregious and conscience-shocking.

38

270.     Plaintiff seeks damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' feesunder 42 U.S.C. 1988, and any other remedies legally appropriate.

## COUNT VII: DELIBERATE INDIFFERENCE: 42 U.S.C.§1983
*Defendant Police Officer Ricky Minshew*

271.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

272.     Defendant Police Officer Ricky Minshew had subjective knowledge that Ahmaud Arbery had a serious medical need when he arrived on the scene and observed that Ahmaud Arbery had been shot and was struggling to breathe.

273.     Defendant Police Officer Ricky Minshew had subjective knowledge that there was a risk of serious harm to Ahmaud Arbery if medical treatment was delayed.

274.     Defendant Police Officer Ricky Minshew was deliberately indifferent to Ahmaud Arbery's risk of serious harm as demonstrated by his disregard of that risk and his failures to take appropriate steps to provide Ahmaud with adequate care for his very serious medical needs.  Instead of attempting to save Ahmaud Arbery's life, Defendant Officer Minshew engaged in casual conversation with the men who pursued and shot him.

275.     Defendant Police Officer Ricky Minshew's  deliberate indifference to Ahmaud Arbery's risk of serious harm  was objectively unreasonable and was undertaken intentionally, with

malice and knowing disregard for Ahmaud's clearly established constitutional rights.

276.     Plaintiff seeks damages, including for the extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. 1988, and any other remedies legally appropriate.

<u>**COUNT VIII: FAILURE TO SUPERVISE, DISCIPLINE, AND TRAIN: 42 U.S.C. § 1983**</u>
*Glynn County*

277.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

278.     Glynn County, through its Police Department, has interrelated de facto policies, practices, and customs which include a failure to supervise, discipline, and train officers.

279.     These interrelated polices, practices, and customs are or should be well-known within the Glynn County Police Department.

280.     Glynn County Police Department's failure to train, supervise, and discipline officers caused the deprivation of Ahmaud Arbery's constitutional rights.

281.     Glynn County Police Department failed to supervise police officers. Specifically:

    a.   Supervisors were unwilling to investigate or report misconduct of police officers.

    b.   Supervisors fail to document instances of officer misconduct.

    c.   Supervisors directed officers to falsify reports to protect fellow officers.

282.     Glynn County Police Department failed to discipline police officers. Specifically:

    a.   Internal Affairs Investigators encourage officers to change their statements to protect police personnel.

    b.   Supervisors are unwilling to discipline police officers.

    c.   Complaints against police officers are systematically disregarded and not investigated by Internal Affairs

283.     Glynn County Police Department failed to train police officers about deputization of private citizens.

284.     Training manuals provided by Glynn County reveal that a prohibition of deputizing citizens is never addressed in academy training or in service training.

285.     Glynn County Police Department created a culture where police officers were not held accountable for reckless, illegal, and unconstitutional conduct.

286.     The failure in training, discipline, and supervision was the moving cause behind Defendant Police Officer Robert Rash encouraging and deputizing Defendants Travis McMichael, Gregory McMichael and William Bryan to take law enforcement action on behalf of Glynn County Police Department.

287.     Glynn County has implemented, enforced, encouraged, and sanctioned the Glynn County Police Department's policies, practices, and customs alleged above in violation of Ahmaud's and other citizens' Fourth and Fourteenth Amendment rights.

288.     Glynn County and Police Chief John Powell were deliberately indifferent to the rights of their citizens, including Ahmaud Arbery, because they ignored a widespread pattern of constitutional violations caused by failures in training, discipline, and supervision.

289.     Glynn County and Police Chief John Powell were deliberately indifferent to the rights of their citizens, including Ahmaud Arbery, because the need for better training and supervision

41

was so obvious that the failure to do so would result in a constitutional violation.

290.     Police Chief Powell was aware of alternative policies and practices that would have protected Ahmaud Arbery's constitutional rights but chose to implement and allow constitutionally deficient policies and practices.

291.     Allen Ours and the Glynn County Commissioner were aware of alternative policies and practices that would have protected Ahmaud Arbery's constitutional rights but chose to implement and allow constitutionally deficient policies and practices.

292.     Plaintiff seeks damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law.

<u>**COUNT IX:  DENIAL OF ACCESS TO COURTS: 42 U.S.C. § 1983**</u>
*Defendants Jackie Johnson and George Barnhill*

293.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

294.     Defendants Jackie Johnson and George Barnhill intentionally concealed from the public and Plaintiff the true facts about Ahmaud Arbery's death and the deputization of the neighbors. Concealing these facts prevented Plaintiff from discovering the truth about Ahmaud Arbery's murder which would form the basis for Plaintiff's claims for redress of the violation of Ahmaud Arbery's constitutionally-protected rights.

295.     Plaintiff has a property interest in pursuing claims on behalf of Ahmaud Arbery for

the violation of his constitutionally-protected rights.

296.     The concealment of these facts led to a delay in Plaintiff knowing the truth and a delay in instituting this action and subsequent mental anguish.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' feesunder U.S.C. 1985 and 1988, and any other remedies legally appropriate.

## COUNT X: CONSPIRACY TO OBSTRUCT JUSTICE: 42 U.S.C. § 1985(2)
*Defendants Jackie Johnson and George Barnhill*

297.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

298.     Defendants Jackie Johnson and George Barnhill conspired to intentionally conceal from the public and Plaintiff the true facts about Ahmaud Arbery's death and the deputization of the neighbors, which would form the basis for Plaintiff's claims for redress of the violation of Ahmaud Arbery's constitutionally-protected rights.

299.     This conspiracy was motivated by racial animus.

300.     Plaintiff has a property interest in pursuing claims on behalf of Ahmaud Arbery for the violation of his constitutionally-protected rights.

301.     The concealment of these facts led to a delay in Plaintiff knowing the truth and a delay in instituting this action subsequent mental anguish.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1985(2), in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and

wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

## COUNT XI: WRONGFUL DEATH/ SURVIVAL ACTION
## O.C.G.A. § 51-4-5, O.C.G.A. § 19-7-1, AND O.C.G.A. § 9-2-41
*Police Officer Robert Rash*

302.     Plaintiff hereby brings a claim pursuant to the Georgia Wrongful Death Statutes.

303.     As the administrator and executor of the Estate of Ahmaud Arbery plaintiff is entitled to recover the full value of the life of her decedent.

304.     Ahmaud Arbery's death was caused by the criminal and negligent action of all named defendants.

305.     Plaintiff claims all available damages under the Georgia Wrongful Death Statutes for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contribution that the Plaintiff's decedent, Ahmaud Arbery, would have rendered but for his traumatic, untimely, and unnatural death.

306.     Plaintiff claims damages for payment for all medical expense, funeral expenses, and burial expenses.

307.     Plaintiff hereby brings a Survival Action under the Georgia Survival Action Statute.

308.     Plaintiff claims all damages recoverable under the Statute, including but not limited to, loss of income both past and future income potential, as well as, pain and suffering prior to death, and for emotional distress suffered by Ahmaud Arbery from the initiation of the attack uponhim until the ultimate time of his death.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive

and exemplary damages as provided by law, and any other remedies legally appropriate.

## COUNT XII: CONSPIRACY/ BATTERY
*Defendants Travis McMichael, Gregory McMichael, William Bryan*

309.      The preceding paragraphs are incorporated by reference as though laid out fully herein.

310.      Defendants Travis McMichael, Gregory McMichael, and William Bryan stalked, tracked, and shot Ahmaud Arbery causing him mental anguish, pain, agony, and untimely death.

311.      The actions of Defendants Travis McMichael, Gregory McMichael, and William Bryan were intentional, harmful, and offensive.

312.      Plaintiff seeks damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law.

## COUNT XIII: WILLFUL AND WANTON MISCONDUCT
*Defendants Travis McMichael, Gregory McMichael, William Bryan, Police Officer Robert Rash*

313.      The preceding paragraphs are incorporated by reference as though laid out fully herein.

314.      Defendants Travis McMichael, Gregory McMichael and William Bryan stalked, tracked, and shot Ahmaud Arbery causing him mental anguish, pain, agony, and untimely death.

315.      The actions of Defendants Travis McMichael, Gregory McMichael, and William Bryan were encouraged and ratified by Defendant and Police Officer Robert Rash.

316.     The actions of Defendants Travis McMichael, Gregory McMichael, William Bryan, and Police Officer Robert Rash were so reckless, and consciously indifferent to the life of Ahmaud Arbery as to be the equivalent of an intent to harm.

317.     Plaintiff seeks damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law.

## COUNT XIV: LIBEL
*Defendant George Barnhill*

318.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

319.     Defendant George Barnhill published writing to both Glynn County Police Department and Attorney General Chris Carr wherein he falsely asserted that Ahmaud Arbery had committed the crime of burglary.

320.     This statement was not privileged.

321.     Defendants George Barnhill's false statements injured Ahmaud Arbery's reputation and cast him in a false negative light.

322.     The false statements alleged that Arbery was guilty of a crime, dishonesty, or immorality.

**WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and

specific damages, including both survival and wrongful death damages, punitive and exemplary

damages as provided by law.

Respectfully submitted,

/s/ James Kyle Califf

**CALIFF LAW FIRM LLC**

J. Kyle Califf
3540 Wheeler Road
Suite 603
Augusta, GA 30909
706-399-9660
kcaliff@califflawfirm.com

**MCELDREW YOUNG PURTELL MERRITT**

S. Lee Merritt
Daniel N. Purtell
Mark V. Maguire
John J. Coyle
123 South Broad Street
Suite 2250
Philadelphia, PA 19109
215-545-8800
dan@mceldrewyoung.com
mmaguire@mceldrewyoung.com
jcoyle@mceldrewyoung.com

**REED SMITH LLP**

| | |
|---|---|
| Rizwan A. Qureshi | John P. Kennedy |
| 1301 K. Street N.W. | 599 Lexington Ave. |
| Suite 1000 | 22nd Floor |
| Washington, D.C. 20005 | New York, NY 10022 |
| 202-414-9200 | 212-521-5400 |
| rqureshi@reedsmith.com | jkennedy@reedsmith.com |
| | |
| Tia M. McClenney | William S. Weltman |
| 225 Fifth Avenue | 10 S. Wacker Dr. |
| Pittsburgh, PA 15222 | 40th Floor |

412-288-3015
tmcclenney@reedsmith.com

Chicago, IL 60606
312-207-1000
wweltman@reedsmith.com


**RODERICK & SOLANGE MACARTHUR JUSTICE CENTER**

Amir H. Ali
Devi M. Rao
Megha Ram
501 H Street NE
Suite 275
Washington, D.C. 20002
202-869-3490
Amir.ali@macarthurjustice.org
Devi.rao@macarthurjustice.org
Megha.ram@macarthurjustice.org

Vanessa Del Valle
375 East Chicago
Chicago, IL 60466
312-503-5932
Vanessa.delvalle@law.northwestern.edu