IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| WANDA COOPER, in her individual capacity and as Administrator of the Estate of the decedent AHMAUD ARBERY,<br><br>    Plaintiff<br><br>v.<br><br>TRAVIS McMICHAEL and GREGORY McMICHAEL and WILLIAM BRYAN and POLICE OFFICER ROBERT RASH and POLICE OFFICER RICKY MINSHEW and GLYNN COUNTY and JACKIE JOHNSON and GEORGE BARNHILL,<br><br>    Defendants | \*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\* Case Number: 2:21-cv-00020-JRH-BWC<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\* |

**MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT
BY DEFENDANT GLYNN COUNTY**

COMES NOW Glynn County, Georgia, and pursuant to Fed. R. Civ. P. 12(b)

moves the Court to dismiss all claims asserted against it in Plaintiff's First Amended

Complaint.[1] In support of this motion, Glynn County shows the following:

---

[1]    Glynn County moved to strike Plaintiff's First Amended Complaint as improperly filed, and opposed Plaintiff's motion for leave to file the untimely pleading *nunc pro tunc*. Dkt. 114; Dkt. 123. The Magistrate Judge entered an order granting Plaintiff's motion and denying the County's motion, to which the County has filed objections that remain pending. Dkt. 128; Dkt. 132. The Magistrate Judge ordered Defendants to respond to the First Amended Complaint by August 29, 2022. Dkt. 128, p. 15. Pursuant to the Magistrate Judge's order, the County is filing this motion to dismiss the First Amended Complaint, but in so doing does not waive its motion to strike the pleading or any of the arguments raised in support of that motion.

**Introduction**

This case arises out of the fatal shooting of Plaintiff's decedent, Ahmaud Arbery, by Defendant Travis McMichael, a private citizen. The alleged witnesses to the shooting – Defendants Gregory McMichael and William Bryan – were also private citizens. No one affiliated with Glynn County was present for the shooting, or for any of the events preceding it. No one affiliated with Glynn County directed, approved, or had any advance knowledge of the actions allegedly taken by Bryan and the McMichaels on the day of the shooting. Nonetheless, Plaintiff alleges – based on a text message sent by a County police officer to a nonparty more than two months prior to the shooting – that Glynn County "deputized" Bryan and the McMichaels to act on its behalf. From that erroneous premise flows Plaintiff's sole claim against Glynn County, for "failure to supervise, discipline, and train."

Plaintiff's attempt to impute to Glynn County the actions of the private citizens involved in the shooting of Arbery suffers from at least three fatal flaws. First, a street-level officer cannot deputize private citizens to act on behalf of the government. Second, even if it were possible for deputization to occur in such a manner, the scant factual allegations pleaded in the First Amended Complaint would not support a claim that such a deputization occurred here. Third and finally, the unforeseeable intervening acts of other persons preclude the drawing of any causal link between the actions of Glynn County officials and Arbery's death. Glynn County played no role in the shooting or

the events preceding it, and Plaintiff consequently cannot state a claim against the County under any theory of recovery.

The specific claim Plaintiff has chosen to assert against the County fails for additional reasons. Plaintiff does not allege a pattern of similar incidents that could have put the County on notice of a need for more, or different, training, and thus could not maintain a claim for "failure to supervise, discipline, and train" even if the deputization arguments on which that claim relies were otherwise sound. Further, Plaintiff's claims against Glynn County are predicated on allegedly wrongful acts by Defendant Rash, but Plaintiff has failed to state a claim that Rash engaged in any unlawful conduct for which Glynn County could potentially be held liable. Plaintiff has not asserted, and cannot assert, a viable claim against Glynn County, and dismissal of the County from this action is warranted.

### Statement of Facts

I.   *An out-of-town property owner learns that multiple people are trespassing in his partially completed house, and communicates with the police and with his neighbors about the trespasses.*

In 2019, Larry English – who lived two hours away, in Coffee County – began construction on a new home in Glynn County's Satilla Shores neighborhood. Dkt. 110, ¶18. Around October of that year, English set up several motion-sensor security cameras inside the structure to help him monitor the site from afar, and began receiving video alerts on his phone showing various persons trespassing inside the partially completed home. Dkt. 110, ¶ 22. Between October 2019 and February 2020, English

received at least eleven such alerts, many of which he reported to the Glynn County Police Department using the non-emergency line. Dkt. 110, ¶ 23.

On October 25, 2019, Glynn County officers including Defendant Robert Rash responded to the construction site after English called to report a trespasser captured by his security cameras. Dkt. 110, ¶ 24. Officer Rash exchanged phone numbers with English. *Id.* Additional trespassers appeared on November 17 and November 18, 2019, and English called the non-emergency line both times. Dkt. 110, ¶¶ 25, 26.

Plaintiff alleges that "[a]fter having to respond to several of these reports from English, the Glynn County Police Department authorized certain of English's neighbors to respond on law enforcement's behalf." Dkt. 110, ¶ 27. Following this vague and conclusory statement are four subsections pertaining to four different neighbors, none of which contains sufficient factual allegations to support the claim that the County "authorized [] neighbors to respond on law enforcement's behalf." *Id.*

A.    *Diego Perez*

After receiving video recordings of trespassers at the site on November 17 and November 18, 2019, English physically visited the site on November 19, 2019. Dkt. 110, ¶ 28. That day, he met his neighbor Diego Perez, whose property backs up to English's. *Id.* After the men exchanged phone numbers, English texted Perez the video of the November 18 intrusion into the house. Dkt. 110, ¶ 30. In response, Perez offered to walk over to English's property and enter the house if English notified him next time a trespasser was detected, and stated that he would also install a camera on his own

home to monitor English's house. Dkt. 110, ¶ 31. Although Plaintiff repeats the conclusory statement that "Glynn County Police Department officials authorized Perez . . . to act as [a] law enforcement officer[] and provided [him] with information to assist in law enforcement activity," no factual allegations relevant to this statement are pleaded. Dkt. 110, ¶ 29. Plaintiff does not allege that Perez had any substantive discussion with Glynn County officials.

      B.    *Gregory McMichael*

On December 20, 2019, English texted Officer Rash a video clip of someone trespassing inside the house three days prior. Dkt. 110, ¶ 32. Rash responded the same day, telling English that one of his neighbors – Greg McMichael – was "retired Law Enforcement and also a Retired Investigator from the DA's office." Dkt. 110, ¶ 33. Rash then provided McMichael's contact information and relayed a message from McMichael, who had evidently said that English could "call him day or night" if anything appeared on his security cameras. *Id.*

Rash's text message to McMichael, which is reproduced in its entirety in the First Amended Complaint, contained no further information. Dkt. 110, ¶ 33. Rash did not indicate that McMichael had stated he would take any specific action in response to receiving a call from English about a trespass at the site. *Id.* Rash did not indicate to English that McMichael was authorized to act on behalf of law enforcement or on behalf

of Glynn County[2], and in fact, Plaintiff acknowledges that Rash was careful to make clear that McMichael was *not* a law-enforcement officer and was instead "retired." Dkt. 110, ¶ 43.

Nevertheless, Plaintiff alleges that the text message "reflected the Glynn County Police Department's deputization, ratification, and endorsement of Defendant Gregory McMichael acting as a law enforcement agent under color of law," and reflected that Rash "had communicated with Defendant Gregory McMichael to confirm his willingness to respond to English's complaints of trespassers entering his structure." Dkt. 110, ¶ 34. But the sole factual basis for these statements is the text message, which contains no information about McMichael actually responding in any way to complaints of trespassers at the construction site. Plaintiff does not plead any factual allegations about a discussion or agreement between McMichael and anyone else about McMichael taking action in response to reports of intruders at the construction site – let alone about McMichael doing so on behalf of law enforcement.

C.     *Travis McMichael*

Although the conclusory statement in Paragraph 27 suggests that the subsections following it will explain the manner in which "the Glynn County Police Department authorized certain of English's neighbors to respond on law enforcement's behalf," the

---

[2]     As noted below, English certainly did not interpret the December 20, 2019 text message to mean that McMichael was authorized to respond on behalf of law enforcement officers to trespasses at the construction site; he called a different neighbor and also contacted Officer Rash, but did not call McMichael, in response to seeing a trespasser at the site in February 2020. Dkt. 110, ¶¶ 63, 68.

subsection concerning Travis McMichael does not even allude to that subject. Rather, Plaintiff alleges that Travis McMichael has "an extensive history of racist and anti-Black behavior," and goes on to detail instances thereof. Dkt. 110, ¶¶ 48-54. Plaintiff offers no factual allegations about any interaction between Travis McMichael and any person affiliated with Glynn County, let alone factual allegations sufficient to suggest that Travis McMichael was somehow authorized to act on behalf of Glynn County law enforcement.

    *D.*    *William Bryan*

Likewise, Plaintiff's factual allegations concerning William Bryan concern only alleged "racist and anti-Black comments." Dkt. 110, ¶¶ 57-60. Bryan is not alleged to have spoken with any person affiliated with Glynn County, and again, Plaintiff pleads no factual information concerning any alleged authorization of Bryan to act on behalf of Glynn County law enforcement.

**II.**    **On February 11, 2020, Glynn County officers physically respond to a call that someone is trespassing at the home site.**

English received a video alert on February 11, 2020, showing a man – Ahmaud Arbery – trespassing inside his house.[3] Dkt. 110, ¶¶ 61, 62. He sent a text message to Perez, the immediate neighbor who had offered to enter the house if the security cameras detected anyone inside. Dkt. 110, ¶ 63. Perez armed himself and walked to

---

[3]    Although Plaintiff does not directly acknowledge that Arbery was trespassing by entering English's partially completed home, the First Amended Complaint repeatedly uses the term "trespass" to describe identical behavior by others. Dkt. 110, ¶¶ 17, 27.

English's property, where he encountered Travis McMichael, who happened to have been driving by as Arbery was entering English's house. Dkt. 110, ¶ 64. Travis McMichael called 911 and stated that a man had run into a house under construction, and that four neighbors were trying to "find and stop" him. Dkt. 110, ¶ 65. Plaintiff alleges that the neighbors, including Perez and the McMichaels, "believed they had authority to pursue the man . . . because they had been deputized by the Glynn County Police Department, including Defendant Officer Rash." Dkt. 110, ¶ 67. But Plaintiff's only factual allegation relevant to this conclusion is the December 20, 2019 text message from Officer Rash to English, which stated only that Greg McMichael had encouraged English to tell him if anyone trespassed in the house.

After texting the video of Arbery to Perez, English also texted it to Officer Rash. Dkt. 110, ¶ 68. Rash, as well as other unidentified Glynn County officers, responded to English's property. *Id.* Although Plaintiff alleges that the officers "conducted a joint search" while working "in conjunction and in conspiracy with" the neighbors, the sole factual basis for these statements is a text message sent by Perez to English later in the evening, stating that "[t]he police showed up and we all searched for a good while." Dkt. 110, ¶¶ 69-71. And although Plaintiff alleges that the neighbors searching for Arbery on February 11 were armed and intended to "confront and arrest [Arbery] by force or threat of force," the First Amended Complaint makes clear that Rash and the other officers did not appear at the site until "*after* Perez and Defendant Travis McMichael engaged in their armed pursuit." Dkt. 110, ¶ 68 (emphasis supplied).

Within the section of the First Amended Complaint setting forth factual allegations regarding February 11, Plaintiff claims that the neighbors had already been deputized prior to that date.[4] Dkt. 110, ¶¶ 67, 70. However, later in the First Amended Complaint, Plaintiff repeatedly asserts that the deputization actually occurred *on* February 11, 2020.[5] Dkt. 110, ¶¶ 250, 258. The only well-pleaded factual allegations concerning the County's involvement in the events of February 11 are 1) that Rash received a text message from English indicating that a trespasser, who turned out to be Arbery, was in the house; 2) that Rash and other officers responded to the property; 3) that Perez and Travis McMichael had already armed themselves and searched the property by the time Rash and the other officers arrived; 4) that McMichael told Rash he had done so; and 5) that some of the neighbors were present while officers also searched the property. Dkt. 110, ¶¶ 68, 70, 76. These allegations – essentially, that the neighbors and officers were present at the same time on the property and were all looking for the person who had just entered the house – fall far short of establishing that the neighbors were deputized to act on behalf of law enforcement on February 11.

---

[4]    As noted above, the factual allegations concerning the time period leading up to February 11 do not support that contention.

[5]    Plaintiff's First Amended Complaint is a classic shotgun pleading, inasmuch as each count "adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). Although this makes the First Amended Complaint confusing to parse and cumbersome to respond to, ultimately, sufficient factual allegations to support Plaintiff's claims against Glynn County do not appear anywhere in the First Amended Complaint's 322 paragraphs.

Plaintiff's passing suggestion in several counts of the First Amended Complaint that the events of February 11 amounted to a deputization is not supported by the corresponding factual allegations.

### III.   *On February 23, 2020, Arbery is pursued, shot, and killed by a group of private citizens after they see him running through their neighborhood.*

Absent from the 60-paragraph section of Plaintiff's First Amended Complaint entitled "Ahmaud Arbery's Murder" is any factual allegation relevant to Glynn County. No one affiliated with the County knew that Gregory McMichael saw Arbery running through his neighborhood on February 23, 2020. Dkt. 110, ¶ 86. No one affiliated with the County knew that Gregory McMichael and Travis McMichael decided to arm themselves and pursue Arbery based on a "gut feeling" that Arbery was responsible for previous thefts in the neighborhood. Dkt. 110, ¶¶ 91-94. No one affiliated with the County knew that Defendant Bryan joined the McMichaels' pursuit. Dkt. 110, ¶ 103. And save for the dispatcher who had answered a 911 call from Gregory McMichael only moments prior, no one affiliated with the County knew that Bryan and the McMichaels cornered Arbery with their vehicles and Travis McMichael fatally shot him with a shotgun. Dkt. 110, ¶¶ 117-127. The only persons present during these events – Arbery, Bryan, and the McMichaels – were private citizens.

Plaintiff does claim that the McMichaels "armed themselves to carry out duties they had been entrusted with by the Glynn County Police Department in response to recent trespasses at the Construction Lot." Dkt. 110, ¶ 95. But as discussed above, the factual allegations in Plaintiff's First Amended Complaint do not come anywhere close

to suggesting that the Glynn County Police Department, or anyone authorized to act for it, had entrusted the McMichaels to carry out duties on its behalf. Again, the *only* well-pleaded facts relevant to this claim are the December 20, 2019 text message from Rash to English, and the simultaneous attempts by neighbors and police to locate a trespasser on February 11, 2020, after English texted both groups about an incursion on his property. Dkt. 110, ¶¶ 33, 68. Moreover, on the day of Arbery's death, Bryan and the McMichaels were not responding to a "trespass at the Construction Lot." Neither the McMichaels nor Bryan even knew that Arbery had been on English's property that day; rather, Gregory McMichael saw Arbery running past his house and decided to pursue him, and the others joined the pursuit. Dkt. 110, ¶¶ 88, 91, 101.

## IV. *Glynn County officers confer with the District Attorney to determine whether criminal charges should be brought in connection with the shooting, and follow her guidance.*

Officers did respond to the scene of the shooting after Arbery was killed.[6] Dkt. 110, ¶ 139. Plaintiff alleges that the unnamed officers were "given admissions, statements, and video while Ahmaud's body still lay on the street that established that

---

[6]     In the First Amended Complaint, Plaintiff for the first time pleads a claim for deliberate indifference against one of the responding officers. Defendant Ricky Minshew has moved for dismissal, and his motion remains pending. Dkt. 124. Plaintiff does not attempt to state a claim against Glynn County based on the actions of Defendant Minshew, and instead grounds her claim against the County solely on the actions of Defendant Rash. *See* Dkt. 110, ¶¶ 277-292 (setting forth sole cause of action against Glynn County and referring only to Rash and to policies relevant to Rash's alleged actions). Glynn County will not repeat unnecessarily the facts relevant to Minshew, which are discussed in Minshew's motion to dismiss but which are ultimately irrelevant to Plaintiff's claims against Glynn County.

he was murdered," but "failed to make arrests at the scene of the murder." Dkt. 110, ¶¶ 143, 145. But Plaintiff does not identify any of the officers to whom these "admissions, statements, and video" were allegedly given, much less offer well-pleaded factual allegations about what information was actually conveyed. Moreover, Plaintiff acknowledges that officers contacted District Attorney Jackie Johnson that same day to inquire whether charges should be brought and arrests made in connection with the shooting. Dkt. 110, ¶ 162. Johnson not only stated that "there was no need to arrest the McMichaels at the time" – she specifically "directed police officers [] to not charge Defendants Gregory McMichael, Travis McMichael, and Bryan with any crimes related to Ahmaud's murder." Dkt. 110, ¶¶ 161, 162. Johnson informed the officers that they would receive further instructions from the Ware County District Attorney's office the following day. Dkt. 110, ¶ 162. The next morning, the Ware County District Attorney told Glynn County Police Department detectives that the shooting was a "justifiable homicide," and reiterated Johnson's instruction to police "to not charge Defendants Gregory McMichael, Travis McMichael, and Bryan with any crimes related to Ahmaud's murder." Dkt. 110, ¶¶ 175, 178.

## Standard of Review

Where a defendant challenges a complaint for failing to adequately state a claim upon which relief can be granted, the court should apply a "two-pronged approach" in analyzing the complaint. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). First, the court should

"eliminate any allegations in the complaint that are merely legal conclusions." *Id.* This first prong excludes "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Second, the court should assume that all well-pleaded factual allegations are true "and then determine whether [those allegations] plausibly give rise to an entitlement to relief." *Am. Dental Ass'n*, 605 F.3d at 1290. In determining plausibility, the court should "draw on its experience and common sense." *Iqbal*, 129 S.Ct. at 1950. Moreover, it is proper for the court to infer " 'obvious alternative explanation[s]' which suggest lawful conduct rather than the unlawful conduct the plaintiff[s] would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal* and relying on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Ultimately, if the plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 1289 (quoting *Twombly*, 550 U.S. at 570).

## Argument and Citation of Authority

In the First Amended Complaint, Plaintiff asserts a single claim against Glynn County under 42 U.S.C. §1983 for "failure to supervise, discipline, and train." Dkt. 110, p. 40. The crux of that claim is that allegedly insufficient training "was the moving cause behind Defendant Police Officer Robert Rash encouraging and deputizing Defendants Travis McMichael, Gregory McMichael and William Bryan to take law enforcement action on behalf of Glynn County Police Department." Dkt. 110, ¶ 286. Plaintiff's claims against Glynn County rest entirely on the flawed premise that Rash

"deputized" the private Defendants to act on behalf of the County, and that the actions

of Rash and the private Defendants can thus be imputed to the County. But Rash did

not – and, as a matter of law, *could* not – do any such thing. For this reason alone, any

claim Plaintiff could assert against Glynn County would be subject to dismissal.

Moreover, even if Plaintiff had pleaded a wrongful act by Rash or any other

Defendant for which Glynn County could potentially held liable, the factual allegations

of the First Amended Complaint would fall far short of actually stating a claim against

Glynn County. To survive a motion to dismiss a claim based on a county's failure to

train or supervise its law-enforcement officers, a plaintiff must generally plead facts

suggesting that the county was on notice of a need to train its officers as a result of a

widespread history of substantiated constitutional violations similar to the one at issue.

Plaintiff's allegations of sporadic, unrelated malfeasance by Glynn County law

enforcement personnel do not meet this standard. For this second and independently

sufficient reason, dismissal is warranted.

I.     *The acts of the private defendants cannot be imputed to Glynn County under any theory of liability.*

A.     *Under Georgia law, a police officer has no authority to deputize private citizens to act on behalf of the government entity that employs him.*

Plaintiff's argument is an unusual one – what scant authority exists regarding

deputization of private citizens under Georgia law is, on average, at least a hundred

years old. In the late nineteenth century, the Supreme Court of Georgia could find "no

law which authorizes [a sheriff] to 'deputize' a private citizen either to make, or assist in

making, [an] arrest, and thus constitute the person so 'deputized' an officer." *Robinson v. State*, 93 Ga. 77, 18 S.E. 1018, 1019 (1893). However, the *Robinson* court noted, a Georgia sheriff at that time could "summon to his assistance [in serving a penal warrant] . . . any citizen of the county." *Id.* Citizens so summoned would be "not themselves officers, nor [] mere private persons," but instead would be considered a *posse comitatus* so long as they were cooperating with the sheriff and working under his orders. *Id.* A member of such a posse acted under color of law, and was entitled to the same legal protections as the sheriff himself, so long as he and the sheriff were "in the same neighborhood, actually endeavoring to make the arrest, and acting in concert with a view to effect this." *Id.*

In 1910, the Supreme Court held that "[a]n officer charged with the execution of process" – a sheriff – "may deputize another person to serve process within his presence, and the arrest will be legal if made in the presence of the officer to whom the warrant is directed." *Hill v. State*, 8 Ga. App. 77, 68 S.E. 614, 614 (1910). *Hill* actually sets forth a more restrictive rule than the earlier *Robinson* by requiring that a person serving a warrant at the sheriff's request be in the sheriff's immediate physical presence at the time of service. *Id.* A 1938 case affirmed that a statutorily authorized deputization by the Commissioner of Game and Fish was valid. *Hanna v. Estridge*, 59 Ga. App. 182, 200 S.E. 174 (1938). And a handful of current statutes likewise authorize deputizations by certain law-enforcement officials. *See* O.C.G.A. §42-5-34 (allowing wardens and superintendents of penal institutions to "deputize any person in their employ");

O.C.G.A. §35-9-2 (authorizing the governor to deputize "special police" with limited powers to protect certain kinds of real property).

All of the above authority has one thing in common – the persons with the authority to deputize others to carry out limited law-enforcement duties are, uniformly, the highest-ranking officials in their respective governmental bodies. No Georgia court has ever found, and no Georgia statutes provide, that a lower-ranking law enforcement officer can appoint others to act on behalf of the government entity that employs him.

As to whether conduct by private citizens may be imputable to a law-enforcement officer and his employer, even if the officer cannot formally "deputize" the private citizens, cases arising in the context of property repossessions are instructive. Appellate courts have recognized that the procedural due process protections of the Fourteenth Amendment may be implicated where a law-enforcement officer is physically present and actively assists one party in a property dispute in gaining possession over the disputed property. *See Marcus v. McCollum,* 394 F.3d 813, 819 (10th Cir. 2004) (collecting cases from appellate courts, including the Eleventh Circuit). "[T]he crucial question is whether the police officer was (1) present simply to stand by in case there was a breach of the peace, or (2) taking an active role that either affirmatively assisted in the [seizure] . . . or intentionally intimidated the [other party] so as to prevent him from exercising his legal right to object to the [seizure]." *Barrett v. Harwood*, 189 F.3d 297, 302–03 (2d Cir. 1999). "[T]he overarching lesson of the case law is that officers may act to diffuse a volatile situation, but may not aid the repossessor in such a

way that the repossession would not have occurred but for their assistance." *Marcus v. McCollum*, 394 F.3d 813, 819 (10th Cir. 2004). One factor that the Eleventh Circuit has found particularly relevant in determining whether an officer's presence rises to the level of state participation in a private seizure is whether the officer accompanies the private party attempting to take possession to the property, thereby potentially giving the possession "a cachet of legality." *Booker v. City of Atlanta,* 776 F.2d 272, 274 (11th Cir. 1985).

Of course, cases concerning property disputes between private parties are factually distinguishable from this case, in which Plaintiff alleges that the private Defendants killed another private citizen without provocation or justification. But the foregoing authority does suggest several factors for evaluating whether actions directed by one private citizen at another private citizen can be imputed to a law-enforcement officer: whether the officer was physically present, whether the officer accompanied the private citizen to the site, whether the officer actively participated in the private citizen's unlawful actions, and whether the private citizen's unlawful actions could have occurred in the same way without the officer's involvement. Where many or all of these factors are present, the improper actions of the private citizen may ultimately be imputed to the officer. *Booker v. City of Atlanta*, 776 F.2d 272, 274 (11th Cir. 1985).

Here, although Plaintiff makes numerous conclusory statements that the "Glynn County Police Department" authorized the private Defendants to act as law enforcement officers, the factual allegations of the First Amended Complaint concern

-17-

only the actions of Officer Rash. Plaintiff does not allege that Rash held a leadership position within the Glynn County Police Department, and indeed, he did not. Certainly, Rash did not hold a position on par with that of a sheriff, a state commission head, a prison warden, or the Governor – executives whom Georgia law has recognized as having some authority to deputize others to carry out law-enforcement functions. And in any event, the power of those officials to delegate authority to private citizens is limited: sheriffs may deputize citizens to serve a specific warrant, but must remain in close if not immediate proximity while service occurs; prison wardens may only deputize persons who are already in their employ; the Governor can deputize special police only in response to a written application identifying the citizen to be appointed and the specific real property on which that citizen will serve. *Robinson v. State*, 93 Ga. 77, 18 S.E. 1018, 1019 (1893); *Hill v. State*, 8 Ga. App. 77, 68 S.E. 614, 614 (1910); O.C.G.A. §42-5-34; O.C.G.A. §35-9-2. No official in Georgia has the ability to orally appoint private citizens to act as full-fledged law-enforcement officers, and a street-level officer like Rash has no authority to deputize anyone to do anything.

Nor can Plaintiff show that Rash – or Glynn County – became responsible for the private Defendants' actions by some means short of actual deputization. *None* of the factors identified in the analogous context of private-party property disputes is met here. Neither Rash nor any other Glynn County officer was present for, accompanied the private Defendants for, or participated in any way in, the events leading to the shooting of Arbery on February 23, 2020. Far from alleging that County officials actively

"aid[ed] the [private Defendants] in such a way that the [shooting] would not have occurred but for their assistance," Plaintiff points out that the private Defendants did *not* contact law enforcement to report their suspicions about Arbery. *Marcus v. McCollum*, 394 F.3d 813, 819 (10th Cir. 2004); Dkt. 110, ¶ 94.

As a matter of law, neither Defendant Rash nor any other Glynn County police officer had the authority to deputize or otherwise empower the private Defendants to perform law-enforcement work on the County's behalf. Because Plaintiff's claim against Glynn County depends on this theory of deputization to link the actions of the private Defendants to the County, and because that theory does not enjoy support in law, Plaintiff's claims against the County fail.

     B.    *The alleged actions of Officer Rash would not amount to a deputization of the private Defendants even if such deputization were possible.*

Plaintiff's First Amended Complaint is long on vague, conclusory statements attempting to impute to Glynn County the actions of the private Defendants, but short on factual allegations. So few are the well-pleaded facts, and so many are the unsupported conclusions of law, that the foregoing Statement of Facts necessarily includes significant analysis of the insufficiency of the factual allegations to support the legal conclusions. The discussion on pages 4-10, above, shows that even if Defendant Rash *could* have deputized private citizens to act as law-enforcement officers, the facts alleged by Plaintiff fall well short of establishing that this actually occurred. Rather, Plaintiff alleges only that Rash sent a single text message to English on December 20, 2019, letting English know that his neighbor was interested in any further reports of

trespasses at English's property, and that Rash responded at the property after receiving a message from English about such a trespass on February 11, 2020. For the reasons set forth fully above, these scant factual allegations do not support any of Plaintiff's sweeping claims that Rash authorized English's neighbors to respond to trespassers on English's property, and Plaintiff's claims would fail even if the deputization theory were not a legal impossibility.

        C.     *Even if Glynn County officers had attempted to deputize the private Defendants, their actions would not have been the cause of Arbery's shooting.*

Because the "mechanical structure" of §1983 is similar to the common law of torts, a §1983 plaintiff "must establish an adequate causal link between the alleged harm and the alleged unlawful conduct." *Dixon v. Burke Cty., Ga.*, 303 F.3d 1271, 1274–75 (11th Cir. 2002). Without causation, a §1983 case fails as a matter of law. *Id.* "The connection between conduct and harm must be legally sufficient to satisfy notions of common fairness and policy." *Id.* "Recovery of damages is limited to those injuries proved to be caused by the defendants." *Troupe v. Sarasota Cty., Fla.*, 419 F.3d 1160, 1165–66 (11th Cir. 2005). For damages to be caused by a constitutional tort, a plaintiff must establish two elements: (1) cause-in-fact, which requires showing that except for that constitutional tort, such injuries and damages would not have occurred, and (2) proximate causation, which requires showing that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue. *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000).

In *Jackson v. Sauls*, officers' illegal conduct during an investigatory stop was held to be the direct and proximate cause of an ensuing shootout that wounded one plaintiff and killed another. A group of three undercover police officers, all of whom were wearing sweatshirts and jeans, suspected that a certain car on the highway might be stolen, and pursued the car until the occupants got out at a motorcycle shop. *Jackson v. Sauls*, 206 F.3d 1156, 1161-62 (11th Cir. 2000). The officers entered the shop and ordered everyone inside to get on the ground, "yelled obscenities at them . . . and never identified themselves as police officers." *Id.*, 1162. Everyone in the shop testified that they believed the officers were "armed robbers about to harm them," and one man – who was not in the car the officers followed to the shop – drew his weapon and fired several times, striking one of the officers. *Id.* The officer ran out of the building and then fired several shots back toward the doorway, hitting and injuring one of the men in the building who had obeyed the command to get on the ground. *Id.* Another of the officers shot and killed a different occupant of the building as the man attempted to crawl outside. *Id.*

The officers argued that the actions of the man in the motorcycle shop who fired on them broke the chain of causation from their unlawful investigative detention of the building's occupants and the subsequent injury and death to two of those occupants. The trial court rejected this argument, and the Eleventh Circuit affirmed, concluding that the element of proximate cause was satisfied because it was reasonably foreseeable that someone in the shop would perceive them to be armed robbers and open fire.

*Jackson v. Sauls*, 206 F.3d 1169 (11th Cir. 2000). The *Jackson* court also analyzed the cause-in-fact element, walking through the "chain reaction" of events that was set off by the officers' unlawful stop and explaining how each event caused the next to occur. *Id.*, 1168-69. Ultimately, the court concluded that jury issues with regard to causation precluded summary judgment in favor of the officers.

By way of contrast, in *Troupe v. Sarasota Cty., Fla.,* the Eleventh Circuit granted summary judgment on causation grounds. There, a SWAT team serving a warrant at a residence surrounded the suspect's car with guns drawn after the suspect and two other men fled the residence and locked themselves in the car. 419 F.3d at 1163-64. The men failed to comply with officer commands to show their hands and exit the vehicle, and the suspect then began driving the vehicle back and forth in the midst of the group of officers. *Id.* at 1164. Eventually, he broke free of the officers surrounding the vehicle and began to drive out of the yard, causing two of the defendant officers to fire at the car; one officer missed, and the other fired a shot that went through the car window and hit the suspect in the back. *Id.* The suspect then drove more than a quarter mile away before crashing the car into a concrete wall while trying to evade other officers, killing himself and one of his passengers in the process. *Id.* The other passenger was injured, and he and the administrator of the estate of the deceased passenger brought suit, making a Fourth Amendment claim against the two officers who fired on the vehicle. *Id.* The district court granted summary judgment on the Fourth Amendment claim on the ground that the defendants did not proximately cause the plaintiffs' injuries, and on

appeal, the Eleventh Circuit affirmed, holding that the driver's operation of the car after he was shot "was the intervening cause" of the passengers' injuries. *Troupe*, 419 F.3d at 1166.

Here, Plaintiff's theory of recovery against the County rests on the assumption that Officer Rash "deputized" the private Defendants to act as law-enforcement officers on the County's behalf. As shown above, Rash could not, and did not, make any such deputization. However, even if Rash had the ability to "authorize[] certain of English's neighbors to respond on law enforcement's behalf . . . in the event of further trespasses on his property," and even if Rash had exercised that authority – neither of which is true – Plaintiff's claims would still fail for want of a causal connection between Rash's actions and those of the private Defendants. Assuming, solely for the sake of argument, that Rash could and did authorize the private Defendants to respond to trespasses on English's property, it might be foreseeable that the neighbors would walk to English's property and attempt to locate the suspected trespasser the next time English alerted them.

But it would not be reasonably foreseeable that the private Defendants would get a "gut feeling" that one of the many people seen on English's security cameras was responsible for thefts in the neighborhood. Dkt. 110, ¶ 93. It would not be reasonably foreseeable that the private Defendants, upon seeing Arbery jogging down the street – nowhere near English's house, on a day that English had not informed them of any trespass at the lot – would begin following him through the streets in their trucks. Dkt.

110, ¶¶ 86, 88. It would not be reasonably foreseeable that the private Defendants would attempt to physically apprehend Arbery despite having no reason to believe he had committed any crime. Dkt. 110, ¶¶ 93, 101. And it would not be foreseeable that the private Defendants would trap Arbery with their vehicles and shoot him with a gun "without provocation." Dkt. 110, ¶¶ 113, 124. Even if Rash actually had deputized the private Defendants to respond to English's reports of trespassers at his house, such deputization would not be the proximate cause of a decision by the private Defendants to chase and shoot Arbery on a day they did not see him anywhere near English's property.

Likewise, whereas the facts in *Jackson* allowed a smooth chain of causation to be identified – officers in plainclothes ran into a building with guns drawn, swearing and ordering everyone inside to get on the floor, causing the occupants of the building to fear that they were being attacked by armed robbers, causing one of the occupants to fire on the officers in self defense, causing the officers to fire back and hit two people – no such connections can be drawn here. Again assuming *arguendo* that Rash deputized the private Defendants to respond to English's reports of trespassers at his house, such deputization would not have caused the private Defendants to get a "gut feeling" that Arbery – alone out of the many trespassers captured on English's cameras – was somehow guilty of theft. And deputization to respond to English's reports of trespassers at his house would not have caused the private Defendants to decide to pursue and apprehend Arbery on a day he was nowhere near English's property and

English did not contact anyone. Had a deputization occurred as Plaintiff alleges, it would not be the cause-in-fact of any of the events that occurred on February 23, 2020.

Like the driver in *Troupe*, the private Defendants engaged in erratic and unpredictable behavior after Officer Rash last took action relevant to this case. The alleged actions of the private Defendants, which were not reasonably foreseeable and did not flow from any actions by Rash or other County officials, were the sole proximate cause and cause-in-fact of Arbery's death. For this additional reason, Plaintiff's claims fail.

## II.   *Plaintiff's First Amended Complaint fails to state a claim for failure to supervise, discipline, or train under 42 U.S.C. §1983.*

Supervisory entities may be held liable under §1983 where they "direct their subordinates to act unlawfully, or know their subordinates will act unlawfully but fail to stop them." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)). In other words, an employer is liable for its employee's violation of a plaintiff's rights only where the employer "officially sanctioned or ordered" the offending conduct. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir.1991).

Absent evidence of direct participation in a constitutional violation, liability cannot attach to a government entity unless there is a causal connection between its actions and the eventual violation. *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Causal connections are established when supervisory entities "direct their subordinates to act unlawfully, or know their subordinates will act unlawfully but fail to stop them."

*Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)).

The inadequacy of law-enforcement training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact. *Gold v. City of Miami*, 151 F.3d 1346, 1350-51 (11th Cir. 1998). To establish such "deliberate indifference," "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* In order to demonstrate that a supervisory entity knew of a need to train, a plaintiff must show "a history of widespread prior abuse" that could be remedied by training. *Wright v. Sheppard*, 919 F.2d 665 (11th Cir.1990). This "prior abuse" must consist of numerous, "substantially similar" instances of unlawful behavior by City employees that were "obvious, flagrant, rampant, and of a continued duration." *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *Denno v. School Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1277 (11th Cir.2000).

Additionally, allegations concerning mere prior complaints of unlawful prior conduct are insufficient – the plaintiff must prove that those complaints actually had merit. *See Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (holding that evidence of ten unsubstantiated excessive-force complaints did not prove city policy of condoning or tolerating excessive force). And even where factually similar cases involving substantiated violations are identified, a plaintiff must identify more than three or four

previous violations to show that abuses are "obvious, flagrant, rampant, and of a continued duration." *Denno v. School Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1277 (11th Cir.2000) (three similar violations in short period of time did not meet "obvious, flagrant, rampant, and of a continued duration" standard); *Clark v. Evans*, 840 F.2d 876, 885 (11th Cir.1988) (four violations in four years did not meet standard). The Eleventh Circuit has noted that this is an "intentionally onerous" standard of proof, and that anything less would essentially "equate to subjecting the [supervising entity] to *respondeat superior* liability — a result never intended by section 1983." *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998).

While the Supreme Court has noted in dicta that employer liability could also attach in the absence of prior incidents, it limited this possibility to a very narrow set of circumstances where the need for training is "so obvious," and the lack of training "so likely to result in the violation of constitutional rights," that the failure to train amounts to deliberate indifference. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989). Neither the Supreme Court, nor the Eleventh Circuit, has ever held that the facts of an actual case before it met this standard, despite numerous invitations to do so. *See, e.g., Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1053 (11th Cir. 2014) (rejecting argument that failure to train jail employees on handling of mentally ill patients met the "so obvious" standard). Instead, these courts routinely note that the standard is "narrow" and would be met only under truly egregious circumstances, like

those in a hypothetical situation where sworn officers are issued firearms and given no training whatsoever in the use of those weapons. *Harris*, 498 U.S. at 390.

Here, Plaintiff relies on a memorandum from the former County Manager that allegedly concluded that there were certain deficiencies in the manner in which the Glynn County Police Department was operated in 2019. Dkt. 110, ¶ 200. But the conclusions from the report cited by Plaintiff are general in nature, and Plaintiff does not identify any findings in the memorandum that citizens' constitutional rights were violated in connection with specific incidents. Of course, even an allegation that the memorandum detailed numerous specific violations of constitutional rights would be insufficient to state a claim for failure to train unless the violations were substantially similar in nature to the one alleged here – but Plaintiff's allegations about the memorandum do not mention specific incidents at all.

The only specific factual allegations offered by Plaintiff concerning alleged "prior incidents of cover-up, corruption, and lack of accountability" concern four incidents that occurred over a fourteen-year period. Dkt. 110, ¶¶ 220-231. But even if each of these incidents involved meritorious claims of substantially similar constitutional violations to the one alleged in this case – which they do not – four incidents in fourteen years are insufficient to establish a "obvious, flagrant, rampant" pattern of improper conduct. *See Clark v. Evans*, 840 F.2d 876, 885 (11th Cir.1988) (four violations in four years did not meet "obvious, flagrant, rampant, and of a continued duration" standard). The Court's analysis could end here, but further examination of the alleged prior

violations identified by Plaintiff reveals that *none* of them involve substantiated claims of misconduct similar to that alleged in this case.

First, Plaintiff alleges that in 2005, a Glynn County officer "shot and injured a man in his car at a gas station." Dkt. 110, ¶ 220. But Plaintiff does not plead that the officer's conduct was improper in any way, let alone that the officer's conduct led to a substantiated finding of a constitutional violation. Second, Plaintiff claims that "a shocking violent video revealed illegal and unconstitutional conduct on behalf of law enforcement" in connection with the death of Caroline Small. Dkt. 110, ¶ 222. That claim was at the center of litigation brought by Small's estate after her death – litigation in which this Court ultimately concluded that "it is clear that no constitutional violation occurred" in connection with Small's death, a decision which the Eleventh Circuit affirmed. *Small v. Glynn Cty., Ga.*, 77 F. Supp. 3d 1271, 1286 (S.D. Ga. 2014), aff'd sub nom. *McGehee v. Glynn Cty., Ga.*, 598 F. App'x 752 (11th Cir. 2015). Third, Plaintiff alleges that "Officer Rash covered up the violent conduct of a fellow officer" by "fail[ing] to detain a fellow officer that assaulted his wife in front of Rash." Dkt. 110, ¶ 228. But Plaintiff does not claim that this alleged conduct was the subject of litigation, internal review, or any other investigation that determined a constitutional violation occurred. Indeed, Plaintiff does not even make a conclusory allegation that Rash's alleged conduct was unconstitutional – only that it was "violent" and "reckless."

Finally, Plaintiff identifies an incident in which a Glynn County investigator was found to have been involved in a sexual relationship with a confidential informant, but

does not explain how that incident has any relevance to this case. Dkt. 110, ¶ 231. It does not – in fact, none of the four incidents alleged by Plaintiff (two officer-involved shootings, failure to make an arrest after an officer witnessed an assault, and improper sexual conduct with a confidential informant) is "substantially similar," or even remotely related, to the misconduct alleged in this case. The incidents identified by Plaintiff involve neither "substantially similar" conduct nor substantiated constitutional violations. As a result, Plaintiff's claim for failure to train would fail even if four incidents in a fourteen-year period would otherwise be sufficient to allow Plaintiff to prove an "obvious, flagrant, rampant" pattern of misconduct. For each of these independently sufficient reasons, Plaintiff cannot state a claim against Glynn County for failure to train.

### Conclusion

For the foregoing reasons, Defendant Glynn County respectfully requests that the Court dismiss all claims asserted against it in Plaintiff's First Amended Complaint.

This twenty-ninth day of August, 2022.

BROWN, READDICK, BUMGARTNER, CARTER, STRICKLAND & WATKINS, LLP

5 Glynn Avenue (31520)
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544

**Attorneys for Glynn County**

/s/ Richard K. Strickland
Richard K. Strickland
Georgia Bar No. 687830
rstrickland@brbcsw.com

/s/ Emily R. Hancock
Emily R. Hancock
Georgia Bar No. 115145
ehancock@brbcsw.com